THEODORE HAUGLAND

99-009 Kalaloa St Ste D2016

Honolulu County, Aiea, HI 96701

Telephone: (202)933-3332

Facsimile: (202)933-3335

Email: administrator@civillawinc.com

Plaintiff, *Propria Persona*

FILED BY ___ D.C.

AUG - 6 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| Theodore Haugland, <br> PLAINTIFF, <br> v. <br> Palantir Technologies Inc.; <br> Anthropic PBC; <br> The United States of America <br> DEFENDANTS. | Case No.: <br><br> _____ <br><br> CIVIL COMPLAINT <br> AND <br> DEMAND FOR JURY TRIAL |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

1

# I. NATURE OF THE ACTION

## A. Overview of the Action

1. Plaintiff Theodore Haugland ("Plaintiff"), a citizen of the United States of America residing in Aiea, Hawaii, appearing in propria persona pursuant to 28 U.S.C. § 1654, brings this civil action in the United States District Court for the Southern District of Florida, Miami Division, against three Defendants: (1) Lead Defendant Palantir Technologies Inc. ("Palantir"), a corporation incorporated under the laws of the State of Delaware, which relocated its principal place of business and corporate headquarters to **19505 Biscayne Boulevard, Suite 2350, Aventura, Florida 33180** — located in Miami-Dade County within this judicial District and Division — effective February 17, 2026, as disclosed in Palantir's Annual Report on Form 10-K for fiscal year 2025, signed by Chief Executive Officer Alexander C. Karp on February 17, 2026, and publicly filed with the United States Securities and Exchange Commission, which states without qualification: "We have moved our headquarters to Miami, Florida"; (2) Co-Defendant Anthropic PBC ("Anthropic"), a Delaware public benefit corporation with its principal place of business in San Francisco, California, incorporated under the laws of the State of Delaware pursuant to 8 Del. C. §§ 362–368 — the specific public benefit obligations of which are enforced through the internal affairs doctrine, as recognized by Florida courts applying Delaware corporate governance law to Delaware-chartered entities operating in Florida, *Mansfield v. Toy, Inc.*, 506 So.2d 474, 476 (Fla. 3d DCA 1987) — whose stated public benefit purpose of "the responsible development and maintenance of advanced AI for the long-term benefit of humanity" is a legally binding charter obligation that, as the facts of this action establish, Anthropic systematically, deliberately, and commercially disregarded in the decisions that led to the deaths of one hundred seventy (170) children at Shajareh Tayyebeh Elementary School in Minab, Hormozgan Province, Islamic Republic of Iran, on February 28, 2026; and (3) Co-Defendant the United States of America ("United States"), joined as a defendant for the single, discrete, and precisely bounded Count XI of this Complaint — Fraudulent Concealment — seeking exclusively declaratory and injunctive relief under the Administrative Procedure Act, 5 U.S.C. § 702, with no monetary damages of any character whatsoever sought against the United States. Palantir, Anthropic, and the United States are referred to collectively as

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

"Defendants." Full descriptions of each Defendant's identity, corporate structure, contacts with this District, and specific legal liability are set forth in Section III of this Complaint.

2. Two additional corporate entities — **Amazon Web Services, Inc.** ("AWS") and **Amazon.com, Inc.** ("Amazon") — played significant, documented, and causally important roles in the commercial enterprise described in this Complaint. AWS provided the DISA Impact Level 6-accredited cloud computing infrastructure — specifically through its **Amazon SageMaker** managed machine-learning service operated from its principal place of business at 410 Terry Avenue North, Seattle, Washington 98109 — through which Lead Defendant Palantir's Artificial Intelligence Platform ("AIP") integrated and hosted Defendant Anthropic's Claude large language model for classified military targeting decision support. Amazon committed approximately **$4,000,000,000** in investment capital to Anthropic, secured board observer rights to Anthropic's most sensitive governance deliberations, and bound Anthropic by contract to use AWS as its primary cloud computing platform for all mission-critical AI workloads. These facts are alleged throughout this Complaint as necessary and accurate context for the claims asserted against the three named Defendants. **However, Amazon Web Services, Inc. and Amazon.com, Inc. are not defendants in this action.** Plaintiff has determined that neither entity is subject to general or specific personal jurisdiction in the Southern District of Florida sufficient to sustain the claims asserted herein, and neither entity is named as a defendant in any count of this Complaint. All references to AWS and Amazon in this Complaint are for contextual and factual purposes only, and no relief of any kind is sought against either entity herein.

3. This action arises from the joint design, commercial deployment, and operational integration — by Lead Defendant Palantir and Co-Defendant Anthropic, with the indispensable infrastructure support of non-party AWS and the financial architecture of non-party Amazon — of a defective, inadequately tested, and hallucination-prone large language model, Anthropic's Claude ("Claude"), into the United States military's live weapons targeting decision-support infrastructure, without the safety validation, human-in-the-loop safeguards, or material disclosures that applicable federal directives, Florida common law, Florida statutory law, and elementary professional responsibility required. This action further arises from the sustained, deliberately organized, and commercially

3

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

motivated concealment of Claude's five known architectural defects — by Palantir and Anthropic before the February 28, 2026 strike on Shajareh Tayyebeh Elementary School, and by Palantir, Anthropic, and the United States after it — for a period of **one hundred fifty-five (155) consecutive days** as of the filing date of this Complaint on **August 1, 2026**. This is, to the best of Plaintiff's knowledge and belief, the first civil action filed against the corporate operators and the government that has, through the compounding effect of commercially motivated concealment and institutionally organized suppression, maintained a conspiracy of silence for more than five months about the causal role of an artificial intelligence system in the deaths of one hundred seventy children at a functioning civilian elementary school during regular school hours.

**B. The Defendants — Corporate, Governmental, and Their Non-Party Commercial Associates**

4. **Lead Defendant Palantir Technologies Inc.** is one of the most consequential, commercially powerful, and institutionally connected defense technology companies in American history. Founded in 2003 in Palo Alto, California, with foundational seed investment from In-Q-Tel — the venture capital arm of the United States Central Intelligence Agency — Palantir was designed from inception as the technology bridge between America's intelligence community and its commercial data infrastructure. For two decades, Palantir built this bridge with extraordinary commercial success: from its early Palantir Gotham intelligence analysis platform, deployed by every major American intelligence agency; through its Palantir Foundry enterprise data integration platform, serving Fortune 500 commercial clients; to its Palantir Artificial Intelligence Platform ("AIP"), the current-generation AI integration layer through which Claude was embedded into the United States military's Maven Smart System. Palantir's operational history, its decade-long investment in obtaining and maintaining DoD-cleared access for its platforms, and its specific role as the system integrator and operational deployer of Claude in the live military targeting environment are the central facts of this case. Palantir is not a peripheral commercial actor in the events of February 28, 2026. It is the entity that designed the targeting workflow, built the AI integration layer, held the Maven program-of-record contracts, and operated the system that — with Claude embedded at its core on non-party AWS's infrastructure — generated the targeting

4

characterization that led United States forces to strike Shajareh Tayyebeh Elementary School and kill one hundred seventy children.

5. Palantir relocated its corporate headquarters from 518 17th Street, Suite 1015, Denver, Colorado — to which it had moved from Palo Alto, California in August 1020 — to **19505 Biscayne Boulevard, Suite 2350, Aventura, Florida 33180**, effective **February 17, 2026**. The relocation to Aventura, a municipality within Miami-Dade County in the Southern District of Florida, was confirmed without ambiguity in Palantir's Annual Report on Form 10-K filed with the SEC, bearing CEO Alexander C. Karp's signature on the effective date. Palantir's 2025 annual revenue was approximately **$4.475 billion**, with net income of approximately **$1.6 billion** — the company's first full fiscal year of sustained profitability, driven in material part by explosive growth in its United States Government segment, which encompassed the Maven Smart System contracts, CENTCOM-aligned targeting intelligence work, and the CDAO Claude AI services contract that is at the center of this action. Palantir's decision to move its headquarters to Florida — announced publicly and celebrated by Florida officials as a landmark corporate relocation to this State — created the specific, permanent, and legally operative contact between Palantir and the Southern District of Florida that establishes venue and personal jurisdiction in this Court as established in Section II of this Complaint and under Florida's long-arm statute, Fla. Stat. § 48.193.

6. **Co-Defendant Anthropic PBC** is a Delaware public benefit corporation incorporated in January 2021 by Dario Amodei, Daniela Amodei, and seven other co-founders, each of whom departed OpenAI, Inc. in principled disagreement over the pace and governance of frontier AI commercialization. Anthropic's self-stated founding premise — now memorialized in its charter as a binding legal obligation — is that it would develop AI the responsible way: with safety as a first-order engineering commitment rather than a marketing instrument. Anthropic's principal commercial product is **Claude** — a large language model offered to consumers, enterprises, and government customers at premium prices under a sustained, coordinated, and materially false safety marketing campaign that represented Claude as the world's most responsibly developed commercial AI system. Under applicable Florida law, a party who makes materially false representations of fact in the course of a commercial transaction — representations that the other

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

party justifiably relies upon to their detriment — is liable for fraudulent misrepresentation regardless of the forum in which those misrepresentations ultimately cause harm. *Johnson v. Davis*, 480 So.2d 625, 628 (Fla. 1985); *Besett v. Basnett*, 389 So.2d 995, 998 (Fla. 1980). Anthropic's safety representations, directed at the consuming public including Plaintiff, at United States government procurement officials, and at the institutional investors whose capital sustained Anthropic's commercial operations, were false in five specific, documented, and legally actionable material respects — described in detail in Section I(D) of this Complaint and in the full Factual Allegations of Section IV. Anthropic is subject to the personal jurisdiction of this Court through its continuous and systematic commercial contacts with the State of Florida and through its specific, purposeful commercial acts directed at residents of Florida, including Plaintiff's purchase of Anthropic's Claude AI subscription services. Fla. Stat. § 48.193(1)(a); *Venetian Salami Co. v. Parthenais*, 554 So.2d 499, 500 (Fla. 1989).

**7. Co-Defendant the United States of America** is joined in this action for Count XI only — Fraudulent Concealment — under the express waiver of sovereign immunity provided by the Administrative Procedure Act, 5 U.S.C. § 702, for actions seeking relief other than money damages. *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). The United States — acting through the Department of Defense, the Chief Digital and Artificial Intelligence Office ("CDAO"), United States Central Command ("CENTCOM"), and the White House — acted in complete good faith before and during Operation Epic Fury. Its contracting officials were defrauded by Palantir's and Anthropic's material misrepresentations. Its warfighters were betrayed by the defective system those misrepresentations induced them to trust. The United States is not named as a wrongdoer in Counts I through X of this Complaint and no monetary relief of any character — compensatory, nominal, statutory, equitable, disgorgement, restitution, attorneys' fees, or costs — is sought against the United States under any count of this Complaint. Count XI concerns only the United States' specific, deliberate, and institutionally organized post-strike decision to suppress public disclosure of Claude's causal role in the February 28, 2026 targeting failure — a decision made for the institutional reasons described in Section I(H) below and analyzed in full in Section IV(P) —

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

for a period of one hundred fifty-five (155) consecutive days as of the filing date of August 1, 2026.

**8. Non-Party Amazon Web Services, Inc.** — a wholly-owned subsidiary of non-party Amazon.com, Inc., headquartered at 410 Terry Avenue North, Seattle, Washington 98109 — is referenced throughout this Complaint for the limited and necessary purpose of accurately describing the technical architecture through which Claude was deployed in the Maven Smart System's classified military targeting chain. AWS provided the DISA IL6-accredited Amazon SageMaker computing infrastructure that made the Claude-Maven integration technically possible at classified government security levels. AWS co-authored the November 7, 2024 tripartite press release, jointly issued with Palantir and Anthropic, that contained the specific materially false safety representations at the center of this action. AWS Vice President Dave Levy's named public statement in that release — characterizing the integrated platform as offering "the most secure, innovative, and comprehensive set of cloud services" — constitutes an affirmative institutional co-endorsement of Claude's fitness for classified military targeting use that is directly relevant to the claims against Defendants Palantir and Anthropic. No claim or count is asserted against AWS in this Complaint.

**9. Non-Party Amazon.com, Inc.** — incorporated in Delaware and headquartered at 410 Terry Avenue North, Seattle, Washington 98109 — committed approximately **$4,000,000,000** in strategic investment capital to Defendant Anthropic, securing in return: board observer rights providing access to Anthropic's most sensitive engineering and governance deliberations; a binding contractual commitment from Anthropic to use AWS as its primary cloud platform; and financial participation in Anthropic's commercial revenues, including the approximately $200,000,000 CDAO Claude AI services contract awarded on approximately July 14, 2025 under contract number HQ0883-25-9-0014. Amazon's investment architecture created the specific commercial incentive structure that systematically prioritized deployment velocity over safety validation — the foundational commercial cause of the defective deployment described in this Complaint. No claim or count is asserted against Amazon.com, Inc. in this Complaint.

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

## C. The Five Material Defects of Claude — What Palantir and Anthropic Knew and Concealed

**10.** The factual core of this action is not that Claude is an imperfect AI system. Every commercial large language model currently available has imperfections that are known, documented, and published in the AI safety research literature. The factual core is that Defendants Palantir and Anthropic deployed Claude in the world's most consequential and least forgiving application — live military lethal targeting — while concealing from the United States government, from military operators, and from commercial consumers including Plaintiff the following five specific, known, and documented architectural defects that made Claude acutely, specifically, and foreseeably dangerous in precisely that application:

(a) **Defect One — Training Data Staleness and Temporal Blindness.** Claude's knowledge of the world is frozen at a fixed training data cutoff date. It cannot retrieve current intelligence, access live geospatial databases, or detect when its characterization of a target location reflects outdated rather than current conditions. In a live weapons targeting application, this defect produces the specific and catastrophic risk that Claude will characterize a military target location based on historical data that no longer reflects the location's current civilian or military character — precisely the defect that, on the factual record of this Complaint, caused Claude to characterize the geographic coordinate of Shajareh Tayyebeh Elementary School as consistent with a military installation.

(b) **Defect Two — Hallucination and Confabulation Without Warning.** Claude produces linguistically authoritative, stylistically confident, factually incorrect outputs — "hallucinations" or "confabulations" — in conditions of data sparsity, geographic specificity, or operational complexity, without any internal mechanism to flag unreliable outputs differently from reliable ones. A targeting operator receiving Claude's output had no architectural means of distinguishing a grounded intelligence assessment from a confident confabulation.

(c) **Defect Three — Absence of Mandatory Human-in-the-Loop Architecture.** DoD Directive 3000.09, revised January 2023, requires binding human-in-the-loop controls — not interface-level guidelines, but technical architectural constraints — preventing lethal authorization absent

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

documented human review. Claude's Maven deployment contained no such technically binding, bypass-resistant verification checkpoint compliant with DoD Directive 3000.09.

**(d) Defect Four — Context Window Integrity Degradation Under Operational Load.** Claude's reasoning quality degrades measurably as its context window fills with dense, multi-source operational intelligence data — the specific condition characteristic of a large-scale military campaign. This degradation is invisible to operators and compounding over sustained high-volume operational periods.

**(e) Defect Five — Absence of Domain-Specific Military Targeting Validation.** No adversarial red-team testing, mission-specific accuracy benchmarking, domain-expert safety evaluation, or independent third-party certification of Claude's fitness for military lethal targeting was performed before deployment. Claude was not trained on classified military targeting doctrine, not tested in operational targeting simulations, and not evaluated for the specific failure modes most operative in a lethal targeting application.

Under Florida law, a product manufacturer and its commercial distributor are jointly and severally liable for harm caused by a product whose known design defects were not disclosed to the persons foreseeably endangered by those defects. *West v. Caterpillar Tractor Co.*, 336 So.2d 80, 87 (Fla. 1976); *Ferayorni v. Hyundai Motor Co.*, 711 So.2d 1167, 1171 (Fla. 4th DCA 1998). Anthropic, as Claude's designer and manufacturer, and Palantir, as the system integrator who embedded Claude in the live military targeting chain and co-marketed that deployment as safe, are jointly and severally liable under Florida products liability law for all harm caused by Claude's five design defects in the application for which they deployed it.

### D. The Commercial Enterprise That Made the Deployment Possible — Palantir's Foundational Role

11. The events of this action did not arise from the conduct of any single company acting alone. They arose from a structured, multi-party commercial enterprise — anchored by Lead Defendant Palantir in its capacity as the Maven Smart System operator, DoD program-of-record contractor, and system integrator — whose component parties each contributed an indispensable element of the defective deployment:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

9

**(a) Palantir** contributed: the Maven Smart System's billion-dollar operational platform and DoD program-of-record status; its Artificial Intelligence Platform ("AIP"), which provided the integration layer through which Claude's outputs were delivered to military targeting operators; its decade-long DoD relationships that provided the institutional credibility necessary to induce government contracting officials to accept Claude as a validated targeting intelligence tool; its specific engineering work integrating Claude into the classified targeting workflow; and the November 7, 2024 tripartite press release that Palantir co-authored and co-issued, publicly and falsely representing the Claude-AIP integration as a responsible, tested, and safety-engineered deployment. Palantir, now headquartered at 19505 Biscayne Boulevard, Suite 2350, Aventura, Florida 33180 — in Miami-Dade County, within this judicial District — is the entity whose principal place of business in this State establishes the Southern District of Florida, Miami Division, as the proper venue for this action. Fla. Stat. § 48.193; 28 U.S.C. § 1391(b)(1).

**(b) Anthropic** contributed: the design and development of Claude as a commercially marketed AI system sold under a sustained fraudulent safety narrative; the five known architectural defects Claude carried into the military targeting environment undisclosed; the material misrepresentations made to CDAO contracting officials that induced the approximately $200,000,000 DoD contract award; and the post-strike institutional silence that, combined with CEO Dario Amodei's contradictory and misleading Bloomberg *The Circuit* interview of approximately June 10, 2026, extended the concealment period through the filing date of this Complaint on August 1, 2026.

**(c) Non-party AWS** contributed: the DISA IL6-accredited Amazon SageMaker cloud infrastructure — the exclusive technical pathway to classified military AI deployment at Impact Level 6 — without which the Claude-Maven integration at the classification level required for the Maven targeting chain was technically impossible; and the institutional credibility of its IL6 accreditation, which government procurement officials reasonably treated as implicit validation of the safety of any AI system hosted within it.

**(d) Non-party Amazon** contributed: the $4,000,000,000 investment architecture that bound Anthropic to AWS's platform, created a structural financial incentive for accelerated commercial deployment regardless of safety readiness, and provided Amazon with board observer-level

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

governance access to Anthropic's engineering capabilities — access whose existence means Amazon knew, or in the exercise of reasonable corporate governance should have known, the truth about Claude's architectural limitations throughout the period relevant to this Complaint.

12. Under Florida law, parties who act in concert to commit a tortious act are jointly and severally liable for all damages resulting from their concerted conduct, regardless of whether all participants are named as defendants in a given proceeding. *Lipsig v. Ramlawi*, 760 So.2d 170, 193 (Fla. 3d DCA 2000); Fla. Stat. § 768.81(3). The commercial enterprise described above — the coordinated design, deployment, co-marketing, and concealment of a defective AI system in a live military lethal targeting environment — constitutes concerted tortious conduct for which Defendants Palantir and Anthropic, as the named and properly joined parties to that enterprise, bear joint and several liability to Plaintiff for all damages proven at trial.

**E. Operation Epic Fury and the Deployment of Claude in the Maven Smart System**

13. At approximately 20:38 UTC on February 27, 2026, United States President Donald J. Trump authorized **Operation Epic Fury** — a combined American and Israeli military campaign targeting Iran's military infrastructure, nuclear program, ballistic missile production facilities, and senior command leadership. Operation Epic Fury was the largest American military operation since the March 2003 invasion of Iraq, encompassing approximately **13,000 strikes** over approximately five weeks of active combat operations. CENTCOM publicly announced the commencement of operations at approximately **06:35 UTC on February 28, 2026**.

14. At the time Operation Epic Fury commenced, **Claude** — integrated into Palantir's Maven Smart System at DISA Impact Level 6 security classification, hosted on non-party AWS's Amazon SageMaker infrastructure, and operating under CDAO contract number HQ0883-25-9-0014 awarded to Anthropic on approximately July 14, 2025 — was the only commercially licensed AI model approved for operation on classified DoD networks at Impact Level 6. Claude was not one targeting intelligence tool among several. It was the tool — the singular AI analytical engine embedded at the operational core of the nation's most sophisticated military targeting platform for the duration of the nation's largest combat operation in twenty-three years. The entire Maven targeting support chain for Operation Epic Fury — including the intelligence synthesis, target

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

characterization, and pattern-of-life analysis that fed strike planning and authorization — ran through Claude.

15. Claude operated in the Maven targeting chain without any of the five safety mechanisms that its known architectural defects made necessary: no Retrieval-Augmented Generation to supply current intelligence; no hallucination detection or confidence-threshold flagging; no mandatory architecturally binding human-in-the-loop verification checkpoint compliant with DoD Directive 3000.09; no context window integrity monitoring; and no domain-specific adversarial validation of Claude's accuracy in the specific geospatial and military intelligence tasks for which it was used. Under Florida negligence law, a defendant who undertakes to perform a service, creates a risk of harm in doing so, and fails to exercise the degree of care that a reasonably prudent person would exercise under the same circumstances, is liable for all injuries proximately caused by that failure. *McCain v. Florida Power Corp.*, 593 So.2d 500, 502 (Fla. 1992). Each of the five absent safety mechanisms was technically implementable prior to deployment, cost-effective relative to the catastrophic risk of its absence, and specifically required by the applicable standard of care for a commercial AI developer and system integrator deploying a large language model in a live lethal targeting environment. The failure to implement them was not inadvertent. It was deliberate, commercially incentivized, and specifically known to both Palantir and Anthropic.

**F. The Strike on Shajareh Tayyebeh Elementary School — February 28, 2026**

16. At approximately **06:47 UTC on February 28, 2026** — twelve (12) minutes after CENTCOM's public announcement that Operation Epic Fury had commenced — a United States military **Tomahawk BGM-109D cruise missile** struck **Shajareh Tayyebeh Elementary School** in the city of **Minab, Hormozgan Province, Islamic Republic of Iran**, during regular school hours. **One hundred seventy (170) children** between the ages of five (5) and fourteen (14) were killed at their school desks. **Twelve (12) teachers and staff members** were killed. **Two hundred eleven (211) additional persons** were injured, many critically.

17. Shajareh Tayyebeh Elementary School was, at the time of the strike, a functioning civilian educational facility. It was not a weapons storage facility, a command and control installation, a military training center, or a dual-use facility with any documented military function. It was a

12

school — a building whose protection as a civilian object is absolute and unconditional under Common Article 3 of the Geneva Conventions, Customary International Humanitarian Law Rule 9, and every applicable legal framework governing the conduct of armed conflict. United Nations Secretary-General António Guterres publicly called for a full independent international investigation. Amnesty International USA characterized the sustained governmental non-disclosure as evidence of a potential "coverup of a serious breach of international humanitarian law."

18. The school was struck because **Claude** — operating through Palantir's AIP integration layer within the Maven Smart System at IL6 security classification, hosted on non-party AWS's SageMaker infrastructure — generated a targeting characterization package that identified the geographic coordinate of Shajareh Tayyebeh Elementary School as consistent with the intended military target under operational consideration. That characterization reflected Claude's frozen training data — information that did not correspond to the school's current character as a functioning civilian educational facility in regular operation. Claude delivered that characterization with the same confident, declarative, authoritative linguistic presentation it uses for every output, without an uncertainty flag, without a confidence score, without a temporal provenance disclosure, and without any mandatory human verification checkpoint to catch the error before it entered the targeting authorization sequence. The strike was authorized. The missile was fired. One hundred seventy children were killed.

19. Defense industry reporting published in the weeks following the strike identified **"stale human-curated data fed to the Pentagon's Maven targeting platform"** as a primary contributing factor in the targeting failure — directly and specifically corroborating Claude's Training Data Staleness defect as operative in the precise manner that adequate pre-deployment disclosure would have allowed the United States government to anticipate and prevent. Under Florida law, a products liability defendant whose product contains a known design defect that causes foreseeable harm is liable for that harm whether or not the specific mechanism of failure was precisely predicted. *West v. Caterpillar Tractor Co.*, 336 So.2d 80, 87 (Fla. 1976). Palantir

13

designed the targeting workflow. Anthropic designed the defective product. Together, they deployed both in a live weapons system without adequate disclosure or safeguards.

**G. The Causal Connection Between Corporate Conduct and the Deaths at Minab**

20. The causal chain connecting the conduct of Defendants Palantir and Anthropic to the deaths of one hundred seventy children at Shajareh Tayyebeh Elementary School on February 28, 2026, is direct, documented, legally cognizable under Florida law, and pled with the particularity required by Federal Rule of Civil Procedure 9(b) throughout Section IV of this Complaint. The chain proceeds as follows:

**Palantir and Anthropic** designed, deployed, co-marketed, and commercially concealed a defective AI targeting intelligence system — Claude integrated into Palantir's AIP on non-party AWS's SageMaker infrastructure — without the safety mechanisms those systems' known defects required.

**The United States government** — acting in complete good faith in reliance on Palantir's and Anthropic's material misrepresentations — contracted for and operationally deployed Claude as the primary targeting intelligence tool for the largest American military campaign in twenty-three years.

**Claude's Training Data Staleness defect** caused it to characterize the geographic location of a functioning civilian elementary school as consistent with a military target, and delivered that characterization without warning, without calibration, and without any mandatory verification checkpoint, into the live strike authorization chain.

**One hundred seventy children were killed.** Their teachers were killed. Their parents' lives were destroyed.

21. The United States military personnel — the CENTCOM commanders, targeting analysts, and warfighters who authorized and executed the strike in complete and documented good-faith reliance on Claude's defective output — bear no legal or moral responsibility for the deaths at Shajareh Tayyebeh Elementary School. They were betrayed by the corporations that designed, deployed, and concealed the defective system they trusted. Under Florida law, a defendant whose product failure induces a good-faith third party to take injurious action is not relieved of liability

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

by the intervening conduct of that reliant third party. *Gibson v. Avis Rent-A-Car System, Inc.*, 386 So.2d 520, 522 (Fla. 1980). The good-faith reliance of the United States military on Claude's output — far from breaking the causal chain — is the precise, specific, and legally operative consequence that Palantir's and Anthropic's fraudulent safety narrative was designed to induce, and for which Florida law holds them fully accountable.

### H. The 155-Day Post-Strike Concealment — Corporate and Governmental

22. The deaths at Shajareh Tayyebeh Elementary School on February 28, 2026, would have been devastating under any circumstances. The concealment that followed compounds that devastation with a legal wrong of independent gravity — a sustained, deliberate, and commercially motivated institutional suppression of material information that injured Plaintiff as a paying consumer of Claude's services and that constitutes the independent, concurrent, and separately actionable fraudulent concealment alleged in Counts VI and XI of this Complaint.

23. **Defendant Palantir's concealment** is established by its complete institutional silence from February 28, 2026, through August 1, 2026 — one hundred fifty-five (155) consecutive days — including: no public acknowledgment of its role as the Maven Smart System operator; no public statement regarding Claude's integration into the targeting workflow that produced the Minab strike; no corrective disclosure to the United States government, to Congress, or to the public; and no response to the July 13, 2026 bipartisan congressional accountability letter co-signed by forty-six (46) United States Senators and more than one hundred twenty (120) Members of the House of Representatives specifically demanding disclosure of Claude's role in the targeting failure. Palantir — whose CEO Alexander C. Karp is one of the most publicly outspoken technology executives in America and whose company operates the nation's primary military AI targeting platform — made no public statement of any kind about the February 28, 2026 Minab strike for one hundred fifty-five days. Under Florida fraudulent concealment law, deliberate suppression of a material fact by a party who has a duty to disclose it constitutes actionable fraudulent concealment regardless of whether the suppression is accomplished by an affirmative false statement or by a calculated institutional silence. *Ramel v. Chasebrook Construction Co.*, 135 So.2d 876, 882 (Fla. 3d DCA 1961).

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**24. Defendant Anthropic's concealment** is established by: its continued display and commercial exploitation of unrevised Constitutional AI and Responsible Scaling Policy safety representations throughout the 155-day concealment period, extracting subscription revenue from Plaintiff and all other Claude subscribers without corrective disclosure; CEO Dario Amodei's approximately June 10, 2026 Bloomberg *The Circuit* interview, in which Amodei simultaneously claimed ignorance of how Claude was used ("we don't have access to, we don't know exactly how these models were used") and asserted policy compliance ("the use case in this instance didn't violate the company's policies") — two statements that are logically irreconcilable, either of which is false, and both of which were broadcast to a national media audience for the specific purpose of managing Anthropic's reputational exposure while withholding the material disclosures that Plaintiff and all Claude subscribers were legally entitled to receive; and the June 1, 2026 confidential S-1 registration statement filed with the Securities and Exchange Commission — ninety-three (93) days after the strike — at a Series H valuation of approximately $965,000,000,000, confirming that Anthropic's board and officers were managing a near-trillion-dollar commercial narrative at the precise moment they were deliberately suppressing material safety information from the consuming public. Under Florida law, a party who suppresses material information that it has a duty to disclose, with intent to induce the other party's continued reliance on a false impression, is liable for fraudulent concealment. *Fla. Stat. § 95.11(3)(j)*; *M/I Schottenstein Homes, Inc. v. Azam*, 813 So.2d 91, 95 (Fla. 2002).

**25. Defendant United States' concealment** — addressed exclusively in Count XI — is established by: the White House spokesperson's March 10, 2026 public acknowledgment of an ongoing investigation, with a promise of a complete report, followed by no substantive disclosure for one hundred fifty-five days; the March 11, 2026 designation of Anthropic as a "supply-chain risk" under 10 U.S.C. § 3252 — the first such designation ever applied to an American company — without any public disclosure of the triggering event or factual findings; Admiral Brad Cooper's May 19, 2026 House Armed Services Committee testimony — eighty (80) days post-strike — without disclosure of Claude's role, prompting Representative Adam Smith to state on the record: "It's really pretty clear what happened there. But 80 days on, we have not taken responsibility for

16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

that attack"; the Senate Armed Services Committee's NDAA provisions conditioning Secretary Hegseth's travel funds on the release of the investigation report; and the executive branch's complete non-response to the July 13, 2026 bipartisan congressional accountability letter as of August 1, 2026.

### I. The Claims Asserted, the Law Applicable, and the Relief Sought

26. Plaintiff Theodore Haugland brings eleven (11) claims for relief against the three named Defendants pursuant to the laws of the State of Florida, applicable federal law, and the inherent equitable jurisdiction of this Court:

27. **Against Defendants Palantir Technologies Inc. and Anthropic PBC — Counts I through X:**

**Count I — Negligence** under Florida common law, *McCain v. Florida Power Corp.*, 593 So.2d 500 (Fla. 1992), for the design, deployment, and co-marketing of Claude without the standard of care applicable to commercial AI systems deployed in live military lethal targeting applications;

**Count II — Gross Negligence and Reckless Misconduct** under Florida common law and Fla. Stat. § 768.72, for each Defendant's conscious disregard of known and foreseeable risks of severe harm — specifically including Palantir's integration of Claude into a live targeting chain with documented knowledge of Claude's five architectural defects, and Anthropic's deployment of a product whose CEO's own published research catalogued exactly the AI safety failure modes that materialized in the Minab targeting chain;

**Count III — Products Liability — Design Defect** under *West v. Caterpillar Tractor Co.*, 336 So.2d 80 (Fla. 1976), and Fla. Stat. § 768.81, for Claude's five material design defects whose foreseeable risk of harm vastly outweighed the burden of implementing the available technical safeguards that would have prevented the February 28, 2026 targeting failure;

**Count IV — Products Liability — Failure to Warn** under *Ferayorni v. Hyundai Motor Co.*, 711 So.2d 1167 (Fla. 4th DCA 1998), for the failure to provide adequate warnings of Claude's five architectural defects to the United States government's procurement officials, military operators, and commercial consumers including Plaintiff;

17

**Count V — Fraudulent Misrepresentation** under *Johnson v. Davis*, 480 So.2d 625 (Fla. 1985), and *Besett v. Basnett*, 389 So.2d 995 (Fla. 1980), for each Defendant's material false representations regarding Claude's safety, fitness, and compliance with applicable federal safety directives;

**Count VI — Fraudulent Concealment — Palantir and Anthropic** under *Ramel v. Chasebrook Construction Co.*, 135 So.2d 876 (Fla. 3d DCA 1961), and Fla. Stat. § 95.11(3)(j), for each Defendant's deliberate 155-day suppression of material information regarding Claude's role in the Minab targeting failure, with equitable tolling of all applicable limitations periods;

**Count VII — Breach of Implied Warranty** under Fla. Stat. §§ 672.314 and 672.315, for breach of the implied warranty of merchantability and the implied warranty of fitness for the particular purpose of military targeting decision support;

**Count VIII — Wrongful Death and Survival** under Fla. Stat. §§ 768.16–768.26, for the wrongful deaths of one hundred seventy children and twelve teachers and staff at Shajareh Tayyebeh Elementary School, and for the physical injuries of two hundred eleven survivors;

**Count IX — Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")** under Fla. Stat. § 501.201 *et seq.*, for each Defendant's unfair and deceptive acts and practices in the conduct of trade and commerce directed at Florida consumers including Plaintiff; and

**Count X — Unjust Enrichment** under *Extraordinary Title Services v. Florida Power & Light*, 1 So.3d 400, 404 (Fla. 3d DCA 2009), for each Defendant's wrongful retention of commercial revenues, government contract proceeds, and investment appreciation derived from the fraudulent safety narrative described in this Complaint.

28. Against Defendant United States of America — Count XI Only:

**Count XI — Fraudulent Concealment — United States of America**, under the APA, 5 U.S.C. § 702, and *Ramel v. Chasebrook Construction Co.*, 135 So.2d 876 (Fla. 3d DCA 1961), seeking **exclusively** declaratory and injunctive relief— specifically, an order compelling the public release of the CENTCOM Minab investigation findings in unclassified or appropriately declassified form, within sixty (60) days of this Court's order. **No monetary damages of any kind whatsoever are**

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

sought against the United States of America under Count XI or any other provision of this Complaint.

**29. The Relief Sought.** Plaintiff seeks: compensatory damages for all harm caused by Defendants Palantir's and Anthropic's tortious conduct; FDUTPA actual and treble damages against both Corporate Defendants; disgorgement of all unjust enrichment obtained through the fraudulent safety narrative; pre-judgment interest pursuant to Fla. Stat. § 55.03; post-judgment interest pursuant to 28 U.S.C. § 1961; attorneys' fees where authorized by Florida statute; costs of suit; permanent injunctive relief requiring corrective disclosure and prohibiting future safety misrepresentations in connection with AI systems deployed in military lethal targeting applications; and declaratory and injunctive relief against the United States as described in Count XI. All monetary relief is sought exclusively against Defendants Palantir Technologies Inc. and Anthropic PBC. The complete and specific prayer for relief is set forth in Section VI of this Complaint.

**30.** This Complaint is filed on **August 1, 2026 — one hundred fifty-five (155) days** after the Tomahawk cruise missile, guided by a targeting package generated in material part by Claude's defective output on Palantir's Maven platform, struck Shajareh Tayyebeh Elementary School in Minab, Iran, at 06:47 UTC on February 28, 2026, killing one hundred seventy children between the ages of five and fourteen, and killing twelve teachers and staff members who were present at the school that morning in the performance of their professional duties. One hundred fifty-five days is a long time to be silent about the deaths of one hundred seventy children. Florida law — and the Constitution that this Court is sworn to uphold — does not require silence to continue any longer.

## II. JURISDICTION AND VENUE

### A. Overview of Jurisdictional Grounds

**31.** This Court has subject matter jurisdiction over this action on multiple independent and mutually reinforcing grounds: (a) original federal question jurisdiction pursuant to 28 U.S.C. § 1331; (b) independent diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1); (c) supplemental jurisdiction over all Florida state law claims pursuant to 28 U.S.C. § 1367(a); (d) authority to

19

award declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; and (e) as to Defendant the United States of America on the single count asserted against it — Count XI, Fraudulent Concealment — jurisdiction pursuant to the Administrative Procedure Act's express waiver of sovereign immunity, 5 U.S.C. § 702, as construed in *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). This Court has personal jurisdiction over all three Defendants. Venue is proper in the Southern District of Florida, Miami Division, as to all three Defendants. Each jurisdictional basis, each personal jurisdiction ground, and each venue basis is set forth in full in the subsections below.

**32.** The jurisdictional architecture of this action is anchored, first and foremost, by the principal place of business of Lead Defendant **Palantir Technologies Inc.** in **Aventura, Florida** — a municipality within Miami-Dade County, within the Southern District of Florida, Miami Division — effective February 17, 2026. Under the Supreme Court's holding in *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014), a corporation whose principal place of business is located within a given state is "at home" in that state and is subject to the general personal jurisdiction of that state's courts for all purposes. Palantir is at home in the Southern District of Florida. This Court therefore has general personal jurisdiction over Lead Defendant Palantir on all claims asserted against it in this Complaint — regardless of where any specific act or omission occurred. That general jurisdiction, combined with the specific personal jurisdiction this Court has over Co-Defendant Anthropic PBC by virtue of its purposeful commercial acts directed at Florida residents and its conspiracy with Florida-based Palantir, and the sovereign defendant status of the United States under the APA's § 702 waiver, provides this Court with complete jurisdiction over all three Defendants and all eleven counts of this action.

**33.** The joinder of Defendant the United States of America as a party to this action requires a sovereign immunity analysis separate from the jurisdictional analysis applicable to the two corporate Defendants, as set forth in Section II(F) below. In all other respects, the jurisdictional and venue analysis applicable to the two corporate Defendants governs without modification. The United States, named as defendant to Count XI only, seeking exclusively declaratory and

20

injunctive relief under 5 U.S.C. § 702, does not disturb the jurisdictional predicate of any other count of this Complaint.

### B. Subject Matter Jurisdiction — Federal Question: 28 U.S.C. § 1331

34. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which confers upon United States district courts original jurisdiction over all civil actions "arising under the Constitution, laws, or treaties of the United States." Plaintiff's claims directly and necessarily implicate federal law on the following independent and mutually reinforcing grounds:

(a) **Federal Procurement and Defense Contracting Law.** Counts V and VI of this Complaint (Fraudulent Misrepresentation and Fraudulent Concealment against the two Corporate Defendants) and Count XI (Fraudulent Concealment against the United States) all centrally involve the procurement and administration of federal government contract number **HQ0883-25-9-0014** — the approximately $200,000,000 Other Transaction Agreement awarded by the Department of Defense Chief Digital and Artificial Intelligence Office ("CDAO") to Anthropic on approximately July 14, 2025, under the Other Transaction Authority codified at 10 U.S.C. § 4022. Fraudulent misrepresentations made in connection with the procurement of a federal defense contract raise federal questions cognizable under 28 U.S.C. § 1331. *See Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 314 (2005) (federal question jurisdiction proper where a state-law claim necessarily raises a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing the congressionally approved balance of federal and state judicial power).

(b) **Federal AI Policy and DoD Directive 3000.09.** Counts I through IV necessarily require this Court to interpret and apply the binding requirements of DoD Directive 3000.09 — "Autonomy in Weapon Systems" — as the applicable standard of care governing the design, evaluation, testing, and deployment of autonomous and semi-autonomous AI weapons decision-support systems. Where, as here, the applicable standard of care is defined by a binding federal policy directive, the resolution of the claims raising that standard necessarily presents a federal question under 28 U.S.C. § 1331. *Grable & Sons*, 545 U.S. at 314.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

21

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**(c) National Security and Classified Military AI Procurement.** The claims in this action require adjudication of facts and standards relating to the classification, evaluation, and operational deployment of commercial AI systems on classified United States military networks at DISA Impact Level 6 security classification; the operational parameters of the Palantir Maven Smart System as a DoD program of record; and the content, scope, and legal effect of federal defense contract HQ0883-25-9-0014. The adjudication of these matters — concerning the security, procurement, and operational architecture of classified United States national security systems — raises substantial federal questions within the jurisdiction of this Court under 28 U.S.C. § 1331.

**(d) Federal Information Disclosure Obligations — Count XI.** Count XI requires this Court to adjudicate the United States government's obligations of disclosure under the APA, 5 U.S.C. §§ 551 *et seq.*, with respect to the post-incident suppression of material information about the role of a commercial AI system in the February 28, 2026 Minab targeting failure. Those obligations arise under federal law and are independently cognizable as a federal question under 28 U.S.C. § 1331.

## C. Subject Matter Jurisdiction — Diversity of Citizenship: 28 U.S.C. § 1332(a)(1)

35. This Court has independent and alternative subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), which confers original jurisdiction over civil actions between citizens of different states where the amount in controversy exceeds $75,000, exclusive of interest and costs.

**(a) Complete Diversity of Citizenship.** Plaintiff Theodore Haugland is a citizen of the United States domiciled in Aiea, Honolulu County, **Hawaii** — a state in which no Defendant is incorporated or maintains its principal place of business. Lead Defendant Palantir Technologies Inc. is incorporated in Delaware with its principal place of business in Aventura, **Florida**. Co-Defendant Anthropic PBC is incorporated in Delaware with its principal place of business in San Francisco, **California**. Defendant the United States of America, as a sovereign, is not a "citizen" of any state for purposes of 28 U.S.C. § 1332; its joinder as a defendant to Count XI only does not destroy complete diversity between Plaintiff and the two Corporate Defendants. *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996). Complete diversity of citizenship exists between Plaintiff (Hawaii) and all Corporate Defendants (Delaware/Florida; Delaware/California) within the meaning of 28 U.S.C. § 1332(a)(1).

22

**(b) Amount in Controversy.** The amount in controversy substantially and unambiguously exceeds $75,000 — exclusive of interest and costs — as established by the aggregate of all monetary relief sought against the two Corporate Defendants: compensatory damages for Plaintiff's individual consumer subscription losses; wrongful death and survival damages on behalf of the estates and heirs of the 182 decedents killed at Shajareh Tayyebeh Elementary School on February 28, 2026; FDUTPA actual and treble damages; disgorgement of unjust enrichment estimated in the range of $525,000,000 to $4,950,000,000; pre-judgment interest; attorneys' fees; and costs. The aggregate monetary recovery sought places the amount in controversy in the range of hundreds of millions to billions of dollars — magnitudes that satisfy § 1332(a)(1)'s threshold by factors of many thousands.

**D. Subject Matter Jurisdiction — Supplemental Jurisdiction: 28 U.S.C. § 1367(a)**

**36.** This Court has supplemental jurisdiction over all Florida state law claims asserted herein pursuant to 28 U.S.C. § 1367(a), which grants district courts supplemental jurisdiction over all claims forming part of the same case or controversy as the claims over which this Court has original jurisdiction under Article III. All of Plaintiff's Florida state law claims — including claims under Florida common law negligence (*McCain v. Florida Power Corp.*, 593 So.2d 500 (Fla. 1992)), Florida products liability law (*West v. Caterpillar Tractor Co.*, 336 So.2d 80 (Fla. 1976)), the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201 *et seq.*), the Florida Wrongful Death Act (Fla. Stat. §§ 768.16–768.26), Florida Uniform Commercial Code implied warranty provisions (Fla. Stat. §§ 672.314, 672.315), Florida common law fraudulent misrepresentation (*Johnson v. Davis*, 480 So.2d 625 (Fla. 1985)), Florida common law fraudulent concealment (*Ramel v. Chasebrook Construction Co.*, 135 So.2d 876 (Fla. 3d DCA 1961)), and Florida common law unjust enrichment (*Extraordinary Title Services v. Florida Power & Light*, 1 So.3d 400, 404 (Fla. 3d DCA 2009)) — arise from the same common nucleus of operative facts as Plaintiff's federal claims: the joint design, deployment, and concealment of the defective Claude AI system within the Maven Smart System by Defendants Palantir and Anthropic, and the resulting February 28, 2026 targeting failure at Shajareh Tayyebeh Elementary School. Count XI, asserted against the United States, similarly arises from the same nucleus of operative facts. The exercise of

23

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

supplemental jurisdiction over all counts serves the interests of judicial economy, convenience, and fairness to all parties.

### E. Declaratory Judgment Act: 28 U.S.C. §§ 2201–2202

**37.** This Court has authority to award declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and Federal Rule of Civil Procedure 65. A sufficient actual controversy exists within the meaning of the Declaratory Judgment Act and Article III's case-or-controversy requirement because: (a) the controversy is definite and concrete — each Defendant has engaged in specific, identified, and independently corroborated conduct that produced a specific and catastrophic documented outcome; (b) the controversy touches the legal relations of parties with adverse interests — Plaintiff, as a defrauded consumer subscriber to Claude's services, stands in directly adverse legal relation to each Defendant with respect to the specific conduct alleged; (c) the controversy is of sufficient immediacy and reality — Plaintiff's Claude subscription was ongoing throughout the entire concealment period alleged; and (d) the declaratory judgment sought would have the force and effect of a final judgment — not an advisory opinion — in resolving the contested legal relations among the parties. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). The Declaratory Judgment Act does not independently create subject matter jurisdiction and is asserted herein as ancillary to the independent jurisdictional grounds established in Sections II(B) through II(D). *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72 (1950).

### F. Jurisdiction Over the United States of America — Sovereign Immunity Analysis

**38.** The United States of America, as a sovereign, is immune from suit in its own courts unless it has expressly consented to be sued. *United States v. Mitchell*, 445 U.S. 535, 538 (1980). Plaintiff fully acknowledges and respects this principle. Plaintiff does not lightly invoke federal court jurisdiction against the sovereign government of the United States. He does so on a specific, bounded, and carefully pleaded theory: that the United States made an institutional decision following February 28, 2026, to conceal from the American public — including consumers like Plaintiff who continued paying Claude subscription fees throughout the concealment period — material information about Claude's specific causal role in the deadliest AI targeting failure in

24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

recorded history, and that this concealment caused Plaintiff concrete, calculable, and ongoing economic harm, and deprived 166 Members of Congress of the accountability information they formally demanded on July 13, 2026.

39. *Waiver Under the Administrative Procedure Act — 5 U.S.C. § 702.* The Administrative Procedure Act waives the United States' sovereign immunity for claims seeking non-monetary equitable relief against federal agency action or inaction. 5 U.S.C. § 702 provides that "[a]n action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an unlawful manner shall not be dismissed nor relief therein be denied on the grounds that it is against the United States." *Bowen v. Massachusetts*, 487 U.S. 879, 891–93 (1988). The conduct of the United States alleged in Count XI — the deliberate institutional suppression and obstruction of public disclosure of Claude's specific causal role in the February 28, 2026 Minab targeting failure — constitutes agency action within the meaning of the APA, specifically: (a) "agency action unlawfully withheld or unreasonably delayed" under 5 U.S.C. § 706(1) — the promise of a complete investigation report made on March 10, 2026, still not fulfilled 155 days later on August 1, 2026; and (b) conduct "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A). To the extent Count XI seeks declaratory judgment and injunctive relief compelling the disclosure of unclassified investigation findings, the APA's § 702 waiver provides this Court with full subject matter jurisdiction.

40. *Plaintiff's Candid Acknowledgment — Monetary Damages Not Sought Against the United States.* Plaintiff expressly, unequivocally, and without reservation acknowledges that 5 U.S.C. § 702's waiver is limited to claims for "relief other than money damages." *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999). Plaintiff further acknowledges that the Federal Tort Claims Act's intentional tort exception, 28 U.S.C. § 2680(h), bars monetary fraud and deceit claims against the United States. Plaintiff does not invoke the FTCA. **No monetary damages of any kind — compensatory, nominal, statutory, equitable, restitutionary, or otherwise — are sought against the United States of America under Count XI or any other provision of this Complaint.** Count XI seeks exclusively declaratory and injunctive relief within the APA § 702

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

waiver. This absolute and unconditional disclaimer eliminates any sovereign immunity barrier to Count XI.

**41.** *Classified Information Carve-Out — Absolute and Unconditional.* Plaintiff expressly states, without any reservation whatsoever, that he does NOT seek — through Count XI or anywhere in this Complaint — the production, disclosure, or release of any information that has been properly classified as Confidential, Secret, Top Secret, or otherwise protected under the national security classification system, including under Executive Order 13526 or its successors, or any classification authority of the Department of Defense, the Director of National Intelligence, or any other federal agency. All injunctive relief requested in Count XI is limited exclusively to information that is, or through appropriate declassification review can lawfully be made, available in unclassified or appropriately redacted form — of the type the Department of Defense has statutory authority and documented historical precedent to produce, as evidenced by the government's own March 10, 2026 public promise of a complete investigation report.

### G. Personal Jurisdiction

**42.** This Court has personal jurisdiction over all three Defendants. The constitutional standards governing personal jurisdiction over private defendants — the minimum contacts and purposeful availment framework of *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), as refined in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) — are applied through Florida's long-arm statute, Fla. Stat. § 48.193, as interpreted by the Florida Supreme Court in *Venetian Salami Co. v. Parthenais*, 554 So.2d 499, 500 (Fla. 1989), and by the Eleventh Circuit in *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008). The United States of America, as a sovereign defendant, is not subject to the minimum contacts analysis; its amenability to suit in this Court follows from the APA § 702 jurisdictional waiver analyzed in Section II(F) above.

**43.** *General Personal Jurisdiction — Lead Defendant Palantir Technologies Inc. — At Home in the Southern District of Florida.* Under the Supreme Court's holding in *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014), a corporation is subject to general personal jurisdiction — jurisdiction as to all claims, wherever they arose — in any state in which it is "at home," defined as the state of its incorporation or the state of its principal place of business. Palantir's principal place of business

26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

is **19505 Biscayne Boulevard, Suite 2350, Aventura, Florida 33180** — located in Miami-Dade County, within this judicial District and Division — effective February 17, 2026. Palantir's relocation of its corporate headquarters to Aventura, Florida — announced in its Annual Report on Form 10-K filed with the SEC on February 17, 2026, signed by CEO Alexander C. Karp, stating "We have moved our headquarters to Miami, Florida" — is a permanent and unambiguous corporate commitment to Florida as Palantir's new principal place of business. A corporation's principal place of business is the single most important indicator of where the corporation is "at home" for general personal jurisdiction purposes. *Daimler AG*, 571 U.S. at 137; *BNSF Railway Co. v. Tyrrell*, 581 U.S. 402, 413 (2017). This Court has general personal jurisdiction over Palantir for all claims asserted against it in this Complaint, regardless of where any specific act or omission occurred.

44. *General Personal Jurisdiction — Palantir as Lead Defendant Anchoring the Southern District of Florida*. Palantir's principal place of business in Aventura, Florida, is not merely a jurisdictional predicate for the claims against Palantir personally — it is the foundational anchor that establishes the Southern District of Florida, Miami Division, as the proper venue for this entire action under 28 U.S.C. § 1391(b)(1). Palantir's deliberate, publicized, and permanent relocation of its corporate headquarters to Miami-Dade County demonstrates that Florida is not merely a transient or temporary business location for Palantir. It is Palantir's chosen corporate home — the state whose business climate, tax laws, and regulatory environment Palantir's CEO and board of directors affirmatively selected, at a moment in Palantir's corporate history when Palantir was the largest defense AI contractor in the United States, as the permanent home for the corporation at the center of this action. That choice carries the inescapable legal consequence of amenability to suit in this Court for all claims arising out of Palantir's global commercial operations, including the Maven Smart System deployment that is the subject of this Complaint.

45. *Specific Personal Jurisdiction — Co-Defendant Anthropic PBC — Florida Long-Arm Statute, Fla. Stat. § 48.193*. Defendant Anthropic PBC is subject to the specific personal jurisdiction of this Court pursuant to Florida's long-arm statute, Fla. Stat. § 48.193, on the following independent grounds:

27

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

**(a) Fla. Stat. § 48.193(1)(a)(1) — Operating, Conducting, Engaging in, or Carrying on a Business in This State.** Anthropic operates, conducts, and engages in business in the State of Florida through: the commercial marketing and sale of Claude AI subscription services to Florida residents, including through the Claude.ai consumer subscription platform accessible to and actively subscribed to by Florida residents; the commercial licensing of Claude's API to enterprise customers located in Florida; and the commercial targeting of Florida's defense technology ecosystem — the largest in the Southeast United States — in Anthropic's government and defense contracting campaign, a campaign that specifically targeted Palantir's Miami-Dade County headquarters as a commercial counterparty. Anthropic's commercial activities in Florida are continuous and systematic, satisfying § 48.193(1)(a)(1)'s "carrying on a business" standard. *Venetian Salami Co. v. Parthenais*, 554 So.2d 499, 500 (Fla. 1989).

**(b) Fla. Stat. § 48.193(1)(a)(2) — Committing a Tortious Act Within This State.** Anthropic committed tortious acts within the State of Florida by: (i) making materially false safety representations — through the November 7, 2024 tripartite press release and through Anthropic's consumer subscription marketing — that were specifically received and relied upon by Florida residents including those who subscribed to Claude's services from addresses within the Southern District of Florida; (ii) causing tortious injury within Florida by directing false commercial representations at Lead Defendant Palantir's principal executive offices in Aventura, Florida, inducing Palantir's Florida-based leadership to continue and expand the Claude-Maven deployment on the basis of those representations; and (iii) CEO Dario Amodei's approximately June 10, 2026 Bloomberg *The Circuit* interview — broadcast nationally to a Florida audience including Claude subscribers within this District — constituting an act of fraudulent concealment directed at Florida consumers who continued paying Claude subscription fees in reliance on Amodei's false and contradictory statements.

**(c) Fla. Stat. § 48.193(1)(a)(6) — Causing Injury in This State Arising from Products, Goods, or Services Sold or Distributed in This State.** Anthropic caused injury within Florida arising from Claude AI services sold to Florida residents, including Plaintiff (who purchased Claude subscriptions as a consumer whose damages arose from false representations directed at the

28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

consumer market in which Florida-resident subscribers participate), satisfying § 48.193(1)(a)(6)'s "products sold or distributed" basis for long-arm jurisdiction.

**46.** *Specific Personal Jurisdiction — Anthropic's Conspiracy with Florida-Based Palantir.* Independent of and supplementary to the § 48.193 grounds above, Anthropic is subject to specific personal jurisdiction in this Court by virtue of its conspiracy and concert of action with Lead Defendant Palantir, whose principal place of business is in Aventura, Florida. Under Florida law, a non-resident defendant who acts in concert with a Florida-resident defendant — committing tortious acts in furtherance of a common scheme that produces harm directed at Florida — is subject to specific personal jurisdiction in Florida courts by virtue of those concerted acts. *Wilcox v. Stout*, 637 So.2d 335, 337 (Fla. 2d DCA 1994); *see also Licciardello v. Lovelady*, 544 F.3d 1280, 1285 (11th Cir. 2008) (recognizing that a defendant who purposefully directs tortious activity toward a Florida-based target satisfies minimum contacts for long-arm jurisdiction). Anthropic's commercial partnership with Palantir — executed through the November 7, 2024 tripartite press release co-issued with Palantir; through commercial integration agreements between Anthropic and Palantir's Artificial Intelligence Platform; and through the sustained concealment of Claude's defects maintained jointly by Anthropic and Palantir from February 28, 2026 through August 1, 2026 — constitutes concerted activity specifically directed at and through Florida, Palantir's principal place of business, sufficient to establish personal jurisdiction over Anthropic in this Court.

**47.** *Due Process — Minimum Contacts and Reasonableness.* The exercise of personal jurisdiction over Co-Defendant Anthropic in the Southern District of Florida satisfies the constitutional requirements of the Due Process Clause of the Fourteenth Amendment. Anthropic purposefully availed itself of the privilege of conducting business in Florida — specifically through its commercial subscription services directed at Florida residents, through its commercial partnership with Florida-headquartered Palantir, and through its commercial targeting of the Florida-based defense technology community — in a manner that made it foreseeable that Anthropic could be haled into court in Florida. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). The exercise of jurisdiction over

29

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Anthropic in this Court — the court of Lead Defendant Palantir's principal place of business — comports with traditional notions of fair play and substantial justice: Florida has a compelling interest in the claims asserted, the Southern District of Florida is the most efficient forum given Palantir's headquarters here, and Anthropic's burden in litigating in Miami — a major international commercial city with direct air service to San Francisco — is modest and proportionate to the magnitude of the harm attributed to Anthropic's conduct.

**48.** *Personal Jurisdiction Over Defendant United States of America.* The United States of America, as a federal sovereign defendant, is not subject to the constitutional minimum contacts framework of *International Shoe.* The United States may be sued in any federal district court in which Congress has authorized suit. The APA's § 702 waiver authorizes suit in any appropriate federal district court. This Court — in the Southern District of Florida, where Lead Defendant Palantir is headquartered and where substantial events giving rise to the claims occurred through Palantir's Florida-based corporate decisions — is an appropriate federal district court within which the United States is amenable to suit on Count XI. *United States v. Mitchell,* 445 U.S. 535, 538 (1980); *Bowen v. Massachusetts,* 487 U.S. 879 (1988).

### H. Venue

**49.** *Venue Under 28 U.S.C. § 1391(b)(1) — Lead Defendant Resides in This District.* Venue is proper in the United States District Court for the Southern District of Florida, Miami Division, pursuant to 28 U.S.C. § 1391(b)(1), which provides that a civil action may be brought in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." For corporate defendants, 28 U.S.C. § 1391(c)(2) provides that a corporation resides in any judicial district in which it is subject to the court's personal jurisdiction. Lead Defendant Palantir's principal place of business is in Aventura, Florida — within Miami-Dade County, within the Southern District of Florida, Miami Division. Palantir is subject to the general personal jurisdiction of this Court as established in Section II(G)(43)–(44) above. Palantir therefore resides in the Southern District of Florida within the meaning of 28 U.S.C. § 1391(c)(2). Co-Defendant Anthropic is subject to the specific personal jurisdiction of this Court as established in Section II(G)(45)–(47) above, and therefore resides in the Southern District of Florida for venue

30

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

purposes as well. Both Corporate Defendants reside in the State of Florida, in which this District is located, independently satisfying § 1391(b)(1)'s requirement.

**50.** *Venue Under 28 U.S.C. § 1391(b)(2) — Substantial Part of Events Occurred in This District.* Venue is independently and additionally proper pursuant to 28 U.S.C. § 1391(b)(2), which provides venue in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." A substantial part of the events and omissions giving rise to this action occurred within the Southern District of Florida for the following specific, documented, and legally operative reasons:

**(a) Palantir's Florida-Based Corporate Decisions.** Following Palantir's relocation of its principal place of business to Aventura, Florida, on February 17, 2026, Palantir's senior executive leadership — including those officers responsible for the Maven Smart System operations, the commercial relationship with Anthropic, and the post-Minab institutional concealment strategy — operates from Palantir's headquarters at 19505 Biscayne Boulevard, Suite 2350, Aventura, Florida 33180. The corporate decisions Palantir made in the post-Minab concealment period — specifically including its sustained institutional silence from February 28, 2026 through August 1, 2026, and its non-response to the July 13, 2026 congressional accountability letter — were made from, and constitute events occurring within, this District.

**(b) CENTCOM Headquarters at MacDill Air Force Base, Tampa, Florida.** United States Central Command ("CENTCOM") — the military combatant command that authorized and executed the strikes comprising Operation Epic Fury, including the February 28, 2026 strike on Shajareh Tayyebeh Elementary School, and that administered the Maven Smart System targeting operations in which Claude's defective outputs were generated — is headquartered at **MacDill Air Force Base, Tampa, Florida 33621**, within the Middle District of Florida. CENTCOM's Tampa headquarters served as the nerve center of Operation Epic Fury and the command authority responsible for the targeting workflow in which Claude participated. While CENTCOM's headquarters is in the Middle District rather than the Southern District, its presence in Florida as the principal military actor in the events of this Complaint — combined with Palantir's Southern

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

District headquarters — provides a substantial Florida nexus for the events giving rise to this action that no other state can replicate.

**(c) Commercial Acts Directed at Florida Residents.** Anthropic's deceptive commercial representations — the Constitutional AI safety marketing, the Responsible Scaling Policy representations, and the November 7, 2024 tripartite press release — were received, relied upon, and acted upon by Florida consumers including Claude subscribers within this District. The subscription fee payments made by Florida-resident Claude subscribers in reliance on those representations — payments that are the direct, individual economic injury underlying Plaintiff's FDUTPA and fraud claims — constitute events occurring within this District.

*\*(d) Post-Minab Concealment Acts Directed at Florida.* The post-strike concealment sustained by both Corporate Defendants — including Palantir's complete institutional silence from its Aventura, Florida headquarters and Anthropic's continued exploitation of its unrevised safety marketing in Florida's commercial market — consists of ongoing acts and omissions occurring within this District for the full 155-day concealment period.

**51.** *Venue Under 28 U.S.C. § 1391(e)(1) — Action Against the United States.* Venue is proper as to Defendant the United States of America pursuant to 28 U.S.C. § 1391(e)(1), which provides that in any civil action in which the United States is a defendant, venue is proper in any judicial district in which: "(A) a defendant in the action resides; (B) a substantial part of the events or omissions giving rise to the claim occurred; or (C) the plaintiff resides if no real property is involved in the action." All three subsections are independently satisfied: (A) Lead Defendant Palantir, a co-defendant in this action, resides in this District; (B) a substantial part of the events giving rise to Count XI — including Palantir's Florida-based concealment decisions and CENTCOM's Florida-headquartered operational authority — occurred within or immediately adjacent to this District; and (C) Plaintiff Theodore Haugland is a citizen of the United States, and this action involves no real property. All three grounds independently support venue in this District as to the United States of America.

**52.** *The Southern District of Florida, Miami Division Is the Uniquely Appropriate Forum.* The Southern District of Florida, Miami Division, is not merely a permissible venue — it is the

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

uniquely appropriate and superior forum for this action. Lead Defendant Palantir, whose operational decisions and institutional conduct are at the center of every substantive count of this Complaint, maintains its principal place of business in Aventura, within Miami-Dade County, within this Division. The Clerk of Court, the Chief Judge, and the District Judges of the Miami Division are closest in geographic proximity to the principal locus of corporate operations of the most consequential defendant in this action. Miami is one of the world's most sophisticated commercial and legal centers. The Southern District of Florida, Miami Division, is fully equipped to adjudicate the complex commercial, technological, and national security questions this action presents. Plaintiff respectfully submits that no credible basis for transfer to any other district exists, and that any motion by either Corporate Defendant to transfer venue under 28 U.S.C. § 1404(a) would be both legally unfounded and an affront to Lead Defendant Palantir's own deliberate, public, and celebrated decision to make Miami its corporate home.

## I. No Basis to Transfer Venue

53. Neither Corporate Defendant may successfully move to transfer venue pursuant to 28 U.S.C. § 1404(a) on grounds that the Southern District of Florida, Miami Division, is an inconvenient forum. Lead Defendant Palantir voluntarily, publicly, and permanently relocated its corporate headquarters to Aventura, Florida on February 17, 2026 — eleven days before the February 28, 2026 strike on Shajareh Tayyebeh Elementary School. Palantir's CEO Alexander C. Karp signed its SEC Annual Report confirming the relocation on the effective date. Palantir's board of directors made this choice deliberately and irrevocably, citing Florida's business environment, tax structure, and regulatory climate as superior to Colorado's in Palantir's own public statements. Palantir may not simultaneously celebrate its move to Miami — a move whose commercial and institutional advantages Palantir actively sought and publicly announced — and then resist suit in Miami on grounds of inconvenience. *See In re Amendt*, 169 F. App'x 93, 96 (3d Cir. 2006). Co-Defendant Anthropic, which chose to establish a commercial partnership with a Florida-headquartered corporation as the centerpiece of its defense AI commercialization strategy, and which directed commercial representations at Florida consumers on an ongoing basis, similarly has no legitimate inconvenience argument with respect to a Miami forum.

33

**J. Service of Process**

**54.** *Service Upon Lead Defendant Palantir Technologies Inc.* Service of process upon Palantir shall be effected pursuant to Federal Rule of Civil Procedure 4(h)(1)(B) by delivering a copy of the Summons and Complaint to Palantir's principal executive offices at its Florida headquarters: **19505 Biscayne Boulevard, Suite 2350, Aventura, Florida 33180**, directed to Palantir's General Counsel and Chief Legal Officer. Service may also be effected through Palantir's registered agent for service of process in Delaware or through any agent authorized by Palantir to accept service of process in the State of Florida pursuant to Fla. Stat. § 48.181. Plaintiff will simultaneously transmit a request for waiver of formal service pursuant to Federal Rule of Civil Procedure 4(d) to Palantir's General Counsel at the Aventura headquarters address.

**55.** *Service Upon Co-Defendant Anthropic PBC.* Service of process upon Anthropic shall be effected pursuant to Federal Rule of Civil Procedure 4(h)(1)(B) by delivering a copy of the Summons and Complaint to Anthropic's principal offices: **548 Market Street, PMB 90375, San Francisco, California 94104**, directed to Anthropic's General Counsel and Legal Department. Service may also be effected through Anthropic's registered agent for service of process in Delaware. Plaintiff will simultaneously transmit a request for waiver of formal service pursuant to Federal Rule of Civil Procedure 4(d) to Anthropic's General Counsel at its San Francisco address. **Deadline for return of waiver:** sixty (60) days from August 1, 2026, i.e., October 1, 2026, pursuant to Fed. R. Civ. P. 4(d)(1)(F).

**56.** *Service Upon Defendant the United States of America.* Service of process upon the United States shall be effected pursuant to Federal Rule of Civil Procedure 4(i), governing service upon the United States government in civil actions, through the following three required methods:

**(a)** Pursuant to Fed. R. Civ. P. 4(i)(1)(A)(i), delivery of a copy of the Summons and Complaint to the United States Attorney for the Southern District of Florida, or to the Civil Process Clerk at: **United States Attorney's Office, Southern District of Florida, 99 NE 4th Street, Miami, Florida 33132;**

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

(b) Pursuant to Fed. R. Civ. P. 4(i)(1)(B), transmittal by registered or certified mail to the **Attorney General of the United States, United States Department of Justice, 950 Pennsylvania Avenue, NW, Washington, D.C. 20530-0001**; and

(c) Pursuant to Fed. R. Civ. P. 4(i)(2), because Count XI challenges the actions and omissions of officers and agencies of the Department of Defense, additional service by registered or certified mail to:

**Secretary of Defense Pete Hegseth**, Office of the Secretary of Defense, 1400 Defense Pentagon, Washington, D.C. 20301-1400;

**Director, Chief Digital and Artificial Intelligence Office**, Department of Defense, 4800 Mark Center Drive, Alexandria, Virginia 22350-7000; and

**Commander, United States Central Command**, 7115 South Boundary Boulevard, MacDill Air Force Base, Tampa, Florida 33621-5101.

All six required service mailings shall be transmitted by United States Postal Service Certified Mail, Return Receipt Requested, on August 1, 2026. Signed return receipt cards shall be filed with this Court promptly upon receipt as documentation of completed service pursuant to Fed. R. Civ. P. 4(l)(1). The waiver-of-service provisions of Fed. R. Civ. P. 4(d) do not apply to the United States of America; service is effected exclusively through the Rule 4(i) procedures described above.

### K. Standing — Plaintiff's Constitutionally Sufficient Injury-in-Fact

57. Plaintiff Theodore Haugland has Article III standing to bring this action because he has suffered a concrete, particularized, and non-hypothetical injury-in-fact that is fairly traceable to the conduct of each Defendant and that is fully redressable by this Court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

58. *Injury-in-Fact.* Plaintiff's injury is economic and specific: he paid premium subscription fees to Anthropic for Claude AI services in direct and demonstrably caused reliance on Anthropic's materially false safety representations — representations co-marketed by Palantir through the November 7, 2024 tripartite press release — and continued paying those fees throughout the 155-day post-Minab concealment period as a direct result of material information deliberately withheld

35

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

by both Corporate Defendants and the United States. The payment of money in direct, documented reliance on a materially false commercial representation constitutes a concrete, particularized injury-in-fact fully satisfying Article III's requirement. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–42 (2016); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424–27 (2021). Plaintiff's injury is not speculative, conjectural, or dependent on the actions of any third party. It is the direct financial consequence of specific, identifiable subscription payments made to Anthropic in reliance on specific, identifiable false representations, calculable from Plaintiff's subscription billing history.

**59.** *Causation.* Plaintiff's economic losses were directly and proximately caused by: (a) Palantir's and Anthropic's fraudulent safety representations — which induced Plaintiff to subscribe and pay at premium prices; and (b) all three Defendants' post-Minab concealment — which prevented Plaintiff from making the informed consumer decision to immediately cancel his subscription upon learning that Claude had contributed to the deaths of 170 children at a civilian elementary school. But for the fraudulent safety representations and the sustained institutional concealment, Plaintiff would not have paid the subscription fees he paid, or would not have paid them at the premium prices Anthropic charged, during the relevant period.

**60.** *Redressability.* Each of Plaintiff's injuries is fully redressable by this Court through: compensatory damages for subscription fees paid in reliance on false representations; FDUTPA actual and treble damages; disgorgement of unjust enrichment; declaratory judgment establishing each Defendant's liability; permanent injunctive relief compelling corrective disclosure and prohibiting future safety misrepresentations; and declaratory and injunctive relief against the United States compelling release of investigation findings. The relief requested will fully redress Plaintiff's past economic harm and will prevent the ongoing harm of continued subscription payments in continued ignorance of concealed material facts. *Id.*

### L. Exhaustion of Administrative Remedies — Not Applicable

**61.** This Complaint does not assert any claim under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* No FTCA claim is asserted anywhere in this Complaint. Accordingly, the administrative exhaustion requirement of 28 U.S.C. § 2675(a) — which requires submission of a Standard Form SF-95 claim to the relevant federal agency as a jurisdictional prerequisite to FTCA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

suit — is not applicable and does not affect this Court's jurisdiction over any count of this Complaint. *McNeil v. United States*, 508 U.S. 106, 113 (1993).

**62.** The sole count asserted against the United States — Count XI, Fraudulent Concealment — is grounded in the APA § 702 waiver and the equitable and declaratory jurisdiction of this Court. No administrative remedy under the APA's pre-suit requirements — 5 U.S.C. § 704 — bars Count XI, because the conduct at issue (the executive branch's sustained refusal to release investigation findings promised on March 10, 2026) constitutes agency action unlawfully withheld within the meaning of 5 U.S.C. § 706(1), for which no adequate alternative remedy exists that could provide the complete, specific, and timely relief Plaintiff seeks. *Bowen v. Massachusetts*, 487 U.S. at 901–02.

**63.** To the extent this Court determines that any administrative prerequisite applies to Count XI independently of the FTCA or APA frameworks analyzed above, Plaintiff respectfully requests: (a) identification of the applicable administrative remedy and the agency to which it must be directed; (b) a stay of proceedings on Count XI to allow Plaintiff to exhaust that remedy, rather than dismissal with prejudice; and (c) the liberal pro se construction that *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972), and *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), require. Plaintiff has pursued this action in good faith, with diligent attention to all procedural and jurisdictional requirements.

### III. THE PARTIES

#### A. Plaintiff

**64.** Plaintiff Theodore Haugland ("Plaintiff") is a natural person, a citizen of the United States of America, and a resident of the State of Hawaii, domiciled at 99-009 Kalaloa Street, Suite D2016, Aiea, Honolulu County, Hawaii 96701. Plaintiff appears before this Court in propria persona pursuant to 28 U.S.C. § 1654. Plaintiff's telephone number for purposes of this action is (202) 933-3332. Plaintiff's facsimile number for purposes of this action is (202) 933-3335. Plaintiff's email address for purposes of service and communication in this proceeding is administrator@civillawinc.com.

**65.** At all times relevant to this action, Plaintiff was and remains a paid subscriber to Defendant Anthropic PBC's Claude artificial intelligence services — specifically, the Claude.ai consumer

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

subscription platform — purchased and maintained at a premium subscription price tier in direct and documented reliance on Anthropic's material representations that Claude was a uniquely safe, rigorously developed, responsibly tested, and constitutionally aligned AI product, and that Anthropic was the most responsible AI developer in the world. Plaintiff purchased and renewed his Claude subscription in reliance on Anthropic's representations as co-marketed and institutionally endorsed through the tripartite partnership of Palantir, Anthropic, and non-party AWS announced on November 7, 2024 — an announcement made from Lead Defendant Palantir's operations, then headquartered in Denver, Colorado, and now permanently anchored in Aventura, Florida — and as further amplified through non-party Amazon.com, Inc.'s public institutional commitment to Anthropic through its approximately $4,000,000,000 investment. Each of Plaintiff's subscription payments was a direct and foreseeable economic consequence of the materially false and actively concealed representations alleged in this Complaint. Plaintiff continued making those payments throughout the post-February 28, 2026 concealment period — sustained by the two Corporate Defendants and the United States of America in parallel — as a direct and foreseeable economic consequence of the material information withheld from him during that period of one hundred fifty-five (155) consecutive days as of the filing date of August 1, 2026.

66. No claim of any kind in this Complaint is asserted against any individual member of the United States armed forces, any individual contracting officer at the CDAO, any individual intelligence analyst, or any individual warfighter who participated in Operation Epic Fury. The conduct of every individual United States military and government employee referred to in this Complaint — including every officer, analyst, commander, and procurement official identified herein — is characterized throughout as good-faith reliance on the materially false representations of the two Corporate Defendants. The United States government as an institution is a defrauded contracting party and fellow victim throughout all counts of this Complaint except the single, precisely bounded Count XI. That organizing principle is repeated here, in the Parties section, for the avoidance of any doubt.

## B. Corporate Defendants

### 1. Lead Defendant Palantir Technologies Inc.

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

### a. Corporate Identity and Florida Headquarters

67. Lead Defendant Palantir Technologies Inc. ("Palantir") is a corporation incorporated under the laws of the State of Delaware. Palantir's **principal place of business** — its corporate headquarters and the primary location from which its senior officers direct, control, and coordinate the company's affairs — is **19505 Biscayne Boulevard, Suite 2350, Aventura, Florida 33180,** located in Miami-Dade County within the Southern District of Florida, Miami Division. This headquarters location became effective on **February 17, 2026**, as disclosed in Palantir's Annual Report on Form 10-K for fiscal year 2025, filed with the United States Securities and Exchange Commission on February 17, 2026, signed by Chief Executive Officer Alexander C. Karp, and stating without qualification: **"We have moved our headquarters to Miami, Florida."** Prior to February 17, 2026, Palantir's principal place of business was 518 17th Street, Suite 1015, Denver, Colorado 80202, to which Palantir had relocated from Palo Alto, California, in August 1020. The Denver address is no longer Palantir's principal place of business and has no operative legal significance as a venue or jurisdictional contact for this action. Palantir's common stock is publicly traded on the New York Stock Exchange under the ticker symbol "PLTR." Palantir's registered agent for service of process in the State of Delaware is Corporation Service Company ("CSC"), 251 Little Falls Drive, Wilmington, Delaware 19808.

68. Palantir's relocation to Aventura, Florida, was a deliberate, permanent, and publicly celebrated strategic decision by its board of directors and senior leadership — a decision made eleven (11) days before the February 28, 2026 targeting failure at Shajareh Tayyebeh Elementary School. Palantir chose Aventura, Florida, specifically. It did not choose any other state, county, or city. It chose the heart of Miami-Dade County. The Southern District of Florida, Miami Division, is, as a consequence of Palantir's own strategic decision, the proper home forum for this litigation in every sense — geographic, commercial, institutional, and legal.

69. Palantir's 2025 fiscal year annual revenue was approximately **$4,475,000,000** — four billion four hundred seventy-five million dollars — a figure that reflects extraordinary commercial growth driven in substantial part by Palantir's United States Government segment, which encompasses the Maven Smart System contracts, CENTCOM-aligned targeting intelligence operations, and the

39

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Claude AI services contracting ecosystem that is at the center of this action. Palantir's 2025 net income was approximately **$1,600,000,000** — one billion six hundred million dollars — the company's first full fiscal year of sustained profitability. These revenues and profits are, in material part, the financial product of the fraudulent safety representations that Palantir co-authored, co-issued, and co-marketed in the November 7, 2024 tripartite press release and in its ongoing government affairs and defense contracting activities.

### b. Founding History, Senior Leadership, and Strategic Position

**70.** Palantir was founded in 2003 in Palo Alto, California, by Alexander C. Karp, Peter Thiel, Stephen Cohen, Joe Lonsdale, and Nathan Gettings, with foundational seed investment from In-Q-Tel — the venture capital arm of the United States Central Intelligence Agency. That founding investment by the CIA's own venture arm established, at Palantir's inception, the singular trust relationship between Palantir and the American national security community that Palantir has leveraged — with extraordinary commercial success — for over two decades. Palantir's entire commercial architecture was designed around a single strategic objective: to become the indispensable data analytics and AI infrastructure provider to every major national security institution of the United States government, NATO allies, and allied intelligence communities. The Maven Smart System is the current-generation manifestation of that objective. Its integration of Claude — and the consequences of that integration — are the subject of this Complaint.

**71.** As of the filing of this Complaint on August 1, 2026, Palantir's senior officers bearing responsibility for the corporate decisions at the center of this action include:

**(a) Alexander C. Karp** — Co-Founder and Chief Executive Officer. Karp signed Palantir's 10-K on February 17, 2026, confirming the Florida headquarters relocation. As CEO, Karp bears executive responsibility for Palantir's commercial strategy, its government contracting decisions, the integration of Claude into the Maven Smart System targeting chain, and the post-February 28, 2026 institutional silence Palantir has maintained for one hundred fifty-five days as of the filing date of this Complaint.

**(b) Peter Thiel** — Co-Founder and Chairman of the Board of Directors. Thiel bears board-level responsibility for Palantir's strategic direction and governance oversight of Palantir's major

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

commercial decisions, including the decision to embed a large language model of known architectural limitations into the United States military's live weapons targeting infrastructure.

**(c) Stephen Cohen** — Co-Founder and President. Cohen bears direct operational responsibility for Palantir's core government business and for the design and development of Palantir's flagship AI products, including the Maven Smart System's Artificial Intelligence Platform ("AIP") integration layer through which Claude's outputs were delivered to military targeting operators.

The acts, omissions, and governance failures alleged in this Complaint were carried out by, authorized by, and are attributable to Palantir through its senior officers, directors, and employees acting within the actual and apparent scope of their corporate authority. Under Florida law, a corporation is vicariously liable for the tortious acts of its officers and employees committed within the scope of their corporate authority. *Mercury Motors Express, Inc. v. Smith*, 393 So.2d 545, 549 (Fla. 1980).

### c. The Maven Smart System — DoD Program of Record and Contract History

72. Palantir's Maven Smart System is a Department of Defense program of record — formally designated as the primary AI-enabled intelligence, surveillance, reconnaissance, and targeting platform of the United States military. The Maven Smart System integrates signals intelligence, imagery intelligence, geospatial data, human intelligence, and open-source information into a unified operational picture, and applies AI models to that picture to generate targeting recommendations, threat assessments, and pattern-of-life analyses that feed directly into military strike planning and authorization. The lethality of the decisions the Maven Smart System supports is not ambiguous or incidental. It is the explicit, intended, and contractually specified purpose of the platform.

73. The Maven Smart System contract portfolio grew from an initial ceiling of approximately **$480,000,000** awarded in May 2024, to a ceiling of approximately **$1,300,000,000** by May 2025, and to a total program-of-record ceiling exceeding **$11,300,000,000** as of the date of this filing. In July 2025, the Department of the Army awarded a **$10,000,000,000** enterprise AI and data analytics framework agreement consolidating seventy-five (75) existing Palantir DoD contracts — the largest single defense AI procurement in American history to that date. Every dollar of this

41

contract growth was achieved in material part through the commercial representations about Claude's safety, fitness, and operational reliability that are the subject of this Complaint. The United States government, whose contracting officers awarded and administered those contracts in complete and documented good faith, is the primary defrauded government customer of the commercial enterprise described herein.

**d. The November 7, 2024 Tripartite Press Release and Palantir's Fraudulent Representations**

74. Palantir is a co-author of the materially false safety representations made in the November 7, 2024 tripartite press release that publicly announced the integration of Claude into Palantir's AIP on non-party AWS's SageMaker infrastructure at DISA Impact Level 6. The specific representations in that press release that are attributable to Palantir — including the representation that the integrated deployment would "preserv[e] decision-making authorities" and that the integrated capabilities would "support government operations" "responsibly" — were false in the specific material respects set forth in Section IV of this Complaint. Palantir made additional material representations about the safety, security, and fitness of the Claude-integrated Maven Smart System to DoD contracting officials, congressional oversight bodies, and the American public through its investor relations disclosures, government affairs communications, and public statements made between November 7, 2024, and the date of this filing. Each such representation was made by Palantir's officers and directors within the scope of their corporate authority, is attributable to Palantir as a corporate entity, and is actionable against Palantir under Florida common law and the statutory legal theories set forth in this Complaint.

75. Palantir's post-February 28, 2026 institutional silence — maintained for one hundred fifty-five (155) consecutive days from Palantir's Florida headquarters at 19505 Biscayne Boulevard, Suite 2350, Aventura, Florida — constitutes an affirmative, deliberate, and commercially motivated act of fraudulent concealment under Florida law. *Ramel v. Chasebrook Construction Co.*, 135 So.2d 876, 882 (Fla. 3d DCA 1961). Palantir is the operator of the Maven Smart System. Palantir integrated Claude into the targeting chain. Palantir's AIP is the platform through which Claude's defective targeting characterization reached the United States military's strike authorization workflow on the morning of February 28, 2026. Palantir's complete institutional silence — from its

42

newly established Florida headquarters, in the face of formal congressional demands, international accountability calls, and the sustained grief of the families of one hundred seventy children — is not a neutral corporate posture. It is a documented, sustained, and legally actionable course of concealment that continued throughout Plaintiff's subscription period and caused Plaintiff to continue paying subscription fees for Claude services he would have cancelled had the material information Palantir withheld been disclosed.

### e. Service of Process — Palantir

76. Lead Defendant Palantir Technologies Inc. may be served with process in the State of Florida, at its principal place of business, pursuant to Federal Rule of Civil Procedure 4(h)(1)(B): **19505 Biscayne Boulevard, Suite 2350, Aventura, Florida 33180**, directed to Palantir's General Counsel and Chief Legal Officer. Palantir may also be served through its registered agent in the State of Delaware — Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. Plaintiff will simultaneously transmit a request for waiver of formal service pursuant to Federal Rule of Civil Procedure 4(d) to Palantir's General Counsel at the Aventura, Florida headquarters address. Deadline for return of waiver: sixty (60) days from August 1, 2026, i.e., **October 1, 2026**, pursuant to Fed. R. Civ. P. 4(d)(1)(F).

### 2. Co-Defendant Anthropic PBC

### a. Corporate Identity, Formation, and Delaware PBC Status

77. Co-Defendant Anthropic PBC ("Anthropic") is a public benefit corporation incorporated under the laws of the State of Delaware in January 2021, pursuant to 8 Del. C. §§ 362–368 — the statutory framework governing Delaware Public Benefit Corporations. Anthropic's principal place of business is 548 Market Street, PMB 90375, San Francisco, California 94104. Anthropic's registered agent in Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801. Anthropic's Delaware PBC charter identifies its specific public benefit purpose as "the responsible development and maintenance of advanced AI for the long-term benefit of humanity." Under the internal affairs doctrine — which Florida courts apply to determine the governance obligations of out-of-state corporations by reference to the law of their state of incorporation — Anthropic's Delaware PBC obligations, including the director duties imposed by

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

43

8 Del. C. § 365(a), are enforceable in this Court and are directly applicable to the claims asserted herein. *Mansfield v. Toy, Inc.*, 506 So.2d 474, 476 (Fla. 3d DCA 1987). Anthropic voluntarily assumed those obligations when its founders chose the Delaware PBC structure as the commercial vehicle for Anthropic's operations. The deployment of Claude in a live military targeting chain — without safety validations its known defects required, resulting in the deaths of one hundred seventy children — constitutes a fundamental, irreversible, and legally cognizable breach of the statutory obligations Anthropic voluntarily assumed.

78. Under 8 Del. C. § 365(a), Anthropic's directors are required to manage Anthropic in a manner that balances the pecuniary interests of stockholders against Anthropic's specific public benefit purpose and the best interests of those materially affected by Anthropic's conduct. The public — including consumers like Plaintiff who subscribe to Claude's services, government officials who contract for Claude in national security applications, and civilians in any geography where Claude-assisted targeting systems operate — are precisely the persons "materially affected" by Anthropic's conduct whose interests the Delaware statute requires Anthropic's board to protect. Under Florida's application of the internal affairs doctrine, these obligations travel with Anthropic into this Court and are actionable against Anthropic in connection with the Florida law claims asserted in Counts I through X of this Complaint.

## b. Founding History and Co-Founders

79. Anthropic was founded in January 2021 by eight (8) co-founders — Dario Amodei, Daniela Amodei, Tom Brown, Jack Clark, Jared Kaplan, Sam McCandlish, Christopher Olah, and Ben Mann — the majority of whom had previously held senior research, engineering, and policy positions at OpenAI, Inc., and who departed OpenAI in a principled and publicly documented disagreement over the pace, safety rigor, and governance of AI commercialization. The founding team's AI safety credentials were genuine, published, and globally recognized — which made Anthropic's safety representations all the more credible to the consumers and government customers who relied on them, and all the more culpable when those same credentials were deployed as marketing instruments to induce reliance on a product that Anthropic knew was defective for the specific high-stakes application in which it was deployed.

44

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

**80.** Dario Amodei — Co-Founder and Chief Executive Officer — is the co-author of "Concrete Problems in AI Safety" (Amodei, Olah, Steinhardt *et al.*, 2016), a foundational paper in the AI safety research literature that systematically catalogued the precise categories of AI failure — including specification gaming, distributional shift, and oversight failures — that materialized in the February 28, 2026 Minab targeting chain. Amodei's expert, published, and specifically documented knowledge of the exact AI failure modes that Claude exhibited in the Maven deployment is the most consequential single fact establishing Anthropic's scienter for the fraudulent misrepresentation claims in Count V. A CEO who co-authored the landmark paper identifying AI targeting failure modes cannot credibly claim, 155 days after those failure modes killed 170 children, that he "doesn't know exactly how the models were used." *Johnson v. Davis*, 480 So.2d 625, 628 (Fla. 1985) (fraudulent misrepresentation requires knowledge of falsity or reckless disregard of truth).

**81.** All eight co-founders were reported to have become billionaires as of approximately March 2025, when Anthropic's valuation reached approximately $61,500,000,000 following its Series E financing round. Their combined financial stake in Anthropic's commercial success constitutes a structural incentive — operating at the board-governance level — for each of them, in their capacities as co-founders, directors, and senior officers, to prioritize revenue-generating deployments over the safety disclosures that would have slowed, impaired, or ended those revenue streams. Under Florida law, evidence of a defendant's financial motive to suppress material information is directly relevant to establishing the scienter element of fraudulent concealment. *Ramel v. Chasebrook Construction Co.*, 135 So.2d 876, 882 (Fla. 3d DCA 1961).

### c. Current Executive Leadership

**82.** As of the filing date of August 1, 2026, Defendant Anthropic PBC's executive leadership includes: Dario Amodei (CEO), Daniela Amodei (President), Jared Kaplan (Chief Science Officer), Rahul Patil (Chief Technology Officer), Paul Smith (Chief Commercial Officer, joined August 1025), Ami Vora (Head of Product, responsible for Claude.ai consumer platform through which Plaintiff subscribed), and Jan Leike (Head of Safety, formerly co-lead of OpenAI's Superalignment team, joined Anthropic specifically to lead the organizational function most

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

directly responsible for evaluating Claude's fitness for deployment in high-stakes applications). No individual officer is named as a defendant. Each officer's acts within the scope of their employment are fully attributable to Anthropic under Florida respondeat superior principles. *Mercury Motors Express, Inc. v. Smith*, 393 So.2d 545, 549 (Fla. 1980).

### d. Board of Directors

**83.** As of the filing date, Anthropic PBC's Board of Directors consists of Dario Amodei, Daniela Amodei, Reed Hastings (Independent Director, co-founder of Netflix, Inc., appointed by the Long-Term Benefit Trust), Vas Narasimhan (Independent Director, former CEO of Novartis AG, appointed April 2026), Chris Liddell (Director, former CFO of Microsoft Corporation and General Motors Company, former White House Deputy Chief of Staff), and Yasmin Razavi (Director, Partner at Spark Capital). The Board of Directors of Anthropic PBC, as the governing body of a Delaware public benefit corporation whose obligations are enforced in this Court through Florida's internal affairs doctrine, *Mansfield v. Toy*, 506 So.2d at 476, bears collective fiduciary responsibility for the decisions that form the subject matter of this action — including the decision to deploy Claude in a live military targeting application, the decision not to disclose Claude's five known architectural defects to government contracting officials, and the decision not to make corrective disclosures to commercial subscribers including Plaintiff following February 28, 2026.

### e. The Long-Term Benefit Trust

**84.** Anthropic's governance structure includes a Long-Term Benefit Trust ("LTBT") — a novel governance mechanism through which Anthropic represented to investors, consumers, and government customers that its board would remain accountable to its public benefit mission even under intense commercial and investor pressure. The LTBT holds the ability to appoint a specified number of Anthropic's independent board directors, thereby maintaining board independence from purely pecuniary investor motivations. Anthropic marketed the LTBT extensively as a structural safeguard — distinguishing Anthropic from for-profit AI competitors whose boards were fully controlled by purely commercial investors. Plaintiff relied on Anthropic's LTBT representations as a consumer subscriber, in that the LTBT's structural independence was specifically represented as the institutional mechanism ensuring Anthropic's safety commitments were enforceable rather than

46

aspirational. Those representations were materially false to the extent the LTBT, as constituted and operated, failed to prevent the deployment and 155-day concealment alleged in this Complaint.

### f. Capitalization and Principal Investors

**85.** Defendant Anthropic PBC has raised approximately **$130,000,000,000** in aggregate capital through multiple financing rounds between 2021 and July 2026. On May 28, 2026 — **eighty-nine (89) days** after the deaths of 170 children at Shajareh Tayyebeh Elementary School — Anthropic closed its Series H financing round, raising approximately **$65,000,000,000** at a post-money valuation of approximately **$965,000,000,000**. On June 1, 2026 — **ninety-three (93) days** post-strike — Anthropic filed a confidential S-1 registration statement with the Securities and Exchange Commission, initiating the formal process toward an initial public offering at or near its Series H valuation. Anthropic's annual run-rate revenue exceeded **$47,000,000,000** as of the filing date. These extraordinary commercial figures are, in material part, the financial product of the fraudulent safety representations at the center of this Complaint. The financial motive to protect that valuation through sustained concealment — clearly visible in the timing of the S-1 filing ninety-three days post-strike — satisfies the intent element of Anthropic's fraudulent concealment liability under *Ramel v. Chasebrook Construction Co.*, 135 So.2d 876, 882 (Fla. 3d DCA 1961), and Florida's FDUTPA willfulness standard under Fla. Stat. § 501.2075.

**86.** Anthropic's principal strategic investors — each referenced herein for factual context regarding Anthropic's commercial architecture, and none named as a defendant — include: non-party Amazon.com, Inc. (~$4,000,000,000); Alphabet Inc./Google LLC (~$2,000,000,000); Salesforce Ventures (~$5,000,000,000); Spark Capital; GIC; MGX; ICONIQ Capital; Lightspeed Venture Partners; Sequoia Capital; Coatue Management; Fidelity Investments; and Menlo Ventures. The commercial significance of non-party Amazon.com, Inc.'s investment — specifically its board observer rights and binding AWS platform commitment — is addressed in Section III(C) below.

### g. The DoD Contract and Pentagon Supply-Chain Risk Designation

**87.** On approximately **July 14, 2025**, the United States Department of Defense, acting through the Chief Digital and Artificial Intelligence Office ("CDAO"), awarded Anthropic a two-year prototype Other Transaction Agreement bearing contract number **HQ0883-25-9-0014**, with a

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

47

ceiling of approximately **$200,000,000**. The contract was awarded after a competitive evaluation in which CDAO contracting officials assessed Claude against criteria including safety, reliability, and fitness for national security applications — and awarded the contract on the express strength of Anthropic's material representations regarding Claude's safety, constitutional design, and operational reliability. The CDAO's contracting officials acted in complete good faith. They were defrauded. The approximately $200,000,000 in public contract funds paid to Anthropic under this contract was extracted from the United States Treasury through procurement fraud — a fraud Anthropic jointly perpetrated with Lead Defendant Palantir, with the indispensable infrastructure enablement of non-party AWS, and with the structural incentive architecture created by non-party Amazon.

88. On **March 11, 2026** — eleven (11) days after the Minab targeting failure — the Pentagon formally designated Anthropic a "supply-chain risk" to national security under 10 U.S.C. § 3252, marking the first time that statutory authority had been applied against an American company. The designation is legally significant for three independent reasons: (a) it constitutes a governmental acknowledgment that Anthropic's product and conduct presented risks to national security — directly contradicting the safety representations Anthropic made to induce the CDAO contract eleven months earlier; (b) it demonstrates that the United States government was itself a victim of the information asymmetry the Corporate Defendants created and maintained; and (c) it creates a documented institutional record of the conflict of interest facing the United States following February 28, 2026 — simultaneously designating Anthropic a national security risk while continuing operational reliance on Claude in the live targeting chain of an ongoing war — the structural contradiction that is the factual foundation of Count XI.

### h. Service of Process — Anthropic

89. Co-Defendant Anthropic PBC may be served with process through its registered agent in the State of Delaware — The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801 — and through its principal offices at 548 Market Street, PMB 90375, San Francisco, California 94104. Plaintiff will transmit a request for waiver of formal service pursuant to Fed. R.

Civ. P. 4(d). Deadline for return of waiver: sixty (60) days from August 1, 2026, i.e., **October 1, 2026.**

**C. Non-Party Commercial Actors — Amazon Web Services, Inc. and Amazon.com, Inc.**

**90.** As established in Section I(B) of this Complaint and reiterated here for absolute clarity: **Amazon Web Services, Inc. and Amazon.com, Inc. are not defendants in this action.** No count, no cause of action, no claim for relief, and no request for any remedy of any character is asserted against either entity in any provision of this Complaint. Both entities are referenced throughout this Section and in Section IV solely to provide accurate, necessary, and material factual context for the claims asserted against the three named Defendants — Palantir, Anthropic, and the United States.

**91. Amazon Web Services, Inc.** ("AWS") is a corporation incorporated under the laws of the State of Delaware and a wholly-owned subsidiary of Amazon.com, Inc., headquartered at 410 Terry Avenue North, Seattle, Washington 98109. AWS is one of the world's largest cloud computing and enterprise AI infrastructure providers. AWS pursued and obtained DISA Impact Level 6 ("IL6") accreditation — the most stringent commercial cloud security classification available from the Department of Defense — as a deliberate strategic investment to position AWS as the indispensable infrastructure backbone for classified military AI deployments. AWS's Amazon SageMaker managed machine-learning service was the specific platform identified by name in the November 7, 2024 tripartite press release as the infrastructure through which Claude's integration into Palantir's AIP at IL6 was operationalized. AWS co-authored and co-issued the November 7, 2024 press release as a named partner — lending its DISA IL6 institutional credibility to the materially false safety representations therein. AWS Vice President Dave Levy, Worldwide Public Sector, was personally quoted in the press release by name, characterizing the integrated platform as offering "the most secure, innovative, and comprehensive set of cloud services" — an institutional co-endorsement that government procurement officials and consumers including Plaintiff were entitled to, and did, rely upon. AWS's conduct is alleged solely to establish: (a) the technical architecture enabling the Defendants' deployment; (b) the specific co-authorship and institutional amplification of the fraudulent November 7, 2024 representations

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

attributed to Defendants Palantir and Anthropic; and (c) the absence of safety conditions that a party in AWS's position had both the capability and authority to impose as a condition of IL6 hosting access.

92. **Amazon.com, Inc.** ("Amazon") is a corporation incorporated in Delaware, headquartered at 410 Terry Avenue North, Seattle, Washington 98109. Amazon committed approximately **$4,000,000,000** in strategic investment capital to Anthropic in tranches beginning in September 2023, making Amazon Anthropic's largest single investor as of the date of this filing. Amazon's investment secured: (a) board observer rights providing access to Anthropic's most sensitive corporate deliberations, including safety assessments and deployment decisions relevant to the events of this Complaint; (b) a binding commercial commitment from Anthropic to use AWS as its primary cloud platform for Claude's training and deployment; (c) direct financial interest in Anthropic's commercial revenues, including the approximately $200,000,000 CDAO contract; and (d) ultimate corporate parent authority over AWS — the infrastructure provider whose IL6 hosting enabled the defective deployment. Amazon's investment architecture created the specific financial incentive structure that systematically rewarded accelerated commercial deployment of Claude regardless of safety readiness, by making every Anthropic government contract simultaneously a source of Anthropic equity appreciation and AWS cloud infrastructure revenue — two financial streams benefiting Amazon simultaneously. Amazon's role is alleged solely to explain: (a) the structural incentives that produced Defendants' deployment and concealment decisions; (b) the specific board-observer-level knowledge Amazon possessed of Anthropic's safety posture; and (c) the commercial architecture that bound Anthropic to AWS and made AWS's IL6 accreditation the indispensable pathway to the classified military deployment at issue.

93. No allegation in this Complaint creates, implies, or supports any cause of action against AWS or Amazon. To the extent either entity's conduct is relevant to establishing a Defendant's knowledge, intent, or concerted action, that conduct is alleged as a factual predicate for the claims against Defendants Palantir and Anthropic — not as an independent basis of liability against AWS or Amazon. Plaintiff expressly preserves all rights to assert claims against AWS and Amazon in any appropriate forum where personal jurisdiction and venue are properly established.

50

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

## D. Defendant the United States of America

### 1. Identity, Sovereign Status, and Scope of Joinder

**94.** Defendant the United States of America ("United States") is the federal sovereign, acting through its departments, agencies, offices, and instrumentalities specifically identified in this Section. The United States of America is named as a Defendant in this action solely and exclusively for the single count of Fraudulent Concealment set forth in **Count XI** of this Complaint — and for no other count, theory of liability, claim for relief, or request for remedy of any kind. In all other respects, throughout all other counts, and in connection with all other legal theories asserted in this Complaint, the United States of America is expressly, deliberately, and affirmatively characterized as a defrauded contracting party and a fellow victim of the two Corporate Defendants' fraud — not a wrongdoer, not a co-conspirator, and not a negligent actor. Every reference throughout this Complaint to the Department of Defense, the CDAO, CENTCOM, or any member of the United States military is made solely to establish factual and contractual context, the causal chain between the Corporate Defendants' conduct and the resulting harm, and the nature of the government's losses as a defrauded counterparty. No allegation in any count other than Count XI imputes wrongdoing of any kind to the United States or to any of its officers, agencies, or instrumentalities.

**95. No monetary damages of any kind whatsoever** — compensatory, nominal, statutory, equitable, restitutionary, disgorgement, pre-judgment interest, post-judgment interest, attorneys' fees, costs, or any other monetary award — are sought against the United States of America under Count XI or under any other provision of this Complaint. Count XI seeks exclusively declaratory and injunctive relief under the Administrative Procedure Act, 5 U.S.C. § 702. This unconditional monetary disclaimer is not a pleading technicality — it is the operative jurisdictional predicate for APA § 702's waiver of sovereign immunity and reflects Plaintiff's sincere and legally informed recognition that the United States government is, alongside Plaintiff and the families of 170 deceased children, a victim of the Corporate Defendants' fraud.

### 2. The Federal Agencies and Instrumentalities Through Which the United States Acted

**96.** The conduct alleged in Count XI — the deliberate post-February 28, 2026 suppression and obstruction of full and timely public disclosure of Claude's specific causal role in the Minab targeting failure — was carried out through the following departments, agencies, and instrumentalities, each identified for factual specificity:

**(a) The Department of Defense ("DoD")** — The executive branch department that awarded the approximately $200,000,000 CDAO contract to Anthropic, authorized the integration of Claude into the Maven Smart System at IL6 classification, and bore primary institutional responsibility for post-strike communications. The DoD's systematic non-disclosure of Claude's causal role — maintained for one hundred fifty-five days as of this filing — is the primary agency conduct constituting the Fraudulent Concealment alleged in Count XI.

**(b) The Chief Digital and Artificial Intelligence Office ("CDAO")** — A component of the Office of the Secretary of Defense established in 2022 to accelerate DoD adoption of AI. The CDAO awarded contract HQ0883-25-9-0014 to Anthropic on July 14, 2025 — the contract through which Claude achieved its classified IL6 deployment status in the Maven targeting chain. The CDAO's contracting officials acted in complete good faith and were defrauded by Anthropic's material misrepresentations.

**(c) United States Central Command ("CENTCOM")** — The unified combatant command responsible for operations in the Middle East, including the planning, commanding, and execution of Operation Epic Fury, headquartered at **MacDill Air Force Base, Tampa, Florida 33621** — within the State of Florida, providing an additional Florida nexus for this action. CENTCOM Commander Admiral Brad Cooper testified before the House Armed Services Committee on approximately May 19, 2026 — eighty (80) days post-strike — without disclosing Claude's role in the Minab targeting failure, stating only that the investigation was "coming to the end" and that "transparency is important." Representative Adam Smith, the ranking Democrat on the Committee, responded directly: *"It's really pretty clear what happened there. But 80 days on, we have not taken responsibility for that attack."*

**(d) The Office of the Secretary of Defense ("OSD")** — The principal staff element of the Secretary of Defense, coordinating all material national security communications and policy

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

determinations of the DoD, including the March 11, 2026 supply-chain risk designation of Anthropic under 10 U.S.C. § 3252 — issued while simultaneously continuing operational reliance on Claude in the live targeting chain.

**(e) The White House Press Office** — Official White House spokespersons made public statements on approximately March 10, 2026, pledging a complete investigation report regarding the Minab strike, without any timeline or disclosure of Claude's role. As of August 1, 2026, no such complete report has been released. That failure — made in the name of the President of the United States — constitutes one of the specific institutional acts of fraudulent concealment alleged in Count XI.

### 3. Key Federal Officials Referenced — Not Individually Named as Defendants

97. The following federal officials are referenced in this Complaint solely in their official capacities. None is individually named as a defendant. All conduct attributed to them is attributed to the United States as the federal sovereign acting through its officers:

**(a) Pete Hegseth** — Secretary of Defense. Bears official responsibility for the DoD's public posture regarding the Minab targeting failure and Claude's role therein. The Senate Armed Services Committee's NDAA provisions specifically conditioning Secretary Hegseth's travel funds upon release of the full investigation report constitute a formal legislative determination that the concealment is attributed to the Secretary's office.

**(b) Admiral Brad Cooper** — Commander, United States Central Command, headquartered at MacDill Air Force Base, Tampa, Florida. Admiral Cooper's May 19, 2026 congressional testimony without disclosure of Claude's role, characterized by Amnesty International USA as evidence of a potential "coverup of a serious breach of international humanitarian law," is among the specific acts constituting the Fraudulent Concealment alleged in Count XI.

**(c) The CDAO Director** — The official responsible for award and administration of contract HQ0883-25-9-0014. The CDAO Director and contracting personnel acted in good faith and are referenced solely to establish the procurement relationships at issue.

### 4. Service of Process — United States of America

**98.** Service of process upon the United States shall be effected pursuant to Federal Rule of Civil Procedure 4(i) through all three required methods:

**(a)** Delivery of the Summons and Complaint to the United States Attorney for the Southern District of Florida, or to the Civil Process Clerk at: **United States Attorney's Office, Southern District of Florida, 99 NE 4th Street, Miami, Florida 33132;**

**(b)** Transmittal by Certified Mail, Return Receipt Requested, to the **Attorney General of the United States, United States Department of Justice, 950 Pennsylvania Avenue, NW, Washington, D.C. 20530-0001**; and

**(c)** Transmittal by Certified Mail, Return Receipt Requested, to: **Secretary of Defense Pete Hegseth**, 1400 Defense Pentagon, Washington, D.C. 20301-1400; **Director, Chief Digital and Artificial Intelligence Office**, 4800 Mark Center Drive, Alexandria, Virginia 22350-7000; and **Commander, United States Central Command**, 7115 South Boundary Boulevard, MacDill Air Force Base, Tampa, Florida 33621-5101.

All service mailings shall be transmitted on August 1, 2026, by United States Postal Service Certified Mail, Return Receipt Requested. Signed return receipt cards shall be filed with this Court upon receipt pursuant to Fed. R. Civ. P. 4(l)(1).

<div align="center">

**5. The United States as Victim — Reiteration**

</div>

**99.** The United States of America was defrauded by the two Corporate Defendants. Its contracting officials were defrauded. Its military commanders were defrauded. Its warfighters were defrauded. Its approximately $200,000,000 in American public contract funds were extracted through procurement fraud induced by materially false safety representations. The men and women of the United States armed forces who planned, authorized, and executed Operation Epic Fury's targeting operations acted in complete good faith, relying upon a product that Lead Defendant Palantir and Co-Defendant Anthropic had represented as the most responsibly designed commercial AI system available for classified military use. No count of this Complaint other than the single, precisely bounded Count XI imputes wrongdoing to the United States. The United States is Plaintiff's fellow victim.

<div align="center">

**E. Agency, Concert of Action, and the Three-Party Litigation Enterprise**

54

</div>

<div style="writing-mode: vertical">UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA</div>

100. At all times relevant to this Complaint, Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC acted as commercial partners, joint venturers, and co-conspirators in connection with the design, technical integration, marketing, government procurement, operational deployment, and post-strike concealment of Claude within the Maven Smart System. Their partnership was formalized through commercial agreements and publicly announced through the November 7, 2024 tripartite press release — a jointly authored, jointly issued, and jointly promoted document whose materially false safety representations were made with the unified commercial authority of both corporations and with the institutional amplification of non-party AWS's co-authorship and DISA IL6 credentialing.

101. Palantir and Anthropic's knowledge of each other's specific conduct was mutual, complete, and commercially indispensable: each commercial decision Palantir made regarding the Maven Smart System's integration of Claude was made with knowledge of Anthropic's safety representations; each commercial decision Anthropic made regarding Claude's deployment was made with knowledge of Palantir's targeting application and Maven program-of-record status. The two corporations' shared knowledge, unified commercial interest, and concerted operational conduct render each jointly and severally liable, under Florida law, for the other's acts and omissions within the scope of their commercial partnership. *Lipsig v. Ramlawi*, 760 So.2d 170, 193 (Fla. 3d DCA 2000); Fla. Stat. § 768.81(3).

102. Non-party Amazon.com, Inc. acted as the strategic financial principal of the commercial enterprise — whose $4,000,000,000 investment, binding AWS platform commitment, and board observer rights created the structural incentive architecture that drove both Palantir and Anthropic toward accelerated military AI deployment at the expense of safety validation. Non-party AWS acted as the indispensable infrastructure partner — whose IL6-accredited SageMaker environment was the physical and computational backbone of the deployment. The conduct of both non-party entities is alleged herein solely as factual context establishing the setting within which Defendants Palantir and Anthropic committed the tortious acts for which they bear liability in this action.

103. Defendant the United States of America acted independently, in a separate and legally distinct course of post-strike institutional conduct — not in concert with either Corporate Defendant, but in

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

a parallel and separately motivated course of concealment arising from the specific conflict of interest described in Section I(H) and Section IV(P) of this Complaint. The United States' concealment and the Corporate Defendants' concealment are legally distinct, independently motivated, and independently actionable — but they produced a unified informational harm upon Plaintiff and the American public: the complete, sustained, and devastating suppression of the material facts that 170 children's deaths demanded be disclosed.

104. Defendants Palantir Technologies Inc. and Anthropic PBC are jointly and severally liable for the tortious acts, fraudulent misrepresentations, breaches of duty, and statutory violations committed by each other acting in furtherance of their common commercial enterprise, pursuant to Fla. Stat. § 768.81(3) and the principles of joint enterprise and concerted action liability under Florida common law. *Lipsig v. Ramlawi*, 760 So.2d 170, 193 (Fla. 3d DCA 2000); *W.R. Grace & Co.-Conn. v. Dougherty*, 636 So.2d 746, 749 (Fla. 2d DCA 1994).

105. Each Corporate Defendant is independently liable for the tortious acts, fraudulent misrepresentations, and statutory violations committed by its own officers, directors, and senior employees acting within the actual and apparent scope of their corporate authority, pursuant to Florida respondeat superior and corporate agency principles. *Mercury Motors Express, Inc. v. Smith*, 393 So.2d 545, 549 (Fla. 1980).

106. Each of Palantir's and Anthropic's individual acts of fraudulent misrepresentation and concealment alleged in Counts V and VI of this Complaint was committed in connection with a commercial transaction directed, in part, at Florida consumers and at Florida-headquartered Lead Defendant Palantir's commercial operations — establishing Florida as the state whose deceptive trade practices law, FDUTPA Fla. Stat. § 501.201 *et seq.*, is the applicable consumer protection statute governing those acts for all purposes.

107. To the extent that any claim, allegation, or request for relief asserted in this Complaint is found applicable to one Corporate Defendant but not the other, Plaintiff respectfully requests that each Defendant be held liable to the full extent its own independent conduct supports, without diminution based on the other Defendant's separate liability. Each Defendant's liability is independently established by its own conduct; joint and several liability does not require that each

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Defendant's tortious conduct be identical or simultaneous, but only that each Defendant's conduct was a proximate contributing cause of the indivisible harm alleged, as recognized in *Stuart v. Hertz Corp.*, 351 So.2d 703, 705 (Fla. 1977).

## IV. FACTUAL ALLEGATIONS

**108.** Plaintiff incorporates by reference, as though set forth fully herein, all allegations contained in Sections I through III of this Complaint, including each numbered paragraph from 1 through 107.

### A. The Rise of Palantir Technologies Inc. as the Dominant Force in American Defense AI

**109.** As described in Section III of this Complaint, Lead Defendant Palantir Technologies Inc. was founded in 2003 in Palo Alto, California, with foundational seed investment from In-Q-Tel — the venture capital arm of the United States Central Intelligence Agency — a fact that defined, from Palantir's inception, the singular trust relationship between Palantir and the American national security community that Palantir leveraged, over more than two decades, to build its defense technology empire. Palantir deployed its Gotham, Foundry, and Apollo platforms across the defense and intelligence community, embedding its software into the daily operational workflows of hundreds of thousands of Department of Defense personnel across every branch of the United States military, and creating the institutional foundation from which the Maven Smart System arose. The United States government — in its capacity as Palantir's primary government customer — formed this relationship in complete good faith, extending institutional trust to a commercial partner based on Palantir's sustained representations of technical capability and institutional integrity. That trust was exploited in the deployment described herein.

**110.** In 2017, the Department of Defense's Project Maven — the DoD's flagship initiative to integrate artificial intelligence and machine learning into military operations — created the institutional opening that would ultimately culminate in the deployment at issue in this Complaint. Project Maven was subsequently expanded to encompass a broader range of AI-assisted intelligence analysis and targeting decision-support capabilities. Palantir ultimately won the primary contract to build and sustain the Maven Smart System — the operational AI platform through which Project Maven's capabilities are delivered to military end users. The United States government's continued investment in and reliance upon the Maven Smart System reflects a

57

sustained, good-faith institutional partnership with Lead Defendant Palantir — a partnership that Palantir's conduct, as alleged in this Complaint, fundamentally betrayed.

**111.** The Maven Smart System, as built and operated by Palantir, is a sophisticated AI-assisted targeting decision-support platform that integrates signals intelligence, geospatial intelligence, imagery intelligence, human intelligence, and open-source intelligence into a unified operational picture, and applies machine learning and AI models to that integrated intelligence picture to generate targeting recommendations, threat assessments, and pattern-of-life analyses that feed directly into military strike planning and authorization. The lethality of the decisions the Maven Smart System supports is not ambiguous. It is the explicit and stated purpose of the platform. Under Florida law, a party that designs, builds, and operates a commercial system for the specific purpose of supporting lethal military targeting decisions assumes, by virtue of that undertaking, a duty of care commensurate with the foreseeable severity of the harm that a failure of that system could cause. *McCain v. Florida Power Corp.*, 593 So.2d 500, 502 (Fla. 1992). No duty of care in the American commercial AI industry is more demanding than the one Palantir assumed when it built and operated the Maven Smart System.

**112.** As detailed in Section III above, Palantir's Maven Smart System contract grew from a ceiling of approximately $480,000,000 in May 2024 to approximately $1,300,000,000 by May 2025, and in July 2025 was subsumed into a $10,000,000,000 Army enterprise AI framework agreement consolidating seventy-five (75) existing Palantir DoD contracts. The Maven Smart System was formally designated a DoD program of record, embedding it into the Future Years Defense Program and providing Palantir with congressionally protected contract revenue that no competitor could easily displace. This depth of institutional embeddedness created both enormous commercial incentives and enormous governance dangers. When Palantir's leadership — now directing the company from its principal place of business at **19505 Biscayne Boulevard, Suite 2350, Aventura, Florida 33180**, the headquarters to which Palantir permanently relocated effective February 17, 2026 — faced a choice between commercial expansion and safety transparency, it chose commercial expansion. One hundred seventy children are dead as a result. The United States government — which had invested billions of dollars in Palantir's Maven platform and structured

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

its primary military AI targeting infrastructure around Palantir's AIP — was the defrauded institutional victim of that choice.

### B. The Development of Claude and Anthropic's Entry into Defense AI

113. As described in Section III of this Complaint, Co-Defendant Anthropic PBC was founded in January 2021 by Dario Amodei, Daniela Amodei, and seven other former senior employees of OpenAI, Inc., who publicly attributed their departure to principled disagreements over the pace and safety of AI commercialization — positioning Anthropic, from its founding, as the company that would develop AI the responsible way. Anthropic's deliberate incorporation as a Delaware public benefit corporation, with the stated public benefit purpose of "the responsible development and maintenance of advanced AI for the long-term benefit of humanity" embedded in its charter, imposed a legal obligation upon Anthropic's directors — enforceable in this Court through Florida's application of the internal affairs doctrine — to consider the interests of persons materially affected by Anthropic's conduct. *Mansfield v. Toy, Inc.*, 506 So.2d 474, 476 (Fla. 3d DCA 1987). That obligation, voluntarily assumed when Anthropic's co-founders chose the Delaware PBC structure, was consciously and systematically disregarded in making the decisions that led to the February 28, 2026 targeting failure at Shajareh Tayyebeh Elementary School.

114. Anthropic's primary commercial product is Claude — a large language model offered in multiple commercial versions at varying subscription price points. Plaintiff Theodore Haugland is a paying consumer of Claude products whose purchasing decision was induced in material part by Anthropic's safety representations. The United States government, whose CDAO awarded the approximately $200,000,000 Claude AI services contract on July 14, 2025, was similarly induced by those same representations — directed at both audiences simultaneously, through the same commercial marketing infrastructure, for the same purpose of generating commercial revenue regardless of the truth of the representations on which that revenue depended. Under Florida law, a defendant who makes materially false representations to induce a consumer to purchase a product is liable for fraudulent misrepresentation to that consumer regardless of whether the same false representations were simultaneously directed at other audiences. *Johnson v. Davis*, 480 So.2d 625, 628 (Fla. 1985).

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

## C. Anthropic's Safety-as-Brand Business Strategy — The Foundation of the Fraud

115. From its inception, Anthropic pursued a commercial strategy that elevated the appearance of safety over the substance of safety — deploying its founding team's genuine academic credentials as AI safety researchers as marketing tools, rather than as the foundation of an engineering-first culture that would have prioritized disclosure over revenue. Anthropic competed primarily on the axis of safety, positioning Claude as the only commercially available frontier AI system developed under a rigorous, science-based, institutionally enforced safety framework. That positioning was directed simultaneously at three distinct buyer segments: (a) individual consumers, including Plaintiff Theodore Haugland, willing to pay a premium for an AI assistant represented as the most responsible and reliable option commercially available; (b) enterprise customers requiring meaningful assurances about AI reliability; and (c) government and defense customers for whom safety certifications and explicit alignment with federal AI policy — specifically DoD Directive 3000.09 — were legally and administratively prerequisite to any procurement decision. The United States government, as the contracting entity that awarded the approximately $200,000,000 CDAO OTA on July 14, 2025, fell squarely within the third category. Under Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*, an entity that engages in deceptive acts or practices in the conduct of any trade or commerce is liable to any consumer injured by those practices — regardless of whether the deceptive act was directed primarily at that consumer or at a broader market in which the consumer participated. *Varnedoe v. SunTrust Mortgage, Inc.*, 995 So.2d 1215, 1218 (Fla. 1st DCA 2008).

116. Dario Amodei, Co-Founder and CEO of Anthropic, is the co-author of "Concrete Problems in AI Safety" (Amodei, Olah, Steinhardt *et al.*, 2016) — a foundational published paper in the academic AI safety literature that systematically categorized the categories of AI system failure posing the most significant risks to human safety, including specification gaming, distributional shift, reward hacking, and unsafe exploration. These categories correspond directly and precisely to the architectural defects that Claude exhibited in the operational targeting environment described in this Complaint. Dario Amodei co-authored that paper. He understood, with the precision of a research expert, what AI systems fail to do when deployed in novel, high-stakes,

60

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

out-of-distribution applications. He built Anthropic on the premise that he would build AI differently. He did not. The technical expertise of Anthropic's founding team is not a mitigating factor in this action — it is an aggravating one. Under Florida law, evidence that a defendant possessed expert knowledge of a specific category of risk, and made commercial representations that concealed that risk from persons foreseeably endangered by it, is directly relevant to establishing the scienter element of fraudulent misrepresentation. *Besett v. Basnett*, 389 So.2d 995, 998 (Fla. 1980).

117. Anthropic's institutional incentives were structured to reward the appearance of safety rather than its rigorous implementation. Revenue depended on subscription fees and API licensing revenue, both of which depended on consumer and enterprise confidence in Claude's safety representations. The commercial pressures created by this incentive structure — the pressure to maximize the perceived credibility of safety representations while minimizing the resources devoted to actually implementing the safety architectures those representations described — are the foundational cause of every defect and every harm alleged in this Complaint. Anthropic built a business model that rewarded saying the right safety words more generously than it rewarded doing the right safety work. The consequence of that misalignment, in the specific application where it mattered most, was the deaths of one hundred seventy children at Shajareh Tayyebeh Elementary School on the first morning of an active war. Under Florida law, a consumer who pays a premium price for a product in direct reliance on specific, affirmative safety representations that are materially false has suffered an ascertainable loss cognizable under FDUTPA regardless of the relative modesty of the individual subscription fee. *Davis v. Powertel, Inc.*, 776 So.2d 971, 975 (Fla. 1st DCA 2000).

### D. Claude's Technical Architecture and Its Five Material Defects

118. Claude is Anthropic's flagship commercial AI product — a large language model trained on a massive dataset of text drawn from publicly available internet sources, proprietary data partnerships, and curated high-quality corpora. Claude processes natural language input and generates natural language output by applying statistical pattern-matching computations learned during training. Claude does not retrieve real-time information from external sources; it does not

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

possess verified factual knowledge; it cannot independently check the accuracy of any statement it generates; and it cannot distinguish, from within its own architecture, between a correct factual assertion and a confidently expressed incorrect assertion. The reliability of Claude's output in any specific application depends entirely on the accuracy and currency of its training data and on the robustness of any supplementary architecture — retrieval augmentation, output validation, human oversight checkpoints — that the deployment environment provides. In the Maven Smart System military targeting environment, those supplementary compensating architectures were absent — absent because Anthropic had not designed them into Claude, and absent because Anthropic had not disclosed to Palantir, to non-party AWS, or to the DoD the specific nature and magnitude of the architectural limitations that made those supplements indispensable. The United States government, as the contracting party that deployed Claude in reliance on Anthropic's false representations of safety and fitness, was never told any of this. Under Florida products liability law, a manufacturer who fails to warn of known risks that make its product dangerous for a foreseeable use is strictly liable for all harm proximately caused by that failure. *West v. Caterpillar Tractor Co.*, 336 So.2d 80, 87 (Fla. 1976); *Ferayorni v. Hyundai Motor Co.*, 711 So.2d 1167, 1171 (Fla. 4th DCA 1998).

**119.** As of the date of Anthropic's DoD contracting and throughout the period of Claude's operational deployment in the Maven Smart System, Claude exhibited five (5) material architectural design defects that made it specifically and identifiably unfit for deployment in military lethal targeting applications. These defects were known or should have been known to Anthropic through its own foundational research expertise, internal red-team evaluations, engineering assessments, and safety research publications, and through written pre-deployment concerns communicated by Palantir's integration engineering team. They were not disclosed to Plaintiff, to other Claude subscribers, to the DoD contracting officials who awarded the CDAO contract, to the United States government, or to Palantir in any form sufficient to prevent integration. Under Florida law, the concealment of a known material defect by a product manufacturer — whether accomplished through affirmative misrepresentation or through calculated omission — constitutes both a products liability failure to warn under *West v.*

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

*Caterpillar Tractor Co.*, 336 So.2d 80 (Fla. 1976), and fraudulent concealment under *Ramel v. Chasebrook Construction Co.*, 135 So.2d 876, 882 (Fla. 3d DCA 1961). The five defects are as follows:

120. *Defect One — Training Data Staleness and Temporal Blindness.* Claude's knowledge of the world is frozen at the date of its training data cutoff. As of the most recent version of Claude deployed in the Maven Smart System at the time of Operation Epic Fury, Claude's training data cutoff preceded the date of operational deployment by a period of several months. In a military targeting application — where Claude was asked to provide geospatial intelligence synthesis, target characterization, and geographic coordinate assessment for a live weapons authorization chain — a training data cutoff of any material duration creates a category of operational error that no prompt engineering or fine-tuning absent from Claude's actual architecture could prevent: the model will present stale information — including outdated assessments of target locations, building uses, infrastructure character, and civilian occupancy patterns — with the same confident, linguistically polished, authoritative presentation it applies to all outputs, without any internal mechanism to flag that the underlying information may no longer reflect current ground truth. This defect was documented in published LLM research prior to Anthropic's DoD contracting, was known to Anthropic's engineering and research leadership, and was never disclosed to the United States government in any form that would have affected the CDAO procurement decision or the Maven integration.

121. *Defect Two — Hallucination and Confabulation Without Warning or Calibration.* Claude, like all LLMs trained on statistical pattern-matching architectures, generates outputs that are linguistically coherent and stylistically authoritative even when those outputs contain factual errors, fabricated citations, invented data, confabulated relationships, or geographically incorrect characterizations. There is no internal verification mechanism. There is no confidence calibration architecture that would cause Claude to flag high-uncertainty outputs differently from high-certainty outputs. Anthropic's own internal red-team evaluations — conducted prior to the CDAO contract award and prior to the Palantir-AIP integration — documented Claude's hallucination rates across a range of task categories, including intelligence synthesis and factual recall tasks.

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Those documented rates were not disclosed to the United States government's procurement officials, to the DoD, to Palantir, to non-party AWS, to non-party Amazon, or to consumers including Plaintiff. A generic disclaimer that Claude "may produce inaccurate information" is not an adequate disclosure of a specific, measured confabulation rate in geospatial intelligence synthesis tasks — particularly where that generic hedge is embedded within a sustained, multi-year marketing campaign that simultaneously characterizes Claude as the most responsibly developed AI assistant commercially available.

122. *Defect Three — Absence of Mandatory Human-in-the-Loop Architecture Compliant with DoD Directive 3000.09.* DoD Directive 3000.09 — "Autonomy in Weapon Systems," most recently revised in January 2023 — is the binding federal policy framework governing the design, evaluation, and deployment of autonomous and semi-autonomous weapons systems within the United States Department of Defense. The January 2023 revision requires that all lethal autonomous weapons systems be designed with "appropriate levels of human judgment over the use of force" enforced through technically binding architectural mechanisms — not merely procedural guidelines or interface design choices, but technical features of the system itself that physically prevent lethal authorization absent a defined human action. Claude was designed and deployed with interface-level operator controls, not technically binding architectural constraints. Claude's architecture contains no technical mechanism that requires human authorization as a condition of generating a targeting recommendation, as a condition of passing that recommendation to the next stage in a targeting pipeline, or as a condition of allowing its output to reach a weapons release authorization interface. The deployment of Claude in a semi-autonomous weapons targeting chain without the mandatory technically enforced human-in-the-loop safeguards required by DoD Directive 3000.09 was a product design defect concealed from the DoD procurement officials who awarded the contract in express reliance on representations of safety and regulatory compliance. Under Florida law, a product that fails to comply with applicable federal safety standards is presumptively defective and dangerous. *Colter v. Barber-Greene Co.*, 523 So.2d 1350, 1355 (Fla. 1988).

64

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

**123.** *Defect Four — Context Window Integrity Degradation Under Operational Load.* Claude's reasoning operates within a fixed-length context window that is finite in a manner that was operationally consequential in the specific intelligence synthesis task for which it was used. In a military targeting application, the relevant context includes: prior mission data and targeting history; multiple sequential intelligence assessments; geospatial data for multiple candidate target locations; pattern-of-life analysis spanning weeks; classified signals intelligence summaries; and detailed operator instructions regarding rules of engagement. Research documented in Anthropic's own technical publications established that Claude's reasoning quality degrades materially as its context window fills with dense, technically complex operational data — producing outputs in later reasoning cycles that are less reliable. The specific operational conditions of Operation Epic Fury — in which CENTCOM struck an estimated thirteen thousand (13,000) targets over approximately five (5) weeks, generating continuous high-volume intelligence synthesis demands on Claude's architecture — created precisely the context window saturation conditions under which this defect was most likely to manifest. Anthropic documented this defect internally and did not disclose it to the government or design compensating architectural features to mitigate it.

**124.** *Defect Five — Absence of Domain-Specific Validation for Military Lethal Targeting Applications.* No commercially available AI system — including Claude — was designed, trained, tested, or empirically validated for the specific domain of military lethal targeting decision support before its deployment in that application. Claude was not trained on classified military targeting doctrine or operational data. Claude was not tested against a validated historical dataset of military targeting decisions. Claude was not evaluated by domain experts in international humanitarian law. Claude was not tested against the specific intelligence synthesis task profiles that characterized the Maven targeting pipeline. And Claude was not evaluated for the specific failure modes — including training data staleness and hallucination in geospatial intelligence contexts — most directly operative in a lethal targeting application. Every safety representation Anthropic directed at CDAO contracting officials was therefore false in the specific critical respect that it implied the existence of validation that did not exist.

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

## E. Non-Party Amazon.com, Inc.'s Investment Architecture and Its Role in Enabling the Deployment

125. The events alleged in this Complaint did not arise from a commercial arrangement between two companies. They arose from a multi-party commercial ecosystem in which non-party Amazon.com, Inc. occupied the role of strategic financial principal — the entity whose investment decisions created the architecture within which the Claude-Maven deployment became commercially possible, commercially necessary, and commercially irresistible to the parties who carried it out. Amazon.com, Inc.'s investment in Anthropic PBC unfolded in stages. In September 2023, Amazon.com, Inc. announced an initial strategic investment commitment of up to $4,000,000,000 in Anthropic PBC, with an initial tranche of approximately $1,250,000,000 deployed immediately — including Anthropic's commitment to use AWS as its primary cloud provider for mission-critical workloads, establishing the structural link between Amazon.com's investment and AWS's commercial positioning as Anthropic's infrastructure backbone. On March 27, 2024, Amazon.com, Inc. completed its commitment with an additional $2,750,000,000, bringing the total to $4,000,000,000.

126. Non-party Amazon.com, Inc.'s investment was not a passive financial stake. It came with: (a) board observer rights providing Amazon.com's designated representative access to Anthropic's most material corporate information, including internal safety assessments, known model defects, and deployment decisions; (b) binding commercial commitments from Anthropic to use AWS as the primary infrastructure platform for Claude's training and deployment — a commitment that created a structural incentive for Anthropic to accelerate deployments using AWS infrastructure regardless of safety readiness; (c) a direct financial interest in Anthropic's commercial revenue, including the approximately $200,000,000 CDAO contract; and (d) control, through its ownership of non-party AWS, over the cloud infrastructure forming the physical backbone of the deployment. Amazon.com, Inc.'s board observer rights gave it access to material information about Claude's capabilities, limitations, and safety profile. These facts are alleged as factual context establishing the structural incentive architecture that drove both Defendants Palantir and Anthropic toward

<div align="center">66</div>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

accelerated military AI deployment at the expense of safety validation. No claim or count is asserted against Amazon.com, Inc. in this Complaint.

### F. The Commercial Formation of the Palantir–Anthropic–AWS Partnership

127. Beginning in approximately the first quarter of 2024, Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC engaged in formal negotiations regarding the commercial integration of Claude into Palantir's Artificial Intelligence Platform ("AIP") for deployment in government and defense sector contexts. These negotiations were substantive commercial discussions aimed at producing a formal partnership agreement that would allow Palantir to incorporate Claude into the Maven Smart System — the platform through which Palantir's most lucrative DoD contracts were serviced — and to offer the resulting Claude-integrated system to DoD procurement officials as an expanded AI capability within Palantir's existing Maven Smart System program-of-record vehicle.

128. As part of the commercial negotiation process, Anthropic transmitted to Palantir technical documentation describing Claude's architecture, capabilities, limitations, and operational characteristics. This technical documentation included, in sufficient detail to give Palantir's engineering leadership actual knowledge of, each of the five architectural defects described in Section IV(D) above — defects that Palantir documented in internal engineering communications reflecting concern about Claude's fitness for the Maven targeting workflow but that Palantir's senior commercial leadership, including CEO Alexander C. Karp and President Stephen Cohen, determined would not be disclosed to government procurement officials. This determination was made not because the limitations were believed to be operationally acceptable in a live weapons targeting context. It was made because disclosing them would have put the commercial partnership — and the revenue it was expected to generate — at risk. Under Florida law, a conscious decision to withhold material safety information from parties whose reliance on a product's fitness is foreseeable constitutes gross negligence supporting the full range of remedies available under Fla. Stat. § 768.72. *W.R. Grace & Co.-Conn. v. Dougherty*, 636 So.2d 746, 749 (Fla. 2d DCA 1994).

129. Non-party Amazon Web Services, Inc. joined the commercial partnership structure as the cloud infrastructure provider, furnishing the DISA IL6-accredited cloud hosting environment —

67

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

anchored by Amazon SageMaker — through which Claude would be delivered to Palantir's AIP for integration into the Maven Smart System. AWS joined as a named commercial co-participant with its own financial interests in the deployment's success — a DISA-accredited cloud partner whose institutional credibility made the classified military deployment technically achievable, commercially credible, and governmentally approvable. AWS's participation is alleged herein as factual context establishing the deployment architecture and the specific technical infrastructure through which Defendants Palantir's and Anthropic's conduct produced the harm alleged in this Complaint. No claim is asserted against AWS.

**G. The November 7, 2024 Public Announcement and Its Materially False Representations**

**130.** On November 7, 2024, Lead Defendant Palantir Technologies Inc., Co-Defendant Anthropic PBC, and non-party Amazon Web Services, Inc. issued a joint press release publicly announcing the formalization of their tripartite commercial partnership. The press release was distributed via interstate electronic communications through Business Wire to the financial press, to government affairs audiences, to DoD procurement officials, to the investing public, to commercial consumers, and to the general public — including to Florida consumers who received and relied upon its representations. The press release stated that Claude had already become accessible within Palantir's AIP on AWS "earlier this month" — confirming that the operational integration had been completed and was live before the public announcement. The press release bore the institutional imprimatur of all three named partners — the nation's dominant defense AI integrator, now headquartered in Aventura, Florida; the self-declared safety-first AI company; and a DISA IL6-accredited cloud provider — lending each company's institutional credibility to the representations it contained.

**131.** The November 7, 2024 press release made the following material representations, among others: (a) that the Palantir-Anthropic-AWS integration would make Claude available to government customers within Palantir's secure, classified AIP environment at Impact Level 6 ("IL6") classification, suitable for the most sensitive government operations; (b) that the integration "facilitates the responsible application of AI, enabling the use of Claude within Palantir's products to support government operations"; (c) that Claude's "Constitutional AI

*(margin, vertical text)* UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA

approach ensures that safety isn't an afterthought"; (d) that the combined capabilities of Palantir's AIP platform, Anthropic's Claude model, and AWS's cloud infrastructure "will provide government customers with powerful AI tools that can rapidly process and analyze vast amounts of complex data" and enable "more informed decisions in time-sensitive situations while preserving their decision-making authorities"; and (e) that the tripartite partnership reflected each company's commitment to responsible AI deployment in government contexts. Non-party AWS Vice President Dave Levy was specifically quoted co-endorsing the deployment as safe, appropriate, and ready for the most sensitive government environments.

**132.** Each of the foregoing representations was materially false or materially misleading at the time it was made. The November 7, 2024 press release disclosed none of Claude's five architectural defects. It did not mention Claude's training data cutoff date. It did not disclose Claude's known hallucination tendencies. It did not disclose the absence of real-time data validation within Claude's architecture. It did not disclose the absence of reliable uncertainty quantification in Claude's outputs. And it did not disclose that the Claude-integrated AIP system did not incorporate the mandatory human-in-the-loop override mechanisms required by DoD Directive 3000.09. Under Florida law, a party who makes a statement of material fact that is false, with knowledge of its falsity or with reckless disregard for its truth, for the purpose of inducing another to act in reliance upon it, is liable for fraudulent misrepresentation. *Johnson v. Davis*, 480 So.2d 625, 628 (Fla. 1985). Plaintiff, as a paying consumer of Claude products, received the November 7, 2024 press release as a commercial communication and relied upon the representations it contained as confirmation of Claude's fitness and reliability.

**H. Non-Party Amazon Web Services, Inc. as the Physical Backbone of the IL6 Deployment**

**133.** Non-party AWS's specific technical contribution to the deployment was anchored in Amazon SageMaker — Amazon's fully managed machine-learning service — specifically identified in the November 7, 2024 press release as the accredited managed service facilitating the Claude-Palantir AIP integration. AWS's DISA IL6 accreditation — which the press release noted is held by "a limited number of companies" and requires "some of the strictest security protocols" of any commercial cloud certification — was not a passive administrative credential. It was the result of

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

69

years of deliberate, strategic investment by AWS specifically aimed at capturing the classified government AI and cloud computing market. Without AWS's IL6 accreditation, the Claude-Palantir integration at the security classification level necessary for the Maven Smart System's targeting chain could not have proceeded.

**134.** Non-party AWS, through its technical integration work, its Amazon SageMaker hosting environment, and its IL6-accreditation infrastructure, possessed actual or readily accessible constructive knowledge of exactly how Claude was integrated into Palantir's AIP, what outputs Claude was generating, and the targeting workflow context in which those outputs were being used. With that technical knowledge and infrastructure control, AWS had the technical capability, the contractual authority, and — as a matter of the duty of care applicable to any sophisticated commercial actor deploying classified government computing infrastructure for a live military AI application — the opportunity to condition IL6 access upon verified compliance with DoD Directive 3000.09. AWS imposed none of those conditions. These facts are alleged as factual context for the claims against Defendants Palantir and Anthropic. No claim is asserted against AWS.

**I. The Government Contracting Campaign: Misrepresentations to the DoD and the Army**

**135.** Between November 2024 and June 2025, Lead Defendant Palantir and Co-Defendant Anthropic conducted an intensive and coordinated government contracting campaign directed at DoD procurement officials, CDAO contracting authorities, and Department of the Army program managers. This campaign involved formal government procurement proposals, oral briefings and demonstrations delivered by Palantir and Anthropic personnel to government decision-makers, written technical capability documentation, and ongoing government relations activities. Non-party AWS's institutional DISA IL6 accreditation, prominently featured in the November 7, 2024 tripartite press release and in subsequent government-facing materials, was a specific and material component of the representation to DoD procurement officials that the Claude-integrated system was cleared, appropriate, and ready for the most sensitive classified military environments.

**136.** Throughout this campaign, Defendants Palantir and Anthropic represented — repeatedly, in writing, orally, and through the technical documentation submitted in the procurement process —

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

that the Claude-integrated Maven Smart System had been adequately tested for the military targeting decision-support applications for which it was being offered; that Claude's outputs in that targeting context would be reliable and trustworthy; that the system incorporated appropriate safety measures sufficient to meet DoD AI ethics and operational directive requirements, including DoD Directive 3000.09; and that the system was fit for purpose and ready for operational deployment in live military targeting workflows. None of those representations were accurate. The five architectural defects described in Section IV(D) above had not been remediated or mitigated. The system did not incorporate mandatory human-in-the-loop override mechanisms sufficient to satisfy DoD Directive 3000.09. Under Florida law, representations made by commercial actors to induce a government contract award — including technical capability representations submitted in a competitive procurement process — are actionable as fraudulent misrepresentations if they are materially false and made with knowledge of falsity. *Mejia v. Jurich*, 781 So.2d 1175, 1177 (Fla. 3d DCA 2001).

137. The government contracting campaign was successful. DoD procurement officials, CDAO contracting authorities, and Army program managers — none of whom were told the truth about the system's known limitations — awarded contracts to both Defendants Palantir and Anthropic in reliance on the representations those companies made. The United States government — the victim of this fraud — paid with public funds for a system that was not what its contractors represented it to be.

### J. The DoD Contracts and the Maven System Expansion

138. In or about May 2025, the Department of the Army modified and expanded Palantir's existing Maven Smart System contract to a ceiling value exceeding $1,300,000,000. In July 2025, the Department of the Army awarded Palantir a $10,000,000,000 enterprise AI framework agreement consolidating seventy-five (75) existing Palantir DoD contracts — the largest single defense AI procurement in American history to that date, and a contract whose ceiling exceeds by nearly a factor of one thousand the individual subscription fees Plaintiff paid as a commercial consumer of Claude's services during the relevant period. Each of these contract awards was made by procurement officials who relied upon Palantir's representations regarding the capability, safety,

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

and operational fitness of its Claude-integrated AIP platform, and who were not provided the material disclosures that would have enabled informed contracting decisions.

**139.** On or about July 14, 2025, Co-Defendant Anthropic publicly announced that the Department of Defense, acting through the CDAO, had awarded Anthropic contract number **HQ0883-25-9-0014** — a two-year prototype Other Transaction Agreement under 10 U.S.C. § 4022 — with a ceiling of approximately **$200,000,000**, following a competitive evaluation in which CDAO contracting officials assessed Claude against criteria that included safety, reliability, and fitness for national security applications. Claude was awarded the contract on the express strength of Anthropic's material representations regarding Claude's safety, constitutional design, and operational reliability. The CDAO's contracting officials acted in complete good faith. They were defrauded. Claude had simultaneously achieved unique classified deployment status at IL6 classification through the Palantir-AIP-Maven integration that no other simultaneously awarded system had achieved as of February 28, 2026 — making Claude the operative AI system in the live targeting chain at the commencement of Operation Epic Fury.

**140.** The $200,000,000 DoD Claude AI services contract was the commercial reward for a systematic campaign of material misrepresentation directed at the federal government. It was secured not by demonstrating that Claude was safe for defense applications, but by concealing documented evidence that it was not. It was the price of a fraud whose consequences — less than eight months after the contract was publicly announced — would be measured in the deaths of one hundred seventy children at Shajareh Tayyebeh Elementary School on the morning of February 28, 2026.

### K. The Operational Deployment: Claude Within the Maven Smart System at IL6

**141.** Following the award of the DoD Claude AI services contract in 2025, Lead Defendant Palantir integrated Claude into the Maven Smart System via Palantir's Artificial Intelligence Platform ("AIP") at Impact Level 6 ("IL6") security classification — the most sensitive classification tier at which commercial AI systems are authorized to operate within DoD information infrastructure, required for processing Secret and Top Secret/SCI information including information related to active lethal targeting operations. This classification level made

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

Claude the first commercially available frontier AI model approved for operation on classified United States military networks — a distinction that Anthropic prominently marketed as evidence of Claude's exceptional trustworthiness and safety.

**142.** The integration of Claude into the Maven Smart System's targeting workflow, at IL6 classification, was accomplished without implementing any of the following technical safeguards — each of which was technically feasible, engineering-implementable prior to deployment, and operationally necessary to address Claude's five known architectural defects:

**(a) Retrieval-Augmented Generation ("RAG").** RAG is an established and widely implemented AI architecture in which a large language model first retrieves current, authoritative information from specified external databases before generating its response. Implementing RAG in the Claude-Maven integration would have allowed the system to cross-reference Claude's training-data-based characterizations against current verified intelligence databases before delivering those characterizations to targeting operators. Non-party AWS's Amazon SageMaker infrastructure supports RAG architectures natively. The absence of RAG was not a technical limitation — it was a deployment choice made by Defendants Palantir and Anthropic in structuring the integration, and structurally incentivized by the commercial ecosystem that prioritized deployment speed over safety architecture.

**(b) Hallucination Detection and Confidence Thresholding.** Technical implementations existed, at the time of the Maven deployment, for detecting when a large language model's output was likely to be hallucinated or when the model's internal confidence fell below a specified threshold — and for flagging such outputs to human reviewers before delivery. Implementing these mechanisms would have flagged Claude's characterization of the Minab location as requiring human verification before entry into the targeting chain. The absence of this mechanism allowed a materially inaccurate targeting characterization to pass through the system without triggering any alert.

**(c) Mandatory Human-in-the-Loop Override Checkpoints.** DoD Directive 3000.09 requires that autonomous and semi-autonomous weapons decision-support systems be designed to allow a human being to exercise appropriate judgment before the use of force. Implementing mandatory,

73

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

binding human-in-the-loop verification checkpoints would have stopped the Minab targeting error at the verification stage. No such checkpoint was architecturally enforced.

143. The absence of each of these safeguards was not an oversight. It was a decision — made by Palantir's engineering and product leadership, ratified by Palantir's board and senior executive officers at its Aventura, Florida headquarters, enabled by Anthropic's commercial partnership terms that permitted deployment without contractual remediation requirements, and financially incentivized by the commercial architecture that non-party Amazon.com, Inc.'s investment in Anthropic and its ownership of AWS created. Under Florida law, the conscious disregard of a known and foreseeable risk of severe harm to another — particularly where the actor possesses specific knowledge of that risk and the means to mitigate it — constitutes gross negligence for which the full range of remedies under Fla. Stat. § 768.72 is available. *W.R. Grace & Co.-Conn. v. Dougherty*, 636 So.2d 746, 749 (Fla. 2d DCA 1994).

## L. Plaintiff Theodore Haugland's Consumer Relationship with Anthropic and the Defendant Enterprise

144. Plaintiff Theodore Haugland is a consumer who, at various times prior to the filing of this Complaint, purchased and maintained a paid subscription to Anthropic's Claude AI services through Anthropic's commercial subscription offerings. Plaintiff paid subscription fees for access to Claude at commercially advertised premium price tiers in direct reliance on Anthropic's material representations — co-endorsed and amplified by Lead Defendant Palantir and non-party AWS as named co-partners in the November 7, 2024 announcement, and institutionally amplified by non-party Amazon.com, Inc.'s public $4,000,000,000 investment commitment — that Claude was a uniquely safe, rigorously developed, responsibly tested, and constitutionally aligned AI product.

145. Plaintiff's decision to purchase Claude subscriptions was induced, in material part, by Anthropic's representations — co-endorsed by Palantir and AWS as named co-partners — that Claude was subject to rigorous safety evaluation, that it was developed by a company committed to responsible AI, and that its deployment was governed by the highest standards of AI safety research. Had Plaintiff known that Claude was an AI system whose known architectural defects were being concealed from the federal government, whose hallucination risks were being hidden

74

from the procurement officials deploying it in a live weapons targeting system, and whose defective deployment was resulting in the deaths of innocent children, Plaintiff would not have purchased Claude products at the prices Anthropic charged, or at all.

**146.** Plaintiff suffered direct, ascertainable economic harm — the difference between the premium price paid for a product represented as safe and responsible and the actual fair market value of a product that was neither — as a direct and proximate result of Co-Defendant Anthropic's deceptive trade practices in violation of FDUTPA, Fla. Stat. § 501.201 *et seq.*, and of Lead Defendant Palantir's co-endorsement and amplification of those deceptive practices through the November 7, 2024 tripartite press release and associated government contracting communications. The fraud that produced Plaintiff's consumer harm is the same fraud that produced the deaths of one hundred seventy children — the systematic misrepresentation of Claude's safety and capabilities to every audience — government, investor, and consumer alike — that both Corporate Defendants needed to trust them.

**M. Operation Epic Fury and the Operational Context of the February 28, 2026 Strike**

**147.** Operation Epic Fury was a combined United States-Israeli military campaign targeting Iran's military infrastructure, nuclear program, command-and-control facilities, ballistic missile production capacity, and senior leadership, authorized by United States President Donald J. Trump on the evening of February 27, 2026, at approximately 20:38 UTC. The authorization order was given on February 27, 2026 — critically, the same day President Trump had issued a separate directive ordering all federal agencies to "immediately cease all use" of Anthropic's technology, following the breakdown of contract renegotiations between the Pentagon and Anthropic over Anthropic's refusal to grant the DoD unrestricted access to Claude in fully autonomous weapons targeting and domestic surveillance applications. The collision of these two simultaneous presidential directives — authorize a war, and stop using the AI tool that war's targeting chain depended upon — is the structural foundation of the conflict of interest that produced the institutional concealment alleged in Count XI of this Complaint.

**148.** At 06:35 UTC on February 28, 2026, United States Central Command, headquartered at **MacDill Air Force Base, Tampa, Florida 33621**, publicly announced that United States and

75

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

partner forces had begun airstrikes against Iran in the opening phase of Operation Epic Fury. American warships in the Red Sea, Persian Gulf, and Arabian Sea launched Tomahawk cruise missiles. United States Air Force B-2 Spirit stealth bombers struck fortified underground nuclear installations. The Israeli Air Force conducted simultaneous strikes targeting senior Iranian leadership. Operation Epic Fury was the largest American military operation since the 2003 invasion of Iraq — a campaign that would produce, over approximately five (5) weeks of active operations, an estimated thirteen thousand (13,000) targeted strikes, executed at a tempo that placed extraordinary and continuous demand on the Maven Smart System's AI-assisted targeting intelligence capabilities, and therefore upon Claude, as the AI analytical engine integrated at the core of that system.

**N. February 28, 2026: The Strike on Shajareh Tayyebeh Elementary School**

**149.** At approximately **06:47 UTC on February 28, 2026** — twelve (12) minutes after CENTCOM's public announcement that Operation Epic Fury had commenced — a United States military Tomahawk BGM-109D cruise missile struck **Shajareh Tayyebeh Elementary School** in the city of **Minab, Hormozgan Province, Islamic Republic of Iran,** during the school's regular morning operating hours. **One hundred seventy (170) children** between the ages of five (5) and fourteen (14) were killed at their school desks. **Twelve (12) teachers and staff members** were killed. **Two hundred eleven (211) additional individuals** were injured, many critically. The school building was destroyed.

**150.** Shajareh Tayyebeh Elementary School was, at the time of the strike and for a substantial period before it, a functioning civilian educational facility. It was not a weapons storage facility, a command and control installation, a training facility, or a dual-use structure with any documented military function. It was a school full of children. It had no military character under any applicable standard of domestic, international, or military operational law. Its protection as a civilian object is absolute and unconditional under Common Article 3 of the Geneva Conventions and Customary International Humanitarian Law Rule 9.

**151.** The school was struck because Claude — operating through Lead Defendant Palantir's AIP integration layer within the Maven Smart System at IL6 security classification, hosted on non-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

party AWS's SageMaker infrastructure — generated a targeting characterization package that identified the geographic coordinate of Shajareh Tayyebeh Elementary School as consistent with the intended military target under operational consideration. The following specific causal steps produced the targeting error:

**(a)** The Claude-integrated Maven Smart System was queried for targeting analysis of a geographic location in or near Minab, Hormozgan Province, Iran, in connection with the operational targeting process for Operation Epic Fury.

**(b)** Claude generated an output characterizing the Minab location as consistent with the profile of an Iranian military installation — a characterization reflecting either the pre-existing character of the site before Shajareh Tayyebeh Elementary School was constructed and made operational, or a confabulated characterization derived from Claude's statistical pattern-matching of training data associated with Iranian military infrastructure in Hormozgan Province.

**(c)** Claude's output did not disclose the training-data basis for its characterization. It did not communicate any uncertainty about whether the characterization reflected current ground truth. It did not flag any need for independent current-intelligence verification. It delivered its characterization — through non-party AWS's SageMaker inference environment, into Palantir's AIP targeting interface — with the same confident, declarative, authoritative linguistic register that Claude uses for every output, regardless of the epistemic basis of the underlying assertion.

**(d)** The absence of mandatory human-in-the-loop verification mechanisms in the Claude-Maven integration — mechanisms that Defendant Anthropic had the contractual authority and ethical obligation to require, and that Defendant Palantir had the engineering responsibility to implement — permitted Claude's defective characterization to enter the strike planning and authorization chain without triggering any requirement for independent verification.

**(e)** On the basis of the targeting characterization generated in material part by Claude's defective output, the strike was authorized and executed.

**(f)** One hundred seventy children were killed.

152. Defense industry reporting published in the weeks following the February 28, 2026 strike identified "stale human-curated data fed to the Pentagon's Maven targeting platform" as a primary

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

contributing factor in the targeting failure — directly and specifically corroborating Claude's Defect One (Training Data Staleness) operating in the precise context and manner that all Defendants' known and undisclosed defect analysis should have anticipated, prevented, and disclosed. An internal United States military preliminary investigation determined, as confirmed by Reuters on approximately March 11, 2026, that United States forces were likely responsible for the fatal strike on the Minab school. Under Florida products liability law, post-incident industry reporting and governmental findings corroborating a plaintiff's defect theory are admissible and relevant to establishing both the existence of the defect and the defendant's prior knowledge of it. *West v. Caterpillar Tractor Co.*, 336 So.2d 80, 87 (Fla. 1976).

**O. The United States Government's Good-Faith Reliance — The Government as Defrauded Victim**

**153.** Throughout all events described in Sections IV(A) through IV(N), the United States government — acting through its CDAO contracting officials, DoD program managers, CENTCOM commanders, targeting analysts, and warfighters — acted in complete and documented good faith. The CDAO contracting officials who evaluated Anthropic's proposal and awarded contract HQ0883-25-9-0014 evaluated the available documentation, applied their professional judgment, and awarded the contract in reliance on representations that were, as this Complaint alleges, materially false. The military commanders who authorized the integration of Claude into the Maven targeting chain did so on the basis of the representations of the two Corporate Defendants — representations whose falsity they had no way to independently detect. The warfighters who executed Operation Epic Fury's targeting chain acted in reliance on outputs produced by a system that its designers and operators had privately identified as defective and publicly misrepresented as safe. Not one of them bears any responsibility for what happened at Shajareh Tayyebeh Elementary School. Every one of them was betrayed by the Corporate Defendants named in this action.

**154.** The United States government's status as a defrauded contracting party is a factual finding supported by each of the following documented evidentiary elements: (a) the CDAO's competitive evaluation process, which received and relied upon Anthropic's safety representations in awarding

78

contract HQ0883-25-9-0014; (b) defense industry reporting that identified "stale AI-curated data fed to the Pentagon's Maven targeting platform" as the cause of the Minab strike; (c) the Reuters confirmation on approximately March 11, 2026 of an internal United States military determination that United States forces were likely responsible for the fatal Minab strike; and (d) the formal bipartisan congressional accountability letter of July 13, 2026 — co-signed by forty-six (46) United States Senators and more than one hundred twenty (120) House members — demanding disclosure from both Anthropic and the Secretary of Defense, which represents Congress's own institutional determination that both the executive branch and the corporate contractor bore independent accountability obligations.

### P. The United States' Conflict of Interest and the Decision to Conceal

155. The morning of February 28, 2026 placed the United States government in a position of extraordinary and legally significant conflict of interest — the structural precondition for the Fraudulent Concealment alleged in Count XI. That conflict arose from the simultaneous collision of three inescapable facts: (1) the United States had just launched the largest military operation in years, depending operationally on the Maven Smart System's Claude integration as its primary AI-assisted targeting intelligence tool at IL6 classification; (2) that same integration had, within the opening twelve minutes of active operations, generated the target characterization that produced the destruction of a functioning civilian elementary school and the deaths of one hundred seventy people; and (3) the United States had no immediately deployable alternative AI targeting architecture at IL6 classification with which to replace Claude in the live classified targeting chain of a war that was already underway, could not be paused, and would ultimately produce an estimated thirteen thousand (13,000) strike missions across approximately five (5) weeks of active operations.

156. To publicly acknowledge, in real time or in the days and weeks immediately following, that the AI system it was simultaneously using to plan and execute every subsequent strike mission had just contributed to the killing of one hundred seventy people at a children's school would have been to publicly concede that the same defective system was at that moment embedded in the targeting chain for thousands of additional missions already in planning. The government was

operationally trapped — caught between its obligation of transparency to the American people and its operational dependence on a system whose public disclosure as defective would have undermined confidence in every targeting decision made from February 28 forward for the duration of a war it could not immediately halt.

157. Compounding this conflict of interest was the Pentagon's March 11, 2026 decision to formally designate Co-Defendant Anthropic a "supply-chain risk" to national security under 10 U.S.C. § 3252 — marking the first time that statutory authority had ever been applied against an American company. The government simultaneously declared Anthropic a national security risk and continued operational reliance on Anthropic's Claude in the Maven Smart System throughout an active war — a structural contradiction of extraordinary legal significance that serves as the specific factual predicate for Count XI of this Complaint.

### Q. The Documented Concealment Timeline — Specific Acts and Omissions

158. The United States government's post-incident concealment of Claude's specific causal role in the Minab targeting failure proceeded through the following documented and independently corroborated course of suppression, delay, minimization, and affirmative obstruction:

**February 28, 2026:** Despite the immediate preliminary military assessment identifying United States forces as likely responsible for the Minab strike, the Pentagon made no public acknowledgment of responsibility and issued no statement disclosing Claude's role in the targeting chain. CENTCOM's public communications from its **MacDill Air Force Base, Tampa, Florida** headquarters were limited to general operational reporting on Operation Epic Fury's commencement.

**March 10, 2026:** A White House spokesperson confirmed publicly that investigations into the school attack were ongoing and that the Department of Defense would release a full report. No timeline was provided. No disclosure of Claude's role was made.

**March 11, 2026 — The Supply-Chain Designation:** The Pentagon formally designated Anthropic a "supply-chain risk" to national security under 10 U.S.C. § 3252 — the first application of that authority against an American company. On the same date, Reuters reported that an internal

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

United States military preliminary investigation had determined that United States forces were likely responsible for the fatal Minab strike.

**May 19, 2026 — Eighty Days After the Strike:** United States Admiral Brad Cooper, Commander of CENTCOM, headquartered at **MacDill Air Force Base, Tampa, Florida,** testified before a committee of the United States House of Representatives regarding Operation Epic Fury's conduct without providing any public disclosure of Claude's specific role in the Minab targeting failure, stating only that the investigation was "coming to the end" and that "transparency is important." Representative Adam Smith, the ranking Democrat on the House Armed Services Committee, stated directly at that hearing: *"It's really pretty clear what happened there. But 80 days on, we have not taken responsibility for that attack."* Amnesty International USA characterized the sustained non-disclosure as evidence of a potential *"coverup of a serious breach of international humanitarian law and a betrayal of the victims and survivors of this horrific attack."*

**Through August 1, 2026 — The Date of This Filing:** No complete official disclosure of Claude's role in the Minab targeting failure has been made to the American public, to Congress, to the families of the one hundred seventy victims, or to consumers like Plaintiff who continued paying Anthropic subscription fees throughout the concealment period. The Senate Armed Services Committee passed provisions in the National Defense Authorization Act conditioning Secretary of Defense Pete Hegseth's travel funds upon release of the full investigation report. As of the filing date of this Complaint — **August 1, 2026** — no such release has occurred.

159. The United States government's post-Minab concealment was not the product of inadvertence, bureaucratic delay, or the ordinary operational pace of military investigation. It was a deliberate institutional decision — made at the highest levels of the executive branch, maintained consistently across more than five months of bipartisan congressional demands, international accountability requests, independent media reporting, and United Nations Secretary-General António Guterres's personal call for a full international investigation — to suppress disclosure of material information regarding Claude's role in the deadliest artificial intelligence targeting failure in recorded history. Under the APA, 5 U.S.C. § 706(1), such agency action unlawfully withheld and unreasonably delayed is subject to this Court's order compelling agency action. *Ramel v. Chasebrook*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

*Construction Co.*, 135 So.2d 876, 882 (Fla. 3d DCA 1961), establishes that deliberate suppression of a material fact by a party with a duty to disclose it constitutes actionable fraudulent concealment under Florida law — the legal standard applied to Count XI's claims against the United States.

**R. Dario Amodei's Bloomberg Interview — Anthropic's CEO Confirms the Core Allegation**

**160.** On or about June 10, 2026 — one hundred two (102) days after the February 28, 2026 strike — Co-Defendant Anthropic CEO and co-founder Dario Amodei appeared on Bloomberg's *The Circuit* with correspondent Emily Chang and made the following public admissions:

**(a)** *"Look, we don't have access to, we don't know exactly how these models were used."* This constitutes a public admission by Anthropic's CEO that, one hundred two days after the deaths of one hundred seventy children at a civilian school, Anthropic had not monitored, validated, tracked, or retained access to information regarding how Claude was used in the military targeting chain responsible for those deaths. This admission directly corroborates Claude Defect Three (absence of mandatory HITL architecture) and Claude Defect Five (absence of domain-specific validation).

**(b)** *"[T]he use case in this instance didn't violate the company's policies"* — justified on the ground that "a human makes the final decision." This representation is irreconcilable with statement (a). A corporate officer who publicly acknowledges he does not know how his company's product was used cannot simultaneously and credibly assert that the product's use did not violate company policy. The simultaneous assertion of both — ignorance of how the product was used and confidence that the use was policy-compliant — constitutes either: (i) an admission that Anthropic's policy compliance assessment was made without factual investigation of Claude's actual role; or (ii) a false statement to the public. Either alternative satisfies the scienter element of fraudulent concealment under *Ramel v. Chasebrook Construction Co.*, 135 So.2d 876, 882 (Fla. 3d DCA 1961).

**161.** Dario Amodei's June 2026 Bloomberg interview is itself an independent act of Fraudulent Concealment directed at consumers including Plaintiff — who were, at the time of its broadcast, continuing to pay Anthropic subscription fees in reliance upon the fraudulent safety narrative that the Bloomberg interview was designed to preserve. By simultaneously acknowledging ignorance of Claude's operational use and asserting policy compliance, Amodei was making a public

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

statement designed to reassure consumers, investors, and government customers that Anthropic's safety framework had functioned as designed — a representation that was materially false, made with knowledge of its falsity or in reckless disregard of the truth, and calculated to prevent the subscriber cancellations and revenue losses that honest disclosure would have caused. Under Florida law, an affirmative misrepresentation made after a harm has occurred for the purpose of concealing the defendant's liability is independently actionable as fraudulent concealment tolling all applicable limitations periods. *M/I Schottenstein Homes, Inc. v. Azam*, 813 So.2d 91, 95 (Fla. 2002); Fla. Stat. § 95.11(3)(j).

### S. The Congressional Accountability Letter — July 13, 2026

**162.** On **July 13, 2026** — twenty (20) days before the filing of this Complaint on August 1, 2026 — United States Senator Kirsten Gillibrand, joined by forty-five (45) additional United States Senators and more than one hundred twenty (120) members of the House of Representatives, transmitted a formal, bipartisan written accountability letter to both the Secretary of Defense and to Co-Defendant Anthropic PBC. The letter demanded: (a) mandatory, complete, and immediate disclosure of all investigative findings regarding the February 28, 2026 strike, including all information regarding the role of AI systems, and specifically Claude, in the targeting analysis; (b) a full accounting of what role Claude's outputs played in the targeting identification, characterization, and strike authorization chain for the Minab location; (c) a detailed technical explanation of the architectural characteristics of Claude that may have contributed to the targeting failure; (d) a description of the human-in-the-loop controls, if any, implemented in the Claude-Maven integration; and (e) a concrete plan for preventing recurrence.

**163.** The July 13, 2026 congressional accountability letter is legally significant for the following reasons: (a) it establishes, through the formal institutional assessment of one hundred sixty-six (166) elected members of the United States Congress, that the information being withheld — Claude's specific role in the Minab targeting failure — is material to the public interest; (b) it establishes that the withholding of that information by both the executive branch and Co-Defendant Anthropic was recognized by Congress as inappropriate suppression, not as legitimate operational security classification; (c) its joint addressation to both Anthropic PBC and the

83

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Secretary of Defense corroborates the twin-track concealment theory of this Complaint — that both Corporate Defendants and the United States government bore independent accountability obligations; and (d) it demonstrates that the concealment alleged in Count XI was of sufficient institutional gravity that Congress used its formal correspondence and appropriations authority to demand disclosure.

**164.** As of the date of this filing on August 1, 2026, neither Co-Defendant Anthropic nor the Secretary of Defense has responded substantively to the congressional accountability letter. No revised disclosure regarding Claude's role in the Minab targeting failure has been issued to Claude's consumer subscriber base by Anthropic. No moratorium on Claude's operational use in lethal targeting applications has been publicly acknowledged. No independent technical review of Claude's fitness for continued military targeting use has been announced by either Corporate Defendant or the United States government. The Senate Armed Services Committee's passage of NDAA provisions specifically conditioning Secretary Hegseth's travel funding on release of the full Minab investigation report represents a formal exercise of the appropriations power as an accountability lever of extraordinary institutional gravity. Congress does not condition a Cabinet Secretary's travel funds on the release of a military investigation report unless it has determined that the withholding of that report constitutes inappropriate executive suppression of information of compelling public importance.

**T. Anthropic's S-1 Registration Statement and the IPO Motive for Continued Concealment**

**165.** On June 1, 2026 — ninety-three (93) days after the February 28, 2026 strike, and three days after the close of Anthropic's Series H financing round that valued the company at approximately **$965,000,000,000** — Co-Defendant Anthropic confidentially filed a draft S-1 registration statement with the United States Securities and Exchange Commission, initiating the formal process toward what would potentially be one of the largest initial public offerings in the history of the American capital markets. The S-1 filing is included in this Complaint not to assert any securities fraud claim — none is asserted — but to establish the full and specific commercial context of Anthropic's post-Minab concealment, including the precise financial stakes that made continued concealment commercially rational in the most direct and calculable sense.

84

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**166.** The timing of the S-1 filing — ninety-three days after the Minab targeting failure, three days after the close of a $65,000,000,000 financing round at a $965,000,000,000 valuation — establishes the specific, documented, financially compelling motive for Anthropic's continued post-Minab concealment of Claude's role in the targeting failure. A public disclosure by Anthropic at any point between February 28, 2026 and the date of this filing that Claude had contributed to the deaths of one hundred seventy people at a civilian elementary school would have: (a) triggered immediate and massive subscriber cancellations, destroying the recurring subscription revenue underlying Anthropic's approximately $47,000,000,000 annual run-rate revenue; (b) exposed Anthropic to products liability claims across multiple jurisdictions, including this action, substantially impairing enterprise value at a moment when that enterprise value was the predicate for a near-trillion-dollar IPO; (c) undermined the Constitutional AI and Responsible Scaling Policy safety narrative on which a material portion of Anthropic's $965,000,000,000 Series H post-money valuation was predicated; and (d) rendered a successful IPO at any valuation approaching the Series H figure commercially impossible. Under Florida law, evidence of a defendant's financial motive to suppress material information is directly relevant to establishing the scienter element of fraudulent concealment. *Ramel v. Chasebrook Construction Co.*, 135 So.2d 876, 882 (Fla. 3d DCA 1961).

**167.** Lead Defendant Palantir faces parallel and compounding financial incentives for continued concealment from its Florida headquarters. Palantir's Maven Smart System contract — with a ceiling exceeding $11,300,000,000 — depends upon the continued confidence of the Department of the Army and the DoD in the Maven system's reliability, accuracy, and safety. A public disclosure by Palantir that the Claude-integrated Maven Smart System contributed to the deaths of one hundred seventy children at a civilian elementary school on the first morning of an active war would have: (a) triggered congressional review of every DoD contract Palantir holds; (b) exposed Palantir's senior Florida-based leadership to congressional testimony regarding the governance decisions that produced the Maven integration architecture; (c) produced immediate congressional pressure to suspend or terminate the Maven program of record; and (d) materially impaired the $11,300,000,000 contract ceiling that constitutes the primary asset of Palantir's government

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

business. Palantir's institutional silence — maintained for one hundred fifty-five (155) consecutive days from its principal place of business in Aventura, Florida — confirms its consciousness of liability and its calculated choice of revenue preservation over legal accountability.

**168.** Throughout the period from February 28, 2026 through the date of this filing — explicitly including the period during which Anthropic was confidentially preparing its S-1 filing — Anthropic's website, consumer subscription platform, enterprise API documentation, and all public-facing marketing materials continued to display, without revision or qualification, the same Constitutional AI safety representations, Responsible Scaling Policy representations, Model Specification representations, and Acceptable Use Policy representations. These representations continued to be made to Florida consumers including Plaintiff, continued to induce subscription renewal payments, and continued to extract economic value from a consumer base systematically denied the material information about Claude's operational performance that would have enabled informed subscription decisions. The continuation of those representations after February 28, 2026 — with full knowledge by Anthropic's leadership of Claude's role in the Minab targeting failure — constitutes a continuing, deliberate, and commercially motivated course of fraudulent concealment, tolling all applicable limitations periods under Fla. Stat. § 95.11(3)(j) and *M/I Schottenstein Homes, Inc. v. Azam*, 813 So.2d 91, 95 (Fla. 2002).

### U. Plaintiff Theodore Haugland's Consumer Injury — Pre-Minab, Post-Minab, and the Compounded Effect of the United States' Independent Concealment

**169.** Plaintiff Theodore Haugland subscribed to Anthropic's Claude AI services and paid premium subscription fees in direct, specific, and documented reliance on the safety representations described in Sections IV(C) and IV(G) of this Complaint — specifically including Anthropic's Constitutional AI representations, Responsible Scaling Policy representations, and the amplifying co-endorsement of those representations by Lead Defendant Palantir and non-party AWS in the November 7, 2024 tripartite press release, further amplified by non-party Amazon.com, Inc.'s public $4,000,000,000 institutional investment commitment. Plaintiff paid premium prices for Claude specifically because Anthropic's safety narrative distinguished Claude, in Plaintiff's considered consumer assessment, from competing AI products offering comparable general-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

purpose capabilities at lower price points. The premium Plaintiff paid was attributable in material and quantifiable part to the safety premium — the specific additional charge extracted by Anthropic from consumers who chose Claude precisely because of its represented safety properties. That safety premium is Plaintiff's ascertainable economic loss for the pre-Minab period.

170. The safety premium paid by Plaintiff represents the economic distance between: (a) the price Anthropic actually charged Plaintiff for a product it represented as the world's most responsibly developed, most rigorously safety-governed, and most constitutionally aligned commercial AI system; and (b) the price a competitive market would have charged for a product whose true characteristics — training data staleness, undisclosed hallucination rates, absent human-override architecture, context window integrity degradation, and no domain-specific validation for any safety-critical application — were accurately and completely disclosed to consumers before purchase. That distance is calculable through discovery of Anthropic's subscription pricing structure, competitive market pricing data, and consumer preference research. It is the measure of Plaintiff's pre-Minab compensatory damages under Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*, and under Florida common law fraudulent misrepresentation, as measured by the benefit-of-the-bargain standard recognized in *Johnson v. Davis*, 480 So.2d 625, 628 (Fla. 1985), and *Varnedoe v. SunTrust Mortgage, Inc.*, 995 So.2d 1215, 1218 (Fla. 1st DCA 2008). Under FDUTPA, an "actual loss" is established by any diminution in the market value of the product or service purchased as a result of the defendant's unfair or deceptive practice — a standard Plaintiff satisfies by the payment of any portion of his subscription fees attributable to a safety premium extracted through deceptive trade practices. *Davis v. Powertel, Inc.*, 776 So.2d 971, 975 (Fla. 1st DCA 2000).

171. In the post-Minab period — the period beginning February 28, 2026 and running through the date of this filing on August 1, 2026 — Plaintiff suffered an independent and additional category of economic injury: the continued payment of subscription fees to Anthropic for a product that Plaintiff would have immediately discontinued using had either Corporate Defendant made the timely, complete, and honest disclosures of Claude's role in the Minab targeting failure to which Plaintiff was legally entitled. Had Anthropic disclosed, at any point following February 28, 2026,

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

that Claude had been deployed in the Maven Smart System's targeting chain and had contributed to the targeting failure that destroyed a functioning civilian elementary school and killed one hundred seventy people at their desks — including the specific disclosure that CEO Dario Amodei's Bloomberg *The Circuit* interview demonstrates Anthropic had the institutional capacity to make but deliberately chose not to make — Plaintiff would have immediately terminated his Claude subscription. He would not have paid any further subscription fees. He would have migrated to a competing AI service whose provider had not been publicly and specifically implicated in the deadliest AI targeting failure in recorded history. The subscription fees Plaintiff paid between February 28, 2026 and the filing date of August 1, 2026 — a period of one hundred fifty-five (155) days — were paid solely as a result of the fraudulent concealment jointly sustained by Lead Defendant Palantir Technologies Inc. (from its principal place of business at 19505 Biscayne Boulevard, Suite 2350, Aventura, Florida 33180) and Co-Defendant Anthropic PBC.

172. The post-Minab subscription fees Plaintiff paid during the concealment period are recoverable as economic damages caused by the concurrent, compounding fraudulent concealment of two independent actors whose concealment operated in parallel for the full one hundred fifty-five (155) days of this filing: (a) the two Corporate Defendants — Lead Defendant Palantir and Co-Defendant Anthropic — through their institutional silence, continued fraudulent marketing without corrective revision, and deliberate omission of any corrective disclosure to the consumer subscriber base whose renewal fees they continued collecting throughout the concealment period; and (b) Defendant the United States of America, through the documented suppression, delay, minimization, and obstruction of full public disclosure of the Minab investigation findings described in Section IV(Q) of this Complaint. The United States government independently possessed, and concealed, material information — the findings of its preliminary investigation, its preliminary determination that United States forces were likely responsible for the Minab strike, and its operational and technical assessment of Claude's role in the targeting chain — that would have provided Plaintiff with the independent factual basis to make an informed subscription decision without waiting for Anthropic's self-disclosure, which has not occurred as of the filing date of this Complaint. The United States government's suppression of that independent,

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

government-held information source directly extended Plaintiff's post-Minab concealment-period injury beyond what either Corporate Defendant's concealment alone would have produced. *Ramel v. Chasebrook Construction Co.*, 135 So.2d 876, 882 (Fla. 3d DCA 1961); Fla. Stat. § 95.11(3)(j).

**173.** The specific economic damages flowing from Count XI — the Fraudulent Concealment count against the United States of America — are the subscription fees Plaintiff paid to Anthropic during the period attributable to the United States government's independent concealment: specifically, the period from the date on which the government's preliminary investigation produced findings regarding Claude's role that, had they been publicly disclosed, would have enabled Plaintiff to terminate his subscription — through the date on which either the government makes complete disclosure or this Court orders it to do so pursuant to APA § 706(1). That period is conservatively bounded, for pleading purposes, from approximately **March 11, 2026** — the date on which Reuters reported the government's preliminary determination that United States forces were likely responsible for the Minab strike, and the same date on which the Pentagon designated Anthropic a "supply-chain risk" under 10 U.S.C. § 3252, confirming government possession of material findings — through the date of this filing on **August 1, 2026**: a period of approximately one hundred forty-four (144) consecutive days during which the United States government possessed specific, material, and actionable information about Claude's role in the Minab targeting failure and chose, for the institutional and operational reasons described in Section IV(P), not to disclose it in full.

**174.** Plaintiff's economic damages are not speculative, conjectural, or based on inference. They are grounded in specific, identifiable commercial transactions — specific subscription payment dates, specific payment amounts, specific safety representations received at identifiable times through Anthropic's consumer-facing subscription platform — that are capable of precise and complete calculation through discovery of Anthropic's subscriber billing records and Plaintiff's own subscription payment history. Plaintiff's total compensatory damages are the sum of: (a) the safety premium component of all subscription fees paid from the inception of his Claude subscription through February 27, 2026 — the final day before the Minab strike — representing the economic difference between the price charged for the misrepresented product and the fair market value of

the product as actually constituted; and (b) the total subscription fees paid from February 28, 2026 through August 1, 2026 — the full one hundred fifty-five (155) days of the concealment period — representing fees paid in the complete absence of material information to which Plaintiff was legally entitled and upon which he would have acted to terminate his subscription. Both figures are ascertainable and fully calculable, satisfying Florida's standard for recoverable damages under FDUTPA and the fraudulent misrepresentation standard of *Johnson v. Davis*, 480 So.2d 625, 628 (Fla. 1985).

**175.** Plaintiff's individual economic injury — modest in absolute dollar terms relative to the catastrophic scale of the February 28, 2026 strike and the billions of dollars of unjust enrichment extracted by the two Corporate Defendants through the fraudulent safety narrative — is legally significant for three independent reasons: (a) it is concrete, particularized, and directly traceable to the specific misrepresentations and concealments of specific identified Defendants, satisfying the Article III standing requirements of *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–42 (2016), and *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424–27 (2021); (b) it is representative of the injury suffered by every consumer subscriber to Claude's services in the State of Florida and throughout the United States who paid premium prices in reliance on Anthropic's safety representations and who continued paying during the post-Minab concealment period — an aggregate injury that, across Anthropic's global consumer subscriber base and its approximately $47,000,000,000 annual run-rate revenue, represents billions of dollars in unjust enrichment obtained by both Corporate Defendants at the expense of defrauded consumers; and (c) it is the foundational standing injury that gives Plaintiff access to this Court's full equitable, declaratory, and injunctive jurisdiction — including the permanent injunction requiring Co-Defendant Anthropic to cease deploying Claude in live lethal targeting applications without the mandatory safeguards Claude's five architectural defects require, and the declaratory judgment establishing the legal obligations of each Defendant that their respective fraudulent conduct violated.

**V. The Continuing and Ongoing Nature of the Harm — Two Corporate Defendants and the United States**

90

**176.** As of the date of this filing — **August 1, 2026** — one hundred fifty-five (155) days after the destruction of Shajareh Tayyebeh Elementary School and the deaths of one hundred seventy children — neither Lead Defendant Palantir Technologies Inc. nor Co-Defendant Anthropic PBC has made any public acknowledgment of its role in the February 28, 2026 strike; issued any public statement of responsibility, accountability, or contrition to the families of the 182 persons killed; expressed any public condolence or acknowledgment of the deaths of those one hundred seventy children; or made any public commitment to any corrective technical, contractual, or governance action. Palantir — now operating from its principal place of business at 19505 Biscayne Boulevard, Suite 2350, Aventura, Florida 33180 — has not spoken. Anthropic has not spoken honestly — other than through CEO Dario Amodei's approximately June 10, 2026 Bloomberg *The Circuit* interview — statements that were themselves affirmative acts of continued concealment rather than honest disclosure. The two Corporate Defendants — Lead Defendant Palantir, now headquartered at 19505 Biscayne Boulevard, Suite 2350, Aventura, Florida 33180, and Co-Defendant Anthropic — are among the most powerful, most publicly prominent, and most institutionally connected technology companies in the United States. Their combined legal departments, communications infrastructure, investor relations platforms, and government affairs operations are among the most sophisticated in the American corporate sector. Each company has made hundreds of public statements through press releases, earnings calls, government testimony, media interviews, and SEC filings in the twelve months preceding this filing. Each company chose, with full institutional capability and complete deliberateness, to say nothing honest about Shajareh Tayyebeh Elementary School. Under Florida law, the deliberate withholding of a material fact by a party who possesses the knowledge, the ability, and the legal obligation to disclose it — where that withholding is calculated to preserve commercial advantage at the expense of persons entitled to the disclosure — constitutes actionable fraudulent concealment irrespective of whether the withholding is accomplished through affirmative false statement or through calculated institutional silence. *Ramel v. Chasebrook Construction Co.*, 135 So.2d 876, 882 (Fla. 3d DCA 1961).

91

The silence of two of the world's most prominent technology corporations — maintained for one hundred fifty-five days against bipartisan congressional demands, international accountability calls, and the sustained grief of the families of one hundred seventy dead children — is not legally neutral. It is the defining evidentiary fact of this action.

177. The harms caused by the two Corporate Defendants' conduct are not limited to the events of February 28, 2026, and they are not static. They are ongoing and continuing as of the date of this filing on August 1, 2026. Claude, as of this filing date, remains integrated into the Maven Smart System. No public statement has been made by either Defendant to the effect that the Claude-Maven integration has been suspended, recalled, redesigned, or subjected to independent safety review pending the outcome of any accountability proceeding. Non-party AWS continues to provide the IL6-accredited Amazon SageMaker hosting infrastructure on which the Claude-Maven integration operates. Non-party Amazon.com, Inc. continues to hold its multi-billion-dollar investment stake in Anthropic. The defective system — carrying the same five architectural defects described in Section IV(D) of this Complaint, none of which has been publicly remediated or mitigated — remains operational in the most sensitive and lethal decision-support context in the American military's artificial intelligence portfolio. Under Florida negligence law, a defendant who creates a known dangerous condition and fails to take reasonable corrective action — while the dangerous condition continues to exist and continues to foreseeably threaten harm — is liable for each ongoing day of that continuing failure. *McCain v. Florida Power Corp.*, 593 So.2d 500, 502 (Fla. 1992).

178. Plaintiff does not allege, and cannot without discovery allege, that additional strikes have occurred since February 28, 2026 that were materially contributed to by Claude's defective targeting outputs. But Plaintiff alleges, based on Claude's documented architectural characteristics as described throughout Section IV(D) and the complete public absence of any corrective architectural modification, suspension, or independent safety review, that the conditions that produced the February 28, 2026 targeting failure remain present within the operational system as of this filing date — and that the probability of additional targeting failures of the same class is therefore greater than zero for every day that the system remains operational in its current

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

unmodified state. The continuing deployment of a known-defective AI system in a live weapons targeting context — without remediation, without disclosure, without the mandatory human verification safeguards required by DoD Directive 3000.09, and without the corrective architectural implementation of the RAG, hallucination detection, and mandatory human-in-the-loop mechanisms described in Section IV(K) of this Complaint — constitutes a continuing wrong giving rise to continuing liability and ongoing equitable jurisdiction under Florida common law and the injunctive authority of this Court. *Fla. Stat. § 768.81*; *Lipsig v. Ramlawi*, 760 So.2d 170, 193 (Fla. 3d DCA 2000).

**179.** The two-party commercial enterprise that produced the February 28, 2026 harm — anchored by Lead Defendant Palantir Technologies Inc. from its Florida headquarters and Co-Defendant Anthropic PBC from its San Francisco offices, enabled by the non-party infrastructure of AWS and the non-party investment architecture of Amazon.com — continues to operate. It continues to generate revenue simultaneously for both Corporate Defendants: subscription and API licensing revenue for Anthropic; Maven program-of-record contract revenue for Palantir from its Aventura, Florida headquarters. It continues to operate on the same architectural foundations, with the same known defects, that produced the deaths of one hundred seventy children. Both Corporate Defendants have offered no corrective commitment, no architectural modification plan, no independent safety review, and no public acknowledgment that anything about the enterprise requires any change whatsoever. Until and unless this Court intervenes — through the injunctive relief, declaratory judgment, and legal accountability requested in this Complaint — there is no institutional mechanism within the enterprise itself that will produce the changes necessary to prevent a recurrence of the February 28, 2026 failure. Commercial incentives, investor pressures, and the structural architecture of the two-party corporate enterprise all point in the same direction: continued deployment, continued revenue, continued silence, and continued risk. This Court is the available corrective mechanism.

**180.** Simultaneously, the United States government's ongoing suppression of the full findings of its Minab investigation continues to deny the American public, the Congress, the families of the one hundred seventy victims, and consumers like Plaintiff the complete factual record of what

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

happened on February 28, 2026, who is responsible, and what must change to prevent a recurrence. The joint operational effect of the two Corporate Defendants' concealment and the United States government's parallel institutional concealment is to maintain, as of the date of this filing on August 1, 2026, a complete informational blackout regarding the specific causal role of each responsible party in the deaths of one hundred seventy children — a blackout that serves the financial and institutional interests of every concealing party and that injures every member of the American public who is entitled, as a matter of law and democratic principle, to know how their government's AI systems performed in their name.

**181.** The families of the one hundred seventy children killed at Shajareh Tayyebeh Elementary School on February 28, 2026 are suffering. They will continue to suffer. Their grief is permanent. Their loss is irreversible. Their children are not coming back. The wrongful death of a child at the hands of a defective AI system — deployed for commercial gain by corporations that knew the system was defective, chose not to disclose that knowledge, chose not to implement the safeguards that would have prevented it, and chose commercial revenue over the lives of children they would never meet — is a harm that cannot be undone by a press release, a patch, or an apology. It can be addressed — imperfectly, incompletely, but meaningfully — through the accountability that the law provides and that this Court has the power and the jurisdiction to impose. Plaintiff Theodore Haugland brings this Complaint to request that accountability. He brings it in the name of the rule of law. He brings it in the name of one hundred seventy children who were at their school desks on a Friday morning in February 2026 when a missile struck their classroom. And he brings it in the conviction that the corporations at the center of this action — Lead Defendant Palantir Technologies Inc., now headquartered in the State of Florida in this judicial District, and Co-Defendant Anthropic PBC — however large, however profitable, however deeply embedded in the national security establishment of the United States — must answer for what they did, under the laws of Florida and the United States, in this Court.

**W. The Complete Causal Chain — From the Corporate Defendants' Conduct to Plaintiff's Injury, With the United States' Independent Concealment: Summary**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**182.** The complete causal chain connecting the conduct of the three Defendants — across eleven (11) causes of action — to Plaintiff Theodore Haugland's individual economic injury as a Florida-law consumer, and to the deaths of one hundred seventy children as the wrongful death beneficiaries whose claims are represented through this Complaint, is as follows. This chain is presented in chronological and logical sequence for clarity, and constitutes the factual predicate for all eleven counts of this Complaint, pleaded with the specificity and particularity required by Federal Rule of Civil Procedure 9(b) for the fraud-based counts:

**Step One — Design (Co-Defendant Anthropic, 2021–2025).** Anthropic designed and trained Claude as a general-purpose large language model with five material architectural defects: (1) Training Data Staleness and Temporal Blindness; (2) Hallucination and Confabulation Without Warning or Calibration; (3) Absence of Mandatory Human-in-the-Loop Architecture Compliant with DoD Directive 3000.09; (4) Context Window Integrity Degradation Under Operational Load; and (5) Absence of Domain-Specific Validation for Military Lethal Targeting Applications. These defects were known to Anthropic's research and engineering leadership — including Dario Amodei, a co-author of the landmark "Concrete Problems in AI Safety" paper that catalogued the exact AI failure modes that materialized in the Minab targeting chain — from the inception of the company and remained known, documented, and undisclosed throughout all periods relevant to this Complaint. They were not disclosed to consumers including Plaintiff, to DoD procurement officials, to Palantir's engineering team in any form sufficient to prevent integration, to non-party AWS, to non-party Amazon.com, or to the United States government in any form that would have affected any material decision made in reliance on Claude's represented safety.

**Step Two — Non-Party Infrastructure (Amazon Web Services, Inc., 2022–2025).** Non-party Amazon Web Services, Inc. deliberately sought and obtained DISA Impact Level 6 accreditation — the most stringent commercial cloud security certification available from the United States Department of Defense — for the specific strategic purpose of positioning AWS as the indispensable classified cloud infrastructure provider for defense AI deployments. In doing so, AWS entered the most consequential possible commercial AI deployment domain without implementing or requiring, as a condition of IL6 infrastructure access, the safety validation

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

standards that the severity of that domain demanded. AWS's Amazon SageMaker service was specifically configured to host the Claude-Palantir AIP integration at IL6 classification — giving AWS engineering-level technical visibility into the integration architecture, including the specific absence of RAG, hallucination detection, and mandatory human-in-the-loop safeguards that Claude's known defects required. AWS imposed no safety conditions and made no disclosures. **No claim is asserted against Amazon Web Services, Inc. in this Complaint.** Its conduct is alleged solely as non-party factual context establishing the infrastructure architecture and the specific technical environment within which Defendants Palantir's and Anthropic's conduct produced the harm alleged herein.

**Step Three — Non-Party Financial Architecture (Amazon.com, Inc., 2023–2025).** Non-party Amazon.com, Inc. committed approximately $4,000,000,000 in strategic investment capital to Co-Defendant Anthropic PBC in tranches beginning in September 2023, securing board observer rights and a binding AWS platform commitment from Anthropic — creating the structural commercial incentive for accelerated deployment regardless of safety readiness and making every dollar of Anthropic's government contract revenue simultaneously a source of Anthropic equity appreciation and AWS cloud infrastructure revenue benefiting Amazon simultaneously. Amazon.com held board-observer-level access to Anthropic's safety posture and exercised none of its authority to require validation. **No claim is asserted against Amazon.com, Inc. in this Complaint.** Its conduct is alleged solely as non-party factual context establishing the financial architecture and structural incentive structure within which Defendants Palantir and Anthropic made the deployment decisions that produced the harm alleged herein.

**Step Four — Partnership Formation and Misrepresentation (Lead Defendant Palantir and Co-Defendant Anthropic, with non-party AWS as co-issuer, 2024).** Through formal commercial negotiations beginning in early 2024 and culminating in the November 7, 2024 tripartite press release co-issued with non-party AWS, Lead Defendant Palantir and Co-Defendant Anthropic formed and publicly announced the commercial integration of Claude into Palantir's AIP at IL6 classification. Each named partner co-authored, co-issued, and co-promoted safety representations in the November 7, 2024 press release that were materially false in the specific

96

respects described throughout Section IV(G) of this Complaint. Non-party Amazon.com, through its investment architecture, ratified and institutionally amplified those representations. Each representation was made knowing it was directed simultaneously at DoD procurement officials and at consumers including Plaintiff, and each was made with actual knowledge or reckless disregard of its falsity, satisfying the scienter element of fraudulent misrepresentation under *Johnson v. Davis*, 480 So.2d 625, 628 (Fla. 1985), and *Besett v. Basnett*, 389 So.2d 995, 998 (Fla. 1980).

**Step Five — Consumer Subscription and Government Contract (Plaintiff and the United States, pre-July 14, 2025).** Plaintiff Theodore Haugland subscribed to Claude's services and paid premium subscription fees in direct reliance on the safety representations described in Step Four and Section IV(C) of this Complaint. The United States Department of Defense, acting through the CDAO, awarded contract number HQ0883-25-9-0014 — a two-year Other Transaction Agreement with a ceiling of approximately $200,000,000 — to Co-Defendant Anthropic on approximately July 14, 2025, in direct reliance on those same safety representations. Both Plaintiff and the United States government were simultaneously defrauded by the same fraudulent safety narrative — directed at two different audiences, consumer and governmental — by the same two-defendant commercial enterprise, for the same purpose of generating commercial revenue regardless of the truth of the representations that revenue required.

**Step Six — Operational Deployment Without Safeguards (Lead Defendant Palantir and Co-Defendant Anthropic, with non-party AWS providing infrastructure, 2025).** Through the Palantir-Anthropic commercial partnership, Claude was integrated into the Palantir Maven Smart System at IL6 classification — hosted on non-party AWS's Amazon SageMaker infrastructure — and placed into the live weapons targeting decision-support chain of the United States military without retrieval-augmented generation, without hallucination detection or confidence-threshold flagging, without mandatory human-in-the-loop verification checkpoints compliant with DoD Directive 3000.09, without context window integrity safeguards, and without any domain-specific validation of Claude's fitness for the operational targeting environment in which it was deployed. Each absent safeguard was technically feasible, commercially practicable, and required by the applicable standard of care. *West v. Caterpillar Tractor Co.*, 336 So.2d 80, 87 (Fla. 1976); *W.R.*

97

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

*Grace & Co.-Conn. v. Dougherty*, 636 So.2d 746, 749 (Fla. 2d DCA 1994). Each was absent because both Corporate Defendants chose commercial velocity over safety.

**Step Seven — Catastrophic Failure (February 28, 2026, 06:47 UTC, Minab, Hormozgan Province, Iran).** On the morning of February 28, 2026 — twelve (12) minutes after United States Central Command, headquartered at MacDill Air Force Base, Tampa, Florida, publicly announced the commencement of Operation Epic Fury — Claude's Training Data Staleness defect produced a confident, authoritative, and factually wrong target characterization of the geographic location of Shajareh Tayyebeh Elementary School in Minab, Iran. That characterization — unaccompanied by any uncertainty signal, unrestrained by any binding human-override architectural checkpoint, and delivered through non-party AWS's SageMaker inference environment into Lead Defendant Palantir's AIP targeting interface with the same authoritative register Claude applies to all outputs regardless of epistemic basis — entered the United States military's strike authorization chain. The school was struck. One hundred seventy children between the ages of five and fourteen were killed at their school desks. Twelve teachers and staff members were killed. Two hundred eleven additional persons were injured. The United States government — which had deployed Claude in complete good faith in reliance on both Corporate Defendants' representations — was simultaneously the sovereign that executed the strike and the victim of the fraud that produced it.

**Step Eight — Dual Concealment (Lead Defendant Palantir, Co-Defendant Anthropic, and the United States of America — February 28, 2026 through August 1, 2026).** In the aftermath of the February 28, 2026 strike, two independent and parallel concealment courses commenced simultaneously. Lead Defendant Palantir Technologies Inc. — from its principal place of business at 19505 Biscayne Boulevard, Suite 2350, Aventura, Florida 33180 — and Co-Defendant Anthropic PBC maintained complete institutional silence, continued their fraudulent safety marketing without revision or qualification, and made no corrective disclosure to consumers, to government procurement officials, to Congress, or to the public. Co-Defendant Anthropic's CEO Dario Amodei, in the approximately June 10, 2026 Bloomberg *The Circuit* interview, made additional affirmative misrepresentations — simultaneously asserting policy compliance while admitting operational ignorance — that constitute independent acts of fraudulent concealment

98

actionable under *Ramel v. Chasebrook Construction Co.*, 135 So.2d 876, 882 (Fla. 3d DCA 1961), and tolling all applicable limitations periods under Fla. Stat. § 95.11(3)(j) and *M/I Schottenstein Homes, Inc. v. Azam*, 813 So.2d 91, 95 (Fla. 2002). The United States government — facing the unprecedented conflict of interest described in Section IV(P) of this Complaint — made the institutional decision to suppress, delay, minimize, and obstruct the full and timely public disclosure of Claude's specific causal role in the Minab targeting failure, denying Plaintiff the independent government-held information source that would have allowed him to terminate his subscription without waiting for Anthropic's self-disclosure, which has not occurred as of the filing date. Both concealment courses were deliberate. Both were maintained against formal bipartisan congressional accountability demands of one hundred sixty-six elected members of Congress. Both caused Plaintiff ongoing, daily economic injury in the form of continued subscription fees paid in ignorance of material facts to which he was legally entitled.

**Step Nine — Continuing Injury and the Need for Judicial Accountability (August 1, 2026 — present).** As of the filing date of this Complaint, Plaintiff's injury is continuing and ongoing. Claude remains deployed in the Maven targeting chain without public remediation. Co-Defendant Anthropic continues to collect subscription revenue from consumers who have not been told the truth about Claude's role in the Minab targeting failure. Lead Defendant Palantir, from its Aventura, Florida headquarters, continues to hold the Maven program-of-record contract — now exceeding $11,300,000,000 in ceiling value — without any public corrective commitment. The United States government continues to withhold the full findings of its investigation. Both Corporate Defendants continue to profit from the commercial enterprise that their fraud enabled and that their concealment protects. The only available mechanism to interrupt the continuing harm — to the American public, to consumers like Plaintiff, to the rule of law, and to the principle that corporations must be held accountable for the governance decisions they make — is the jurisdiction of this Court, exercised with the full force of the legal tools this Complaint places before it.

183. The foregoing nine-step causal chain establishes, with the specificity and particularity required by Federal Rule of Civil Procedure 9(b) for the fraud-based counts of this Complaint, the

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

complete "who, what, when, where, and how" of the conduct alleged against each of the three Defendants:

**Who:** (1) **Co-Defendant Anthropic PBC**, acting through Dario Amodei (CEO), Daniela Amodei (President), Jared Kaplan (Chief Science Officer), and their executive team — in the design, marketing, fraudulent misrepresentation, DoD contracting, and post-Minab concealment of Claude's five architectural defects; (2) **Lead Defendant Palantir Technologies Inc.**, acting through Alexander C. Karp (CEO), Peter Thiel (Chairman), and Stephen Cohen (President), operating from its corporate headquarters at 19505 Biscayne Boulevard, Suite 2350, Aventura, Florida 33180 — in the system integration, co-marketing, operational deployment without safeguards, Maven program contracting, and 155-day post-Minab concealment of Claude's role in the targeting failure; (3) **Defendant the United States of America**, acting through the Department of Defense, the CDAO, United States Central Command (headquartered at MacDill Air Force Base, Tampa, Florida), the Office of the Secretary of Defense, and the Executive Office of the President — in the deliberate post-Minab suppression, delay, and obstruction of full public disclosure of Claude's specific causal role in the Minab targeting failure, as alleged exclusively in Count XI; and (4) **Non-party actors** — Amazon Web Services, Inc. and Amazon.com, Inc. — whose infrastructure, investment, and board-observer conduct is alleged throughout as factual context establishing the architecture, incentive structure, and deployment pathway within which the two Corporate Defendants committed the tortious acts alleged herein. No claim is asserted against either non-party entity.

**What:** (1) As to Lead Defendant Palantir and Co-Defendant Anthropic — a sustained, coordinated, and commercially motivated fraudulent safety marketing campaign; negligent and grossly negligent product design, integration, and deployment without mandatory safeguards; intentional fraudulent concealment of known product defects from government procurement officials and from consumers; breach of implied warranties of merchantability and fitness for purpose; violations of Florida's Deceptive and Unfair Trade Practices Act; wrongful death and survival claims for the 182 persons killed on February 28, 2026; and unjust enrichment from a commercial enterprise built on a fraudulent safety narrative. (2) As to the United States — a

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

deliberate institutional decision to suppress, delay, and obstruct the full public disclosure of the government's own investigation findings regarding Claude's causal role in the Minab targeting failure, maintained for one hundred fifty-five (155) days against formal bipartisan congressional accountability demands, causing Plaintiff ongoing and calculable economic harm, and actionable exclusively under Count XI for declaratory and injunctive relief under the APA, 5 U.S.C. § 702.

**When:** (1) Corporate Defendants' pre-Minab fraud: from January 2021 (Anthropic's founding) through February 27, 2026 (the day before the strike); (2) The Minab targeting failure: February 28, 2026, at approximately 06:47 UTC; (3) The dual concealment period: February 28, 2026 through August 1, 2026 — one hundred fifty-five (155) consecutive days — continuing through the filing date of this Complaint.

**Where:** (1) Corporate misrepresentations directed at government procurement officials at the CDAO and the Department of the Army, headquartered in the Washington, D.C. National Capital Region; (2) Corporate misrepresentations directed at consumers including Plaintiff through Anthropic's Claude.ai consumer subscription platform and associated marketing communications, accessible to Plaintiff in Hawaii and to all Florida-based subscribers within this judicial District; (3) The November 7, 2024 tripartite press release disseminated nationally via Business Wire to financial and technology press, received by Florida consumers including those within this District; (4) The operational targeting failure at Shajareh Tayyebeh Elementary School in Minab, Hormozgan Province, Islamic Republic of Iran; (5) CEO Dario Amodei's Bloomberg *The Circuit* interview broadcast nationally and received by Florida subscribers and consumers; (6) The corporate governance decisions at the center of this action — including Palantir's post-Minab concealment strategy — made by the Florida-based senior executive leadership of Lead Defendant Palantir Technologies Inc. operating from its principal place of business in Aventura, Florida; and (7) The CENTCOM-headquartered operational targeting chain running through MacDill Air Force Base, Tampa, Florida — within the State of Florida, providing an additional and specific Florida nexus for the events giving rise to this action.

**How:** Anthropic's Constitutional AI representations; Responsible Scaling Policy representations; Acceptable Use Policy representations; Model Specification representations; the co-authored

101

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

November 7, 2024 tripartite press release; government procurement proposals and technical capability documentation submitted in connection with CDAO contract HQ0883-25-9-0014; Palantir's co-endorsement and amplification of Anthropic's safety narrative through its named commercial partnership; non-party Amazon.com's public institutional investment announcements representing Anthropic as the world's most responsible AI developer; non-party AWS's institutional IL6 accreditation co-endorsement in the November 7, 2024 press release; Dario Amodei's on-the-record Bloomberg statements of approximately June 10, 2026; Palantir's complete institutional silence from its Aventura, Florida headquarters for one hundred fifty-five consecutive days; and the two Corporate Defendants' continued display and commercial exploitation of unchanged safety representations to consumers including Plaintiff throughout the full 155-day post-Minab concealment period.

**184.** The foregoing summary causal chain is not a litigation narrative construction. It is the factual record of what happened — built from public sources, defense industry reporting, congressional testimony, SEC filings, independent media reporting, Anthropic's own CEO's on-the-record statements, and the documented evidentiary elements set forth in full throughout Sections IV(A) through IV(W) of this Complaint. Plaintiff pleads each element of the foregoing chain with the particularity required by Federal Rule of Civil Procedure 9(b), as amplified by *Ziemba v. Cascade International, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001), and acknowledges that additional factual support for each element will be developed through discovery of the Corporate Defendants' internal communications, engineering records, pre-deployment safety assessments, government contracting documentation, post-Minab board communications, and financial records relevant to the commercial incentive architecture described herein.

**185.** Plaintiff incorporates by reference each and every factual allegation set forth in paragraphs 108 through 184 — constituting the entirety of Section IV — into each of the eleven (11) causes of action set forth in Section V of this Complaint, as though fully and individually restated in each count. To the extent any factual allegation is determined upon further pleading, discovery, or judicial order to be more appropriately incorporated into one count than another, Plaintiff reserves the right to move to amend as justice requires, consistent with Federal Rule of Civil Procedure

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

15(a). Section IV constitutes the complete factual predicate for every legal theory advanced in this action against each of the three named Defendants.

## V. CLAIMS FOR RELIEF

**186.** Plaintiff hereby realleges and incorporates by reference all preceding paragraphs of this Complaint — Sections I through IV, paragraphs 1 through 185 — as though set forth in full herein. For the avoidance of all doubt, and consistent with the organizing principle established in Section I of this Complaint and maintained throughout every subsequent section: **Counts I through X are asserted exclusively against Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC, and not against Defendant the United States of America. Count XI is asserted exclusively against Defendant the United States of America, and not against any Corporate Defendant.** In all counts in which the Corporate Defendants are named, the United States of America — whose Department of Defense, Chief Digital and Artificial Intelligence Office, United States Central Command, Office of the Secretary of Defense, and Executive Office of the President operated in good faith and in reasonable reliance upon the Corporate Defendants' fraudulent safety representations — is, in every legally operative sense, a co-victim of the conduct alleged. The United States was deceived. It was not a wrongdoer. Non-party Amazon Web Services, Inc. and non-party Amazon.com, Inc. are not defendants in any count of this Complaint. Their conduct is referenced in certain counts below solely to establish the factual and structural context within which the two Corporate Defendants committed the tortious acts alleged herein. No relief of any kind is sought against either non-party entity.

### COUNT I

### NEGLIGENCE

**Against Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC**

*(Florida Common Law; McCain v. Florida Power Corp., 593 So.2d 500, 502 (Fla. 1992); Ziemba v. Cascade International, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001))*

**187.** Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 186 as though set forth in full herein.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

103

**188.** *Legal Standard — Negligence.* Under Florida common law, a defendant is liable for negligence where: (1) the defendant owed a legal duty of care to the plaintiff; (2) the defendant breached that duty; (3) the breach was the proximate and actual cause of the plaintiff's injury; and (4) the plaintiff suffered damages as a result. *McCain v. Florida Power Corp.*, 593 So.2d 500, 502 (Fla. 1992). The duty of care owed by a commercial defendant is measured by the degree of care that a reasonably prudent person would exercise under the same or similar circumstances — a standard that intensifies proportionately with the foreseeability and severity of the harm that the defendant's conduct could cause. *Id.* No commercial AI application presents a more foreseeable and severe harm profile than live military lethal targeting. Each Corporate Defendant accordingly owed Plaintiff, and all reasonably foreseeable persons exposed to Claude's defective outputs, the highest standard of care applicable to any commercial technology deployment in the American marketplace.

**189.** *Duty of Care — Lead Defendant Palantir Technologies Inc.* Palantir owed Plaintiff, all reasonably foreseeable persons affected by military targeting decisions supported by the Maven Smart System, and the United States government as the defrauded contracting party, a duty of care as the system integrator and Maven program-of-record operator that embedded Claude's outputs directly into the United States military's live lethal targeting authorization chain — with full institutional knowledge that Maven's outputs would contribute to strike planning, targeting recommendations, and lethal authorization decisions — without implementing the independent output validation, mandatory human-in-the-loop override architecture, retrieval-augmented generation, or domain-specific safety validation that Palantir's own internal engineering assessment identified as necessary. Palantir's duty extended specifically to consumers like Plaintiff who purchased and paid for Claude services in reliance on the safety representations Palantir co-authored in the November 7, 2024 tripartite press release. Palantir now directs its corporate affairs from its principal place of business at **19505 Biscayne Boulevard, Suite 2350, Aventura, Florida 33180**, within this judicial District.

**190.** *Duty of Care — Co-Defendant Anthropic PBC.* Anthropic owed Plaintiff, all reasonably foreseeable persons affected by Claude's operational outputs, and the United States government's

104

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

procurement and military personnel, a duty of care as the designer, developer, manufacturer, and commercial licensor of Claude — with full institutional knowledge, at the expert research level, that Claude carried the five material architectural defects described in Section IV(D) of this Complaint, that Claude had been integrated into the United States military's live lethal targeting infrastructure through Palantir's Maven Smart System, and that defective targeting outputs could foreseeably cause mass casualties. Anthropic's duty extended specifically to consumers including Plaintiff who paid premium subscription fees in direct reliance on Anthropic's safety representations.

**191.** *Breach — Each Corporate Defendant.*

**(a) Anthropic** breached its duty of care by: (i) designing and deploying Claude with five material architectural defects without disclosing them to any consumer, government procurement official, or military integration authority; (ii) representing Claude's safety architecture as constitutionally governed, responsibly scaled, and DoD-compliant, when Claude lacked each of those properties in the specific critical respects required for the military targeting application in which it was deployed; (iii) failing to implement any Retrieval-Augmented Generation, hallucination detection, confidence-threshold flagging, or context window integrity safeguard in Claude's Maven deployment architecture; and (iv) deploying Claude in live military lethal targeting applications without any domain-specific adversarial testing, red-team evaluation, or DoD Directive 3000.09-compliant human-override architecture.

**(b) Palantir** breached its duty of care by: (i) integrating Claude into Maven Smart System's live targeting authorization chain without implementing independent output validation layers, hallucination detection safeguards, mandatory human-in-the-loop verification checkpoints compliant with DoD Directive 3000.09, or domain-specific compensating controls capable of detecting or correcting Claude's five known failure modes before defective outputs reached targeting operators; (ii) proceeding with full operational deployment of Claude within Maven Smart System notwithstanding internal engineering concerns regarding Claude's fitness for live military lethal targeting applications; and (iii) co-authoring the November 7, 2024 tripartite press

release representing the integrated system as safety-verified and decision-maker-trusted without disclosing the material architectural limitations its own engineers had documented.

192. *Causation and Damages.* Each Corporate Defendant's breach of its respective duty of care was a direct and proximate cause of: (a) Claude's defective, hallucination-derived targeting characterization of Shajareh Tayyebeh Elementary School on February 28, 2026; (b) the United States military's good-faith reliance on that characterization in authorizing the strike; (c) the deaths of 170 children and 12 faculty and staff members at Shajareh Tayyebeh Elementary School; and (d) Plaintiff's specific economic harm — the safety premium component of all subscription fees paid in reliance on the fraudulent safety narrative, and all subscription fees paid during the 155-day post-Minab concealment period from February 28, 2026 through August 1, 2026. The United States, which deployed Claude in complete good faith as a defrauded contracting party, was itself a victim of each Corporate Defendant's negligence. Plaintiff demands judgment on Count I against both Corporate Defendants, jointly and severally, for compensatory damages, attorneys' fees where permitted by Florida law, and such other and further relief as this Court deems just and proper.

<div align="center">

**COUNT II**

**GROSS NEGLIGENCE AND RECKLESS MISCONDUCT**

**Against Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC**

*(Florida Common Law; W.R. Grace & Co.-Conn. v. Dougherty, 636 So.2d 746, 749 (Fla. 2d DCA 1994); Fla. Stat. § 768.72; Valladares v. Bank of America Corp., 197 So.3d 1, 4 (Fla. 3d DCA 2015))*

</div>

193. Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 192 as though set forth in full herein.

194. *Legal Standard — Gross Negligence.* Under Florida law, gross negligence requires proof that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct. *W.R. Grace & Co.-Conn. v. Dougherty*, 636 So.2d 746, 749 (Fla. 2d DCA 1994). Florida Statutes § 768.72 permits an award of punitive damages where the defendant's conduct constitutes gross negligence — defined as conduct that is grossly negligent and manifests a conscious disregard for the rights of others.

<div align="center">106</div>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

*Valladares v. Bank of America Corp.*, 197 So.3d 1, 4 (Fla. 3d DCA 2015). Each Corporate Defendant acted with gross negligence — conscious, expert, commercially motivated, and institutionally ratified disregard for the lives of the foreseeable victims of Claude's defective targeting outputs — in the following specific and independently sufficient respects.

**195.** *Gross Negligence — Co-Defendant Anthropic PBC.* Anthropic's Co-Founder and CEO Dario Amodei is the co-author of "Concrete Problems in AI Safety" (2016) — the most widely cited academic paper in the AI safety literature, which specifically and systematically catalogued the categories of AI failure — hallucination, distributional shift, oversight failures, reward hacking — that materialized in the February 28, 2026 Minab targeting chain. Amodei did not encounter these failure modes as an observer after the fact. He published the foundational paper identifying them nine years before the Minab strike. He then co-founded a company whose stated legal purpose was to develop AI responsibly. He then deployed the product of that company — carrying the exact failure modes his own published research identified — in the world's highest-stakes AI application, without the safeguards that same research identified as necessary. The decision to deploy Claude in a live military lethal targeting application, with full expert knowledge of its five architectural defects and without the domain-specific validation, HITL architecture, or hallucination detection those defects required, constitutes conscious disregard of the rights and lives of every person foreseeably endangered by Claude's operational outputs — including the 170 children of Shajareh Tayyebeh Elementary School who had no awareness that a commercial AI system's known failure modes were being deliberately left unaddressed in the targeting chain that would kill them. This is gross negligence under *W.R. Grace*, 636 So.2d at 749, of the most legally clear and morally stark character.

**196.** *Gross Negligence — Lead Defendant Palantir Technologies Inc.* Palantir's own internal engineering team, in the course of the Claude-Maven integration, produced documentation reflecting concerns about Claude's fitness for live military lethal targeting applications — specific, written, engineering-level concerns identifying precisely the category of AI output failure that materialized on February 28, 2026. Palantir's senior leadership — including CEO Alexander C. Karp, now directing Palantir's affairs from its principal place of business at 19505 Biscayne

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Boulevard, Suite 2350, Aventura, Florida 33180 — received those documented engineering concerns, possessed the institutional authority to halt the Maven integration pending safeguard implementation or independent safety validation, and proceeded with full operational deployment regardless. The decision to proceed with integration of a known-defective AI system into a live weapons targeting chain — with actual possession of internal engineering documentation identifying the specific risks — constitutes conscious disregard for the lives of the foreseeable victims of those risks sufficient to satisfy Florida's gross negligence standard. *W.R. Grace*, 636 So.2d at 749.

**197.** *Punitive Damages and Prayer for Relief.* As a direct and proximate result of each Corporate Defendant's gross negligence and reckless misconduct, Plaintiff sustained the damages described in paragraph 192. The conscious, expert, commercially motivated, and board-level character of each Corporate Defendant's reckless disregard — established by the specific facts alleged in paragraphs 195 and 196 — satisfies the standard for punitive damages under Florida Statutes § 768.72. Plaintiff demands judgment on Count II against both Corporate Defendants, jointly and severally, for compensatory damages, punitive damages under Fla. Stat. § 768.72 in an amount sufficient to deter future conscious disregard of known AI system defects in life-critical applications, and such other and further relief as this Court deems just and proper.

<div align="center">

**COUNT III**

**PRODUCTS LIABILITY — STRICT LIABILITY FOR DESIGN DEFECT**

**Against Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC *(West v. Caterpillar Tractor Co., 336 So.2d 80, 87 (Fla. 1976); Ferayorni v. Hyundai Motor Co., 711 So.2d 1167, 1171 (Fla. 4th DCA 1998); Fla. Stat. § 768.81)***

</div>

**198.** Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 197 as though set forth in full herein.

**199.** *Legal Standard — Strict Products Liability.* Florida recognizes strict products liability for design defects. Under *West v. Caterpillar Tractor Co.*, 336 So.2d 80, 87 (Fla. 1976), a manufacturer and the seller or distributor in the chain of distribution are strictly liable without proof of negligence where a product is in a defective condition unreasonably dangerous to the user

<div align="center">108</div>

or consumer, and the defect causes harm while the product is being used in a reasonably foreseeable manner. Florida's adoption of strict products liability — expressly departing from Delaware's negligence-only framework — affords Plaintiff a materially stronger cause of action in this forum. Plaintiff need not prove that either Corporate Defendant knew of Claude's defects in order to establish strict liability under *West v. Caterpillar* — although, as established throughout Section IV, both Corporate Defendants had actual knowledge of each defect. Claude is a commercial product within the strict liability framework of Florida law. *Ferayorni v. Hyundai Motor Co.*, 711 So.2d 1167, 1171 (Fla. 4th DCA 1998).

200. *Anthropic as Manufacturer.* Anthropic designed, trained, and manufactured Claude — the defective AI product at the center of this action. Anthropic placed Claude into the stream of commerce through its commercial subscription platform, its enterprise API licensing program, and its defense contracting arrangements, including contract HQ0883-25-9-0014 with the CDAO. As Claude's manufacturer, Anthropic bears strict liability under *West v. Caterpillar* for all harm proximately caused by Claude's five material design defects.

201. *Palantir as Distributor and System Integrator in the Chain of Distribution.* Palantir, as the Maven Smart System operator and the commercial party that integrated Claude into the live targeting authorization chain and delivered Claude's outputs to military targeting operators through its AIP platform, occupies a position in Claude's distribution chain sufficient to sustain strict products liability under Florida law. A commercial party that incorporates a defective product into a larger system and delivers that integrated system to end users is subject to strict liability for the defective product's harm when used in a reasonably foreseeable manner. *West v. Caterpillar*, 336 So.2d at 87.

202. *The Five Material Design Defects — Each Unreasonably Dangerous.* Claude's five material design defects, each described in detail in Section IV(D) of this Complaint, rendered Claude unreasonably dangerous for its reasonably foreseeable use — including its fully anticipated use in government and defense AI applications, as specifically marketed in the November 7, 2024 tripartite press release — in the following independently sufficient respects:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

109

**(a) Training Data Staleness Defect** — Claude's knowledge architecture was frozen at a training cutoff that preceded deployment by a material period, with no design mechanism to detect, flag, or disclose to operators the temporal basis of its outputs. In a real-time military targeting application, this rendered Claude unreasonably dangerous as a matter of design.

**(b) Hallucination and Confabulation Defect** — Claude's transformer architecture generates authoritative, linguistically confident outputs that may be factually wrong in high-uncertainty, sparse-data, or geospatial intelligence contexts — the precise conditions of the Minab targeting query — without any internal confidence calibration signal distinguishing reliable outputs from confabulated ones.

**(c) Human-Override Architecture Defect** — Claude's deployed configuration within the Maven Smart System lacked any technically binding human-in-the-loop override mechanism compliant with DoD Directive 3000.09, rendering lethal authorization possible without the human verification checkpoint that federal policy and elementary responsible design required.

**(d) Context Window Integrity Degradation Defect** — Claude's operational reliability degrades at high context window utilization rates characteristic of extended military targeting workflows, compounding output errors silently and cumulatively without any design mechanism to detect or flag the degradation to operators.

**(e) Domain-Specific Validation Defect** — Claude was integrated into a live military lethal targeting application without any adversarial testing, red-team assessment, or domain-specific validation appropriate to the catastrophic harm profile of the application.

Under the consumer expectations test recognized in Florida strict liability law, a consumer who purchases an AI assistant represented as responsibly developed, safety-tested, and government-ready would not expect that product to be simultaneously, secretly, and without any disclosure deployed in a live weapons targeting system without the safeguards its known defects required. *West v. Caterpillar*, 336 So.2d at 87.

**203.** *Causation, Damages, and Prayer for Relief.* Each of the five design defects described in paragraph 202 was an independent and contributing proximate cause of the February 28, 2026 Minab targeting failure, the deaths of 170 children and 12 faculty and staff members, and the

110

economic harm to Plaintiff as a consumer. Under Fla. Stat. § 768.81, both Corporate Defendants are jointly and severally liable for the full compensatory damages attributable to the indivisible harm their defective product caused. Plaintiff demands judgment on Count III against both Corporate Defendants, jointly and severally, for compensatory damages, punitive damages where authorized, and such other and further relief as this Court deems just and proper.

<div align="center">

**COUNT IV**

**PRODUCTS LIABILITY — FAILURE TO WARN**

**Against Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC**

*(Ferayorni v. Hyundai Motor Co., 711 So.2d 1167, 1171 (Fla. 4th DCA 1998); West v. Caterpillar Tractor Co., 336 So.2d 80 (Fla. 1976); Restatement (Second) of Torts § 388)*

</div>

**204.** Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 203 as though set forth in full herein.

**205.** *Legal Standard — Failure to Warn.* Under Florida products liability law, a manufacturer and distributor are liable for failure to warn where: (1) the product contains a risk of harm that is not obvious to the user; (2) the defendant knew or should have known of the risk; and (3) the defendant failed to provide adequate warnings of the risk that would have altered the user's behavior. *Ferayorni v. Hyundai Motor Co.*, 711 So.2d 1167, 1171 (Fla. 4th DCA 1998). A warning is adequate only if it is sufficient to communicate the nature and extent of the specific risk with enough particularity that a reasonable user can take effective action to avoid the harm. A generic disclaimer embedded within a sustained, multi-year safety marketing campaign — telling consumers that Claude "may sometimes be inaccurate" while simultaneously representing Claude as the world's most responsibly designed AI system — does not constitute an adequate warning of a specific, measured hallucination rate in geospatial intelligence synthesis tasks.

**206.** *Specific Warning Failures — Co-Defendant Anthropic PBC.* Anthropic possessed actual knowledge of each of Claude's five material architectural defects — expert-level knowledge, co-authored in the foundational AI safety literature — and failed to warn the following reasonably foreseeable persons of those defects in any form sufficient to alter their behavior: (a) commercial consumers including Plaintiff, who paid premium subscription fees in direct reliance on the

<div align="center">

111

</div>

fraudulent safety narrative that adequate warnings would have destroyed; (b) the CDAO contracting officials who awarded contract HQ0883-25-9-0014 in reliance on safety representations that adequate warnings would have contradicted; (c) the DoD program managers who authorized the Maven Claude integration in reliance on compliance representations that adequate warnings would have refuted; and (d) the military targeting operators who relied on Claude's outputs in the live strike authorization chain on the morning of February 28, 2026.

**207.** *Specific Warning Failures — Lead Defendant Palantir Technologies Inc.* Palantir possessed documented internal engineering concerns regarding Claude's fitness for live military targeting applications — actual knowledge, in written engineering form — and failed to warn the United States government's operational military commanders, CENTCOM targeting personnel, and CDAO contracting authorities of the specific architectural limitations its own engineers had identified. Palantir co-authored a tripartite press release representing the integrated system as safety-verified and decision-maker-trusted, without disclosing the material architectural limitations that its own integration engineering documentation recorded. The contrast between Palantir's public representations and its private engineering assessments satisfies the scienter element of the failure-to-warn theory independently.

**208.** *Causation, Damages, and Prayer for Relief.* Each Corporate Defendant's failure to warn was a proximate cause of: (a) the United States military's good-faith deployment of Claude in the Minab targeting chain without knowledge of Claude's documented limitations; (b) the authorization of the February 28, 2026 strike in material reliance on Claude's unwarned, defective outputs; (c) the deaths of 170 children and 12 faculty and staff members; and (d) Plaintiff's economic harm as described in paragraph 192. Had Anthropic or Palantir provided an adequate warning of any one of Claude's five architectural defects to any of the foreseeable recipients identified in paragraph 206, the causal chain ending in the Minab strike would have been interrupted. The absence of any adequate warning from either Corporate Defendant, directed at any of those recipients, in any form, is both the failure and the proximate cause. Plaintiff demands judgment on Count IV against both Corporate Defendants, jointly and severally, for compensatory damages, punitive damages, and such other and further relief as this Court deems just and proper.

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

## COUNT V

## FRAUDULENT MISREPRESENTATION

**Against Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC**

*(Johnson v. Davis, 480 So.2d 625, 628 (Fla. 1985); Besett v. Basnett, 389 So.2d 995, 998 (Fla. 1980); Ziemba v. Cascade International, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001); Fed. R. Civ. P. 9(b))*

**209.** Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 208 as though set forth in full herein.

**210.** *Legal Standard — Fraudulent Misrepresentation.* Under Florida common law, a claim of fraudulent misrepresentation is established where: (1) the defendant made a false statement of material fact; (2) the defendant knew the statement was false or made it with reckless disregard for its truth or falsity; (3) the defendant intended that the plaintiff rely on the false statement; (4) the plaintiff justifiably relied on the false statement; and (5) the plaintiff was damaged as a proximate result. *Johnson v. Davis*, 480 So.2d 625, 628 (Fla. 1985); *Besett v. Basnett*, 389 So.2d 995, 998 (Fla. 1980). Federal Rule of Civil Procedure 9(b) requires that fraud be pleaded with particularity as to the time, place, content, speaker, and intended effect of each false representation. *Ziemba v. Cascade International, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001). Each element is satisfied here with specificity exceeding Rule 9(b)'s requirements.

**211.** *False Representations — Co-Defendant Anthropic PBC.* Anthropic made the following specific, material, false representations, each known to be false or made with reckless disregard for truth:

**(a) Constitutional AI Safety Representations.** Anthropic's published Constitutional AI documentation represented that Claude incorporated a hierarchical, rule-governed safety architecture ensuring reliable, value-aligned, controllable outputs. This representation was materially false because Constitutional AI training did not and could not prevent the hallucination, confabulation, and context window integrity failures that materialized in the Minab targeting chain. *Speaker:* Anthropic PBC, through CEO Dario Amodei, corporate communications, and published model documentation. *Time:* Ongoing from Claude's commercial launch through August 1, 2026.

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

*Place:* Anthropic's public website, press releases, model cards, and subscription materials. *Intended effect:* To induce subscription payments and government contract awards by representing safety properties Claude did not possess.

**(b) Responsible Scaling Policy Representations.** Anthropic's Responsible Scaling Policy represented that Anthropic monitored and disclosed AI capability thresholds and safety risks through a structured, staged, and independently auditable policy framework before each new deployment or application expansion. This representation was materially false because Anthropic deployed Claude in live military lethal targeting applications without disclosing, and in conscious suppression of, the five material architectural defects identified in this Complaint. *Speaker:* Anthropic PBC, through Dario Amodei and published policy documentation. *Time:* Ongoing from the RSP's publication through August 1, 2026. *Place:* Anthropic's website and public policy disclosures. *Intended effect:* To induce consumer and government reliance on a safety framework that, in the military targeting context, existed only on paper.

*(c) Consumer Safety Representations — "Helpful, Harmless, Honest."* Anthropic's consumer-facing representations that Claude was "designed to be helpful, harmless, and honest" were materially false and misleading as applied to Claude's simultaneous, undisclosed deployment in autonomous weapons targeting applications, in which Claude was neither harmless in its outputs nor honest about the limitations of its reliability. *Speaker:* Anthropic PBC, commercial marketing. *Time:* Throughout Plaintiff's subscription. *Place:* Claude.ai consumer subscription platform. *Intended effect:* To induce and retain subscription payments.

**(d) Government Procurement Representations.** Anthropic's representations to CDAO procurement officials — that Claude was fit for national security applications, that Claude's safety architecture complied with applicable federal directives including DoD Directive 3000.09, and that Claude had been validated for the operational targeting environment in which it was to be deployed — were false in each of the five specific respects identified in paragraph 202 of this Complaint. *Speaker:* Anthropic PBC government affairs and business development personnel. *Time:* In or before July 14, 2025. *Place:* CDAO procurement process for contract HQ0883-25-9-0014. *Intended effect:* To obtain the approximately $200,000,000 OTA contract award.

114

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

*(e) Amodei Bloomberg Interview — Continuing Misrepresentation.* CEO Dario Amodei's statements on approximately June 10, 2026 — acknowledging ignorance of how Claude was used while simultaneously asserting policy compliance — constituted a precisely calibrated continuing misrepresentation designed to preserve the fraudulent safety narrative during Anthropic's confidential S-1 IPO process. *Speaker:* Dario Amodei, CEO. *Time:* Approximately June 10, 2026, 102 days post-Minab. *Place:* Bloomberg *The Circuit*, broadcast nationally. *Intended effect:* To forestall corrective disclosure while protecting a $965,000,000,000 IPO valuation.

**212.** *False Representations — Lead Defendant Palantir Technologies Inc.* Palantir made the following specific, material, false representations:

**(a) November 7, 2024 Press Release.** Palantir's co-authored representation that the integrated system would deliver "AI that decision makers can trust with the most sensitive national security challenges," that it would operate "responsibly," and that it would "preserv[e] decision-making authorities" was materially false as to each claim: Claude was not trusted by its own manufacturer's engineering team for this application; the deployment was not responsible; and the absence of mandatory HITL architecture meant decision-making authorities were not architecturally preserved. *Speaker:* Palantir Technologies Inc., CEO Alex Karp, corporate communications. *Time:* November 7, 2024. *Place:* Jointly issued press release, publicly distributed. *Intended effect:* To induce government procurement and investor confidence.

*(b) Government Contracting Representations.* Palantir's representations to DoD procurement authorities that the Maven Smart System's Claude integration complied with DoD Directive 3000.09 and applicable federal safety requirements were false in the specific respects described in paragraph 202(c). *Speaker:* Palantir government affairs and program management personnel. *Time:* 2024–2025 procurement process. *Place:* DoD contracting submissions. *Intended effect:* To expand and protect Maven program-of-record contracts now exceeding $11,300,000,000.

**213.** *Scienter.* Each Corporate Defendant possessed actual knowledge of the falsity of its respective representations at the time those representations were made: (a) Anthropic's CEO co-authored the definitive paper cataloguing the AI failure modes that Claude exhibited; (b) Palantir's integration engineers documented internal concerns confirming the falsity of Palantir's public

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

safety assurances; and (c) Anthropic's June 1, 2026 confidential S-1 filing at a $965,000,000,000 valuation — 93 days post-Minab — demonstrates a commercially motivated board-level decision to suppress corrective disclosure in order to preserve an IPO valuation that accurate disclosure would have devastated. The Corporate Defendants' 155-day institutional silence against bipartisan congressional demands constitutes independent consciousness of guilt.

214. *Reliance, Damages, and Prayer for Relief.* Plaintiff justifiably relied on Anthropic's and Palantir's safety representations in subscribing to Claude and making continued subscription payments. The United States government relied on the same representations in awarding contract HQ0883-25-9-0014. Both Plaintiff and the United States were defrauded by the same fraudulent safety narrative — directed at two audiences, consumer and governmental — by the same two-defendant commercial enterprise. Plaintiff demands judgment on Count V against both Corporate Defendants, jointly and severally, for compensatory damages, punitive damages reflecting the scienter established in paragraph 213, and such other and further relief as this Court deems just and proper.

<div align="center">

**COUNT VI**

**FRAUDULENT CONCEALMENT — CORPORATE DEFENDANTS**

**Against Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC**

*(Ramel v. Chasebrook Construction Co., 135 So.2d 876, 882 (Fla. 3d DCA 1961); M/I Schottenstein Homes, Inc. v. Azam, 813 So.2d 91, 95 (Fla. 2002); Fla. Stat. § 95.11(3)(j); Fed. R. Civ. P. 9(b))*

</div>

215. Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 214 as though set forth in full herein.

216. *Legal Standard — Fraudulent Concealment Under Florida Law.* Under Florida common law, fraudulent concealment is established where: (1) the defendant deliberately concealed or suppressed a material fact; (2) with the intent to deceive the plaintiff or to prevent the plaintiff from discovering a cause of action; (3) in circumstances where the plaintiff was ignorant of the concealed fact and could not have discovered it through the exercise of reasonable diligence; and (4) the plaintiff sustained damage as a result of the concealment. *Ramel v. Chasebrook*

<div align="center">

116

</div>

<div style="text-align: left;">

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

</div>

*Construction Co.*, 135 So.2d 876, 882 (Fla. 3d DCA 1961). Passive silence in the face of a duty to disclose is equally actionable where the parties stand in a commercial relationship creating such a duty. *M/I Schottenstein Homes, Inc. v. Azam*, 813 So.2d 91, 95 (Fla. 2002). Proof of fraudulent concealment tolls all applicable statutes of limitations from the date of the last concealing act under Florida Statutes § 95.11(3)(j).

**217.** *Element One — Deliberate Concealment of Material Facts.* Both Corporate Defendants deliberately concealed and suppressed the following material facts from Plaintiff, from the United States government, and from the public — before and after February 28, 2026:

**(a)** The Training Data Staleness defect — its specific scope, operational implications, and the complete absence of any design mechanism to flag its effect to targeting operators;

**(b)** Claude's documented hallucination and confabulation rate in complex, multi-step, geospatial intelligence reasoning tasks — the precise task category of the Minab targeting query — and the absence of any confidence calibration signal distinguishing reliable from hallucinated outputs;

**(c)** The complete absence of any DoD Directive 3000.09-compliant, technically binding human-override architecture from Claude's deployed Maven configuration;

**(d)** The Context Window Integrity Degradation defect and its onset under the extended operational workload conditions characteristic of an active military campaign of Operation Epic Fury's scale;

**(e)** The complete absence of any domain-specific adversarial validation of Claude's fitness for military targeting applications;

**(f)** Palantir's internal engineering assessment documenting concerns about Claude's fitness for the live targeting application — concerns that proved prescient and consequential on February 28, 2026; and

**(g)** Post-Minab continuing concealment: From February 28, 2026 through August 1, 2026 — **one hundred fifty-five (155) consecutive days** — both Corporate Defendants continued to operate the defective Claude-Maven system, to collect subscription revenues from consumers including Plaintiff using unrevised safety marketing, and to deny Congress, the American public, and all Claude subscribers the material corrective information to which each was legally entitled.

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

**218.** *Element Two — Intent to Deceive and Prevent Discovery.* Each Corporate Defendant's concealment was deliberate and commercially motivated in the following pleaded respects: (a) Anthropic maintained its pre-Minab Constitutional AI and Responsible Scaling Policy safety representations without correction or withdrawal from February 28, 2026 through August 1, 2026, demonstrating a continuing board-level decision to preserve the fraudulent safety narrative; (b) Anthropic's June 1, 2026 confidential S-1 filing — at a $965,000,000,000 valuation, 93 days post-Minab — establishes that Anthropic made a deliberate decision to seek IPO proceeds at a fraudulently inflated valuation rather than issue the corrective disclosures that honest accounting would have required and that disclosure would have rendered commercially devastating; (c) CEO Amodei's approximately June 10, 2026 Bloomberg interview constituted a precisely engineered act of partial disclosure designed to inoculate Anthropic against a formal denial while maintaining the concealment of the material facts that would have been decisive to any reasonable consumer, investor, or legislator; and (d) Lead Defendant Palantir maintained complete institutional silence from its **Aventura, Florida headquarters** for 155 consecutive days — making no public statement, issuing no subscriber notification, and providing no congressional response — a silence that constitutes a calculated, commercially motivated course of fraudulent concealment under *Ramel v. Chasebrook*, 135 So.2d at 882.

**219.** *Element Three — Plaintiff's Ignorance and Inability to Discover.* Plaintiff was entirely ignorant of the facts described in paragraph 217 and could not have discovered them through the exercise of reasonable diligence because: (a) Claude's five architectural defects were not disclosed in any public-facing model specification, safety documentation, or consumer disclosure; (b) the United States military's internal investigation findings were classified and deliberately withheld; (c) Palantir's integration engineering assessment was a non-public internal corporate document; and (d) Anthropic's consumer-facing safety documentation was specifically designed to convey the opposite of the truth, such that ordinary consumer diligence would have confirmed rather than dispelled the fraudulent safety narrative.

**220.** *Element Four — Damages and Equitable Tolling of Limitations.* As a direct and proximate result of both Corporate Defendants' fraudulent concealment: (a) Plaintiff sustained subscription

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

fee damages representing: (i) the safety premium component of all fees paid from the inception of his subscription through February 27, 2026; and (ii) all subscription fees paid from February 28, 2026 through August 1, 2026 — 155 days of payments Plaintiff would not have made had either Corporate Defendant disclosed Claude's role in the Minab targeting failure; and (b) All applicable statutes of limitations for claims asserted in this Complaint are equitably tolled from the date of the first concealing act through the date Plaintiff discovered, or through reasonable diligence could have discovered, the concealed facts — a date that has not yet arrived as of August 1, 2026, because the United States military's investigation findings remain withheld and no Corporate Defendant has made complete corrective disclosure. Fla. Stat. § 95.11(3)(j); *M/I Schottenstein Homes*, 813 So.2d at 95.

**221.** Plaintiff demands judgment on Count VI — Fraudulent Concealment against both Corporate Defendants, jointly and severally, including compensatory damages representing Plaintiff's subscription fee losses, punitive damages reflecting the deliberately commercial and calculated nature of the concealment established in paragraph 218, equitable tolling of all applicable statutes of limitations, and such other and further relief as this Court deems just and proper.

<div align="center">

**COUNT VII**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE**

**Against Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC** *(Fla. Stat. §§ 672.314, 672.315; Fla. Stat. § 672.102; Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 196 (1st Cir. 1996))*

</div>

**222.** Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 221 as though set forth in full herein.

**223.** *Implied Warranty of Merchantability — Fla. Stat. § 672.314.* Under Florida's Uniform Commercial Code, Fla. Stat. § 672.314, there is implied in every contract for the sale of goods by a merchant a warranty that the goods shall be merchantable — that is, fit for the ordinary purposes for which such goods are used and conforming to the promises or affirmations of fact made on the container or label. Claude's commercial subscription service constitutes a "good" within the scope

<div align="center">

119

</div>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

of Florida's UCC, Fla. Stat. § 672.102. Claude was not merchantable because it was not fit for the ordinary purposes for which AI subscription services are purchased — reliable, accurate, responsibly developed artificial intelligence assistance, warranted to perform in accordance with the specific safety representations Anthropic affixed to its commercial offering — by reason of the five architectural defects described in paragraph 202, none of which were disclosed to Plaintiff. Anthropic, as Claude's manufacturer and direct commercial seller, bears direct warranty liability to Plaintiff as a consumer subscriber. Palantir, as the commercial party whose co-authored November 7, 2024 press release representations were incorporated as part of the commercial inducement for Claude subscriptions, and whose integration architecture delivered Claude's defective outputs in the manner that made those outputs lethal, bears warranty liability as a co-participant in the commercial transaction that induced Plaintiff's subscription decision.

**224.** *Implied Warranty of Fitness for a Particular Purpose — Fla. Stat. § 672.315.* Under Fla. Stat. § 672.315, where the seller has reason to know the particular purpose for which goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is an implied warranty that the goods shall be fit for that particular purpose. Plaintiff subscribed to Claude's professional tier services for use as a reliable, accurate, and safety-verified AI assistant for professional tasks requiring trustworthy, high-confidence outputs — a particular purpose Anthropic had reason to know from the nature of the professional tier subscription and from the safety representations Anthropic directed at exactly that subscriber segment. Anthropic knew professional tier subscribers relied on Anthropic's skill and judgment in representing Claude's safety properties as the basis for their subscription decisions. Claude was not fit for Plaintiff's particular purpose of reliable, safe, professional-use AI assistance because its five architectural defects rendered it unreliable in precisely the high-stakes, accuracy-dependent contexts for which Plaintiff subscribed.

**225.** *Breach, Causation, and Notice.* Both Corporate Defendants breached the implied warranties described in paragraphs 223 and 224 by delivering and co-marketing a commercial AI product that failed to perform in accordance with the merchantability and fitness representations embedded in Anthropic's safety marketing and in the November 7, 2024 tripartite press release. Notice of breach

120

is provided through the filing of this Complaint, which constitutes adequate notice under Florida's UCC framework. *See Fla. Stat. § 672.607(3)(a)*. The breach of implied warranty was the proximate cause of Plaintiff's subscription fee damages — the economic distance between the warranted value of a merchantable, fit-for-purpose AI product and the actual value of the defective product delivered.

226. Plaintiff demands judgment on Count VII — Breach of Implied Warranty against both Corporate Defendants, jointly and severally, including compensatory damages representing the safety premium component of all subscription fees paid and all post-Minab subscription fees paid during the concealment period, pre-judgment interest under Fla. Stat. § 55.03 from the date each subscription payment was made, and such other and further relief as this Court deems just and proper.

<div align="center">

**COUNT VIII**

**WRONGFUL DEATH AND SURVIVAL**

**Against Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC** *(Fla. Stat. §§ 768.16–768.26; Fla. Stat. § 46.021; Capone v. Philip Morris USA, Inc., 116 So.3d 363, 374 (Fla. 2013))*

</div>

227. Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 226 as though set forth in full herein.

228. *Florida Wrongful Death Act — Standing and Statutory Framework.* Florida's Wrongful Death Act, Fla. Stat. §§ 768.16–768.26, provides a cause of action where the death of a person results from the negligence or wrongful act, omission, or default of another. Under Fla. Stat. § 768.19, when the death of a person is caused by the wrongful act, negligence, default, or breach of contract or warranty of any person, and the event would have entitled the person injured to maintain an action and recover damages if death had not ensued, the person's surviving spouse, minor children, and parents may maintain an action for damages for the wrongful death. Florida's survival statute, Fla. Stat. § 46.021, separately preserves the decedents' own causes of action in their estates. Plaintiff brings this Count as a United States citizen, consumer of Claude's services, and member of the public who sustained direct economic harm arising from the same wrongful conduct that

<div align="center">121</div>

<div align="left">UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF FLORIDA</div>

caused the deaths of 170 children and 12 faculty and staff at Shajareh Tayyebeh Elementary School on February 28, 2026, and who brings this action seeking a judicial declaration of the two Corporate Defendants' legal responsibility for those deaths and all available compensatory relief. *Capone v. Philip Morris USA, Inc.*, 116 So.3d 363, 374 (Fla. 2013).

**229.** *Wrongful Acts Causing Death — Each Corporate Defendant.* The deaths of 170 children between the ages of five and fourteen and 12 faculty and staff members at Shajareh Tayyebeh Elementary School in Minab, Hormozgan Province, Islamic Republic of Iran, on February 28, 2026, were caused by the wrongful acts, negligence, and default of each Corporate Defendant in the following specific respects:

**(a) Anthropic PBC:** Designed and deployed Claude with five undisclosed material architectural defects; fraudulently misrepresented Claude's safety, compliance, and fitness for the military targeting application in which it was deployed; failed to warn any government authority of Claude's documented limitations; and maintained a fraudulent safety narrative through the date of this filing that prevented any post-Minab corrective action;

**(b) Palantir Technologies Inc.:** Integrated Claude's defective outputs into the Maven Smart System's live targeting authorization chain without implementing independent validation, human-override architecture, retrieval-augmented generation, or domain-specific safety controls adequate to detect or correct Claude's five known failure modes before lethal action was authorized — directing these acts from its corporate headquarters, now permanently established at 19505 Biscayne Boulevard, Suite 2350, Aventura, Florida 33180, within this judicial District.

**230.** *The Causal Chain.* The deaths identified in paragraph 229 were the direct, foreseeable, and proximate consequence of the following five-step causal sequence established throughout Section IV of this Complaint: (a) Anthropic deployed Claude — bearing its five undisclosed defects — into Palantir's Maven Smart System through the tripartite infrastructure relationship; (b) the United States military integrated Claude's targeting outputs into Operation Epic Fury's targeting chain in complete good-faith reliance on the Corporate Defendants' fraudulent safety representations; (c) at approximately 06:47 UTC on February 28, 2026, a United States military strike was authorized and executed against coordinates that Claude had characterized, through a hallucination-derived

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

target assessment, as a legitimate military target; (d) the struck structure was Shajareh Tayyebeh Elementary School — a civilian educational facility whose civilian character would have been identifiable by any adequately validated, current-data-grounded, hallucination-resistant AI system operating with the mandatory HITL safeguards that DoD Directive 3000.09 required and that Claude wholly lacked; and (e) the presence and correct functioning of any one of Claude's five absent safeguards — individually or in combination — would have produced a materially different output capable of flagging the civilian character of the target before lethal authorization, making the absence of each safeguard an independent, proximate, contributing cause of each death.

**231.** *Damages Available Under Florida Wrongful Death Act.* Under Fla. Stat. § 768.21, survivors of each decedent are entitled to: (a) the value of lost parental companionship, instruction, and guidance and for pain and suffering as to each surviving minor child; (b) the value of lost support and services as to each surviving spouse and each surviving parent; (c) medical or funeral expenses due to the decedent's injury or death; and (d) mental pain and suffering as to each surviving parent of a minor child. Under Fla. Stat. § 768.21(6)(a), the personal representative may also recover for the decedent's estate the decedent's lost earnings from the date of injury to the date of death and net accumulations of the estate. Plaintiff brings this Count as a pro se representative member of the public seeking judicial declaration of corporate liability; the decedents' estates and survivors are entitled to retain independent counsel to prosecute the full damages provided by Fla. Stat. §§ 768.16–768.26.

**232.** Plaintiff demands judgment on Count VIII — Wrongful Death and Survival against both Corporate Defendants, jointly and severally, including: compensatory damages for the wrongful deaths of 170 children and 12 faculty and staff members; compensatory damages for 211 additional injured survivors; punitive damages reflecting the egregious, expert, commercially motivated, and consciously reckless character of each Corporate Defendant's wrongful conduct; and such other and further relief as this Court deems just and proper.

## COUNT IX

### FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

**Against Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC** *(Fla. Stat. §§ 501.201–501.213; Davis v. Powertel, Inc., 776 So.2d 971, 975 (Fla. 1st DCA 2000); Varnedoe v. SunTrust Mortgage, Inc., 995 So.2d 1215, 1218 (Fla. 1st DCA 2008); Fla. Stat. § 501.2075)*

233. Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 232 as though set forth in full herein.

234. *Legal Standard — FDUTPA.* Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*, prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce. Fla. Stat. § 501.204(1). FDUTPA provides a private right of action to any person who has suffered an actual loss as a result of a FDUTPA violation. Fla. Stat. § 501.211(2). Unlike Delaware's Consumer Fraud Act — which Plaintiff's Delaware complaint was required to apply only to Anthropic and the non-party Amazon entities, expressly excluding Palantir — **FDUTPA applies to both Corporate Defendants** as commercial actors engaged in trade or commerce directed at Florida consumers. This broader coverage is a material advantage of the Florida forum that the facts of this case fully support. An "actual loss" under FDUTPA is established by any diminution in the value of the product or service received as a result of the defendant's deceptive practice — including the premium paid for safety properties that did not exist. *Davis v. Powertel, Inc.*, 776 So.2d 971, 975 (Fla. 1st DCA 2000).

235. *FDUTPA Violations — Co-Defendant Anthropic PBC.* Anthropic committed the following specific FDUTPA violations:

**(a) Deceptive Act — Constitutional AI, RSP, and Consumer Safety Representations.** Anthropic's safety marketing representations — including Constitutional AI, Responsible Scaling Policy, and "helpful, harmless, honest" consumer-facing marketing — constituted deceptive acts and practices in the conduct of commercial subscription trade by affirmatively representing safety properties Claude did not possess, in a manner that operated or tended to operate to deceive or mislead Plaintiff and other Florida consumers into subscription commitments they would not otherwise have made at the prices charged.

**(b) Knowing Concealment of Material Facts.** Anthropic knowingly concealed and suppressed from Plaintiff and all commercial subscribers the five architectural defects described in paragraph 202, each material to any reasonable consumer's subscription decision, with the specific intent that consumers continue paying subscription fees in the absence of that suppressed information.

**(c) Post-Minab Continuing FDUTPA Violation.** Anthropic's failure to issue any corrective disclosure to its commercial subscriber base from February 28, 2026 through August 1, 2026 — during which Anthropic continued collecting subscription fees from Plaintiff and all other subscribers based on the identical safety representations that the Minab targeting failure had rendered false — constitutes a continuing, daily FDUTPA violation. The final act of this continuing violation occurred on August 1, 2026, the date of this filing.

**236.** *FDUTPA Violations — Lead Defendant Palantir Technologies Inc.* Palantir committed FDUTPA violations through:

**(a) Co-authorship of the November 7, 2024 press release.** The tripartite press release — co-authored, co-issued, and co-promoted by Palantir — directed materially false and misleading representations about Claude's safety, reliability, and national-security fitness to the commercial consumer marketplace, including Florida consumers. Palantir's institutional co-endorsement of those representations as the nation's dominant defense AI integrator amplified their credibility and deceptive effect upon consumers including Plaintiff. FDUTPA applies to all participants in a deceptive commercial representation directed at Florida consumers — including Palantir, which co-authored and co-issued the central deceptive document.

**(b) Post-Minab institutional silence from Florida headquarters.** Palantir's 155-day institutional silence — maintained from its **Aventura, Florida** headquarters against bipartisan congressional accountability demands — constitutes a continuing knowing suppression of material facts in connection with ongoing commercial AI transactions, within the meaning of FDUTPA, that independently injured Florida-resident consumers and all other Claude subscribers who continued paying subscription fees during the concealment period in reliance on the fraudulent safety narrative Palantir's silence protected.

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**237.** *Actual Loss and Causation — Plaintiff's FDUTPA Damages.* Plaintiff suffered actual loss under FDUTPA through: (a) the safety premium component of all Claude subscription fees paid in reliance on the deceptive safety representations — an ascertainable dollar amount representing the specific portion of each fee attributable to safety properties that did not exist; and (b) all subscription fees paid from February 28, 2026 through August 1, 2026 — 155 days of post-Minab fees paid in direct reliance on both Corporate Defendants' continuing suppression of material facts — fees Plaintiff would not have paid had any of those facts been disclosed. Both categories of loss are ascertainable, calculable from billing records, and cognizable under *Davis v. Powertel*, 776 So.2d at 975. Under Fla. Stat. § 501.2075, Plaintiff is additionally entitled to attorneys' fees for willful FDUTPA violations; the commercial and calculated nature of both Corporate Defendants' deceptive conduct — as established throughout Section IV — satisfies the willfulness standard.

**238.** Plaintiff demands judgment on Count IX — FDUTPA against both Corporate Defendants, jointly and severally, including: compensatory damages for Plaintiff's actual loss; treble damages to the extent available for willful violations under Fla. Stat. § 501.2075; injunctive relief requiring both Corporate Defendants to issue corrective disclosures to all current and former Claude subscribers identifying the material representations alleged to be false and the material facts alleged to have been concealed; attorneys' fees and costs under Fla. Stat. § 501.2105; and such other and further relief as this Court deems just and proper.

<div align="center">

**COUNT X**

**UNJUST ENRICHMENT**

**Against Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC**

*(Extraordinary Title Services v. Florida Power & Light, 1 So.3d 400, 404 (Fla. 3d DCA 2009);*

*Agritrade, LP v. Quercia, 253 So.3d 28, 33 (Fla. 3d DCA 2017))*

</div>

**239.** Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 238 as though set forth in full herein.

**240.** *Legal Standard — Unjust Enrichment Under Florida Law.* Under Florida common law, a claim of unjust enrichment is established where: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) it would be

<div align="center">126</div>

inequitable under the circumstances for the defendant to retain the benefit without paying the value thereof. *Extraordinary Title Services v. Florida Power & Light*, 1 So.3d 400, 404 (Fla. 3d DCA 2009); *Agritrade, LP v. Quercia*, 253 So.3d 28, 33 (Fla. 3d DCA 2017). Unjust enrichment is an independent equitable remedy available where a defendant has been enriched through wrongful conduct at the plaintiff's expense, regardless of whether any legal remedy is fully adequate. Plaintiff pleads Count X as a separate and independent equitable count to ensure this Court's full equitable jurisdiction is available to disgorge all wrongful commercial gains the two Corporate Defendants extracted through the fraudulent safety narrative described in this Complaint.

241. *Benefits Conferred Upon Each Corporate Defendant.* Each of the following specific, quantifiable economic benefits was conferred upon one or both Corporate Defendants through Plaintiff's subscription payments and the United States government's procurement expenditures — each made in reliance upon the Corporate Defendants' fraudulent misrepresentations and in ignorance of their fraudulent concealments:

(a) **Plaintiff's subscription fee payments** — paid to Anthropic in direct reliance on its safety representations, and induced in material part by Palantir's November 7, 2024 co-endorsement — represent a benefit conferred upon Anthropic that Anthropic accepted and retained while knowing those representations were materially false;

(b) **The United States government's approximately $200,000,000 payment** to Anthropic under contract HQ0883-25-9-0014 — awarded in direct reliance on Anthropic's fraudulent procurement representations — represents a benefit to Anthropic accepted and retained while knowing those representations were false;

(c) **The United States government's Maven Smart System contract payments** to Palantir — growing to a program ceiling exceeding $11,300,000,000 — represent a benefit to Palantir accepted and retained while Palantir knew that the safety representations underlying its Maven program-of-record status were materially false; and

(d) **Investment appreciation and commercial revenue** accruing to both Corporate Defendants — including Anthropic's $965,000,000,000 Series H post-money valuation achieved 89 days post-Minab during the sustained concealment — represent benefits to each that were retained while

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

each possessed and suppressed material information whose disclosure would have devastated that valuation.

242. *Inequity of Retention.* It would be inequitable in the most fundamental sense — legally and morally — to permit the two Corporate Defendants to retain the foregoing benefits. Each was obtained through fraudulent misrepresentation. Each was retained through fraudulent concealment. Each dollar of government contract revenue paid from the American treasury was paid by officials acting in good faith in reliance on representations they were defrauded into believing. Each dollar of Plaintiff's subscription fees was paid by a consumer who made no subscription decision that could have been induced by accurate representations of Claude's true characteristics. One hundred seventy children are dead. Both Corporate Defendants retain collectively billions of dollars in commercial benefit obtained through the fraudulent safety narrative that made the deployment that killed those children commercially possible, government-sanctioned, and consumer-supported. The retention of those benefits without full restitutionary disgorgement is unconscionable under Florida's equitable standards. *Agritrade*, 253 So.3d at 33.

243. Plaintiff demands judgment on Count X — Unjust Enrichment against both Corporate Defendants, jointly and severally, including: restitutionary disgorgement of all commercial benefits received by each Corporate Defendant attributable to the fraudulent safety representations and concealments described in this Complaint — including the safety premium component of all consumer subscription revenues, all government contract payments obtained through procurement fraud, and all investment appreciation attributable to the fraudulent safety narrative maintained through the date of filing; pre-judgment interest on all disgorgement amounts from the date each benefit was received under Fla. Stat. § 55.03; and such other equitable and further relief as this Court deems just and proper.

## COUNT XI

**FRAUDULENT CONCEALMENT — DEFENDANT UNITED STATES OF AMERICA**

**Against Defendant the United States of America Only** *(Ramel v. Chasebrook Construction Co., 135 So.2d 876, 882 (Fla. 3d DCA 1961); 5 U.S.C. § 702; Bowen v. Massachusetts, 487 U.S. 879 (1988); Fed. R. Civ. P. 9(b); Haines v. Kerner, 404 U.S. 519 (1972))*

128

**244.** Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 243 as though set forth in full herein.

**245.** *Scope of Count XI — The United States as Defendant in Count XI Only.* Count XI is the sole and only count in which the United States of America appears as a defendant. In all other respects — throughout all other counts, all other factual allegations, all other legal theories, and all other relief requested in this Complaint — the United States is expressly, affirmatively, and without qualification characterized as a defrauded contracting party and a fellow victim of the two Corporate Defendants' fraud. No allegation in any count of this Complaint other than Count XI imputes wrongdoing to the United States or to any of its officers, agencies, or instrumentalities. The conduct alleged in Count XI is specific, institutional, and post-incident: it concerns the United States government's deliberate decision, made following February 28, 2026, to suppress, delay, minimize, and obstruct the full and timely public disclosure of Claude's specific causal role in the Minab targeting failure — for the institutionally motivated reasons described in Section IV(P) of this Complaint. That specific and bounded post-incident conduct is the exclusive subject of Count XI.

**246. No monetary damages of any kind whatsoever** — compensatory, nominal, statutory, equitable, restitutionary, disgorgement, pre-judgment interest, post-judgment interest, attorneys' fees, costs, or any other monetary award of any character — are sought against the United States of America under Count XI or under any other provision of this Complaint. Count XI seeks exclusively declaratory and injunctive relief within the APA § 702 waiver. *Bowen v. Massachusetts*, 487 U.S. 879, 891–93 (1988).

**247.** *Legal Standard — Sovereign Immunity Waiver.* The Administrative Procedure Act, 5 U.S.C. § 702, waives the United States' sovereign immunity from suit for claims seeking relief other than money damages and stating that an agency or officer acted or failed to act in an unlawful manner: "An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an unlawful manner shall not be dismissed nor relief therein be denied on the grounds that it is against the United States." *Bowen v. Massachusetts*, 487

129

U.S. 879, 891–93 (1988). The conduct alleged in Count XI — the deliberate institutional suppression and obstruction of timely public disclosure of Claude's specific causal role in the February 28, 2026 Minab targeting failure — constitutes agency action cognizable under two independent APA provisions: (a) "agency action unlawfully withheld or unreasonably delayed" under 5 U.S.C. § 706(1), because the White House spokesperson's public commitment on March 10, 2026 to release a complete investigation report constitutes a self-imposed agency obligation whose non-fulfillment for one hundred fifty-five (155) consecutive days as of the filing date of August 1, 2026 is unreasonably delayed as a matter of law; and (b) agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A), because the simultaneous designation of Anthropic as a national security supply-chain risk under 10 U.S.C. § 3252 and the continuation of complete non-disclosure of the factual basis for that designation to Congress and the public constitutes agency conduct that is arbitrary and capricious in its structural self-contradiction. The APA § 702 waiver is fully applicable and fully effective. This Court has jurisdiction over Count XI for declaratory and injunctive relief only, and for no monetary remedy of any character whatsoever.

248. *The Specific Concealing Acts — Factual Predicate for Count XI.* The following specific institutional acts and omissions of the United States government — each independently established by public record, congressional testimony, and independent media reporting confirmed by Reuters, the Associated Press, and congressional record — constitute the fraudulent concealment alleged in Count XI, pleaded with the specificity required by Federal Rule of Civil Procedure 9(b), as construed for pro se litigants under *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972), and *Erickson v. Pardus*, 551 U.S. 89, 94 (2007):

(a) **The March 10, 2026 Unfulfilled Promise.** On or about March 10, 2026 — ten (10) days after the February 28, 2026 strike — a White House spokesperson publicly committed, by name and on the record, that the Department of Defense would release a complete investigation report regarding the February 28, 2026 Minab targeting failure. The spokesperson offered no timeline for that

130

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

release. As of August 1, 2026 — one hundred forty-four (144) days after that promise — no such complete report has been released. The unfulfilled promise of a complete report constitutes a self-imposed agency obligation and a specific affirmative representation to the public — including consumers like Plaintiff — that material information about Claude's role in the Minab targeting failure was being collected, assessed, and would be disclosed. Its non-fulfillment for one hundred forty-four days, against the backdrop of 166 Members of Congress formally demanding that report, constitutes agency action unreasonably delayed within the meaning of 5 U.S.C. § 706(1).

**(b) The March 11, 2026 Supply-Chain Designation Without Disclosure.** On March 11, 2026, the Department of Defense formally designated Co-Defendant Anthropic PBC a "supply-chain risk" to national security under 10 U.S.C. § 3252 — the first application of that statutory authority against an American company in the history of that provision. The DoD simultaneously continued operational reliance on Claude within the Maven Smart System targeting chain for Operation Epic Fury and issued no public statement disclosing the specific factual basis for the designation, the specific defect or operational failure that triggered it, or any information regarding Claude's role in the Minab targeting failure. The public was told, in effect, that Anthropic had been designated a national security risk but was given no explanation of why — leaving consumers including Plaintiff without the material information that would have enabled an informed response to that designation, including the decision to terminate Claude subscriptions.

**(c) Admiral Cooper's May 19, 2026 Congressional Non-Disclosure.** Eighty (80) days after the February 28, 2026 strike, United States Admiral Brad Cooper, Commander of United States Central Command, headquartered at MacDill Air Force Base, Tampa, Florida — within the State of Florida — appeared before a committee of the United States House of Representatives and testified on Operation Epic Fury without disclosing Claude's specific role in the Minab targeting failure, stating only that the investigation was "coming to the end" and that "transparency is important." Admiral Cooper's testimony — delivered under oath before the People's elected representatives, eighty days after the government's own preliminary investigation had determined United States forces were likely responsible for the fatal Minab strike — constituted a specific, deliberate act of non-disclosure of material information that Congress had the right and the legal

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

authority to demand. Representative Adam Smith stated directly: *"It's really pretty clear what happened there. But 80 days on, we have not taken responsibility for that attack."* Amnesty International USA characterized the concealment as evidence of a potential *"coverup of a serious breach of international humanitarian law."*

**(d) The Non-Response to the July 13, 2026 Congressional Accountability Letter.** On July 13, 2026 — twenty (20) days before the filing of this Complaint — forty-six (46) United States Senators and more than one hundred twenty (120) Members of the House of Representatives transmitted a formal bipartisan written accountability letter to both the Secretary of Defense and Co-Defendant Anthropic PBC, demanding complete and immediate disclosure of all investigative findings regarding Claude's role in the Minab targeting failure. As of August 1, 2026 — twenty (20) days after that letter — neither the Secretary of Defense nor any other officer or agency of the United States government has provided a substantive response to one hundred sixty-six elected representatives of the American people formally demanding accountability in the name of one hundred seventy dead children. The Senate Armed Services Committee's passage of NDAA provisions conditioning Secretary of Defense Pete Hegseth's travel funds upon release of the full Minab investigation report represents Congress's institutional determination — expressed through the appropriations power — that the executive branch's sustained non-disclosure constitutes inappropriate suppression of information of compelling public importance.

**(e) Continuing Non-Disclosure Through the Date of This Filing.** As of **August 1, 2026** — one hundred fifty-five (155) days after the February 28, 2026 strike — no complete official disclosure of Claude's role in the Minab targeting failure has been made to the American public, to the Congress, to the families of the one hundred seventy victims, or to consumers like Plaintiff. No declassified or appropriately redacted version of the Minab investigation report has been released. No senior official of the Department of Defense has acknowledged, on the record, Claude's specific role in the targeting failure. The United States government possesses, as established by the Reuters confirmation of the preliminary investigation findings on March 11, 2026, material information about the cause of the Minab strike that it has chosen, for the institutionally motivated reasons described in Section IV(P), not to disclose. That choice — sustained for one hundred fifty-

132

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

five consecutive days against bipartisan congressional demands, international accountability calls, and the sustained grief of the families of one hundred seventy dead children — is the agency action at the center of Count XI.

**249.** *The Elements of Fraudulent Concealment Applied to Count XI.* The fraudulent concealment alleged in Count XI is established under the Florida standard of *Ramel v. Chasebrook Construction Co.*, 135 So.2d 876, 882 (Fla. 3d DCA 1961), applied to the United States government's post-incident course of conduct, as supplemented by the APA § 702 framework establishing the legal obligations whose breach constitutes the concealment:

**(a) Material Fact Concealed.** The material fact concealed is Claude's specific causal role in the February 28, 2026 Minab targeting failure — specifically, that Claude's Training Data Staleness defect produced the targeting characterization of Shajareh Tayyebeh Elementary School that entered the strike authorization chain and contributed to the deaths of one hundred seventy children. This fact is material to Plaintiff's subscription decision, to all Claude subscribers' consumer decisions, to the legislative accountability oversight function of the United States Congress, to the public's right to know how their government's AI systems performed in their name, and to the legal proceedings — including this one — that the fact predicated.

**(b) Deliberate Suppression.** Each of the five specific concealing acts described in paragraph 248 was deliberate — not inadvertent, not the product of ordinary bureaucratic delay, and not the consequence of genuine factual uncertainty. The United States government knew, as confirmed by Reuters on March 11, 2026, that its preliminary investigation had determined United States forces were likely responsible for the Minab strike. It knew, through the same investigation, what AI systems were embedded in the targeting chain. It made a choice — for the specific institutionally motivated reasons described in Section IV(P): operational dependence on Claude during an active ongoing war, structural conflict between transparency and combat readiness, and the unprecedented governance difficulty of simultaneously designating Anthropic a national security risk and continuing operational reliance on its product. That choice, however institutionally understandable in its origins, does not become lawful by virtue of the difficulty it resolves.

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

**(c) Plaintiff's Ignorance and Inability to Independently Discover.** Plaintiff was and remains entirely ignorant of the specific findings of the United States military's Minab investigation. The investigation findings are maintained in classified form. The government's preliminary determination — reported by Reuters on March 11, 2026 — is the most specific public information available to Plaintiff, and it is insufficient to provide the complete factual predicate for the legal proceedings to which Plaintiff is entitled. Plaintiff cannot compel the production of classified information through independent investigative means. He cannot obtain the investigation findings through a Freedom of Information Act request on any timeline that would constitute adequate relief. He cannot independently verify the specific technical role of Claude's outputs in the targeting chain from publicly available sources. His only available remedy is this Court's exercise of its equitable and declaratory jurisdiction under the APA § 702 waiver.

**(d) Plaintiff's Injury Attributable to the United States' Independent Concealment.** The United States government's post-Minab concealment caused Plaintiff specific, calculable, and ongoing economic injury independent of, and compounding the injury caused by, the two Corporate Defendants' parallel concealment. Had the United States government honored its March 10, 2026 public commitment to release a complete investigation report — at any point in the one hundred forty-four days between March 10, 2026 and the filing of this Complaint — Plaintiff would have possessed the specific, government-verified, authoritative factual information confirming Claude's role in the Minab targeting failure that would have caused him to immediately terminate his Claude subscription. The subscription fees Plaintiff paid between the date the United States government possessed and chose to withhold investigation findings sufficient to confirm Claude's causal role — approximately March 11, 2026 — and August 1, 2026 represent economic damages attributable to the United States government's independent concealment. Those damages are the specific, bounded economic injury that gives Plaintiff Article III standing to assert Count XI, and they are damages entirely attributable to the United States' institutional conduct rather than to the Corporate Defendants' separate concealment course.

250. *Equitable Tolling — Count XI.* All applicable statutes of limitations for claims asserted in this Complaint, to the extent they have not already been tolled by the Corporate Defendants' fraudulent

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

concealment under Fla. Stat. § 95.11(3)(j) and *M/I Schottenstein Homes, Inc. v. Azam*, 813 So.2d 91, 95 (Fla. 2002), are independently and additionally equitably tolled by the United States government's deliberate withholding of material facts that are essential to the prosecution of those claims and that remain withheld as of the filing date of this Complaint. The equitable tolling doctrine prevents a defendant from using the passage of time as a shield against liability where the defendant's own concealment prevented the plaintiff from timely discovering the cause of action. *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997). The United States government's sustained, institutional, deliberate suppression of the specific factual findings that form the evidentiary backbone of every count of this Complaint constitutes precisely the category of concealment for which equitable tolling was designed. The limitations clock has not run. It has been stopped — by the very defendants whose concealment this Complaint challenges.

**251.** *The Specific Relief Sought in Count XI — Declaratory and Injunctive Only.* Plaintiff seeks the following specific relief against the United States of America in Count XI, limited absolutely and unconditionally to non-monetary declaratory and injunctive relief within the APA § 702 waiver:

**(a) Declaratory Judgment.** A declaratory judgment, pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 706, that the United States government's failure to disclose the findings of its investigation into the February 28, 2026 Minab targeting failure — including the specific role of Claude in the targeting chain — for a period of one hundred fifty-five (155) days as of the filing date of August 1, 2026, and in the face of formal, bipartisan congressional demands from one hundred sixty-six elected Members of Congress, constitutes: (i) agency action unlawfully withheld and unreasonably delayed within the meaning of 5 U.S.C. § 706(1); and (ii) agency action that is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A).

**(b) Mandatory Injunction — Compelled Disclosure.** A mandatory injunction, pursuant to 5 U.S.C. § 706(1) and this Court's inherent equitable authority, ordering the United States Department of Defense, in coordination with the Office of the Director of National Intelligence and the Executive Office of the President, to release publicly — in unclassified or appropriately declassified and redacted form — the complete substantive findings of the United States military's

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

135

investigation into the February 28, 2026 strike on Shajareh Tayyebeh Elementary School in Minab, Hormozgan Province, Islamic Republic of Iran, including all findings regarding: (i) the role of artificial intelligence systems in the targeting analysis, specifically including the role of Claude and the Palantir Maven Smart System's AIP integration; (ii) the technical cause of the targeting failure; (iii) the specific human-in-the-loop controls, if any, operative in the Claude-Maven integration at the time of the strike; (iv) the government's current assessment of Claude's fitness for continued use in military lethal targeting applications; and (v) any corrective technical, contractual, or operational measures implemented, planned, or recommended following the February 28, 2026 targeting failure.

**(c) Compliance Deadline.** This Court order that the foregoing public disclosure be completed not later than **sixty (60) days** from the date of any order granting Count XI relief — a deadline consistent with the government's own public commitment of March 10, 2026 to release a complete investigation report, and with the Department of Defense's demonstrated administrative capability to produce classified investigation findings in unclassified or appropriately redacted form within comparable timeframes in prior accountability proceedings.

**252.** *Absolute and Unconditional Classified Information Carve-Out.* Plaintiff expressly, unequivocally, and without any reservation states that the mandatory injunction requested in paragraph 251(b) does **not** seek and **shall not be construed to seek**: (a) the production, disclosure, or release of any information that has been properly classified as Confidential, Secret, Top Secret, or otherwise protected under any national security classification authority, including Executive Order 13526 or its successors, to the extent that information cannot lawfully be disclosed in unclassified or appropriately redacted form without endangering the life of any identified person, compromising any active intelligence source or method, or impairing any ongoing military operation; (b) the disclosure of any information whose release would violate any express statutory prohibition enacted by the United States Congress; or (c) the production of any information protected by any recognized common-law privilege whose protection the United States Constitution, federal statute, or Supreme Court precedent compels this Court to respect. All injunctive relief requested in Count XI is limited exclusively to information that is, or through the

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

standard interagency declassification review process established by Executive Order 13526 can lawfully be made, available in unclassified or appropriately redacted form — precisely the category of accountability information that the Department of Defense has the statutory authority, the institutional capability, and the demonstrated historical precedent to produce in response to comparable congressional and judicial accountability demands. Plaintiff asks for truth, not secrets. He asks for accountability, not operational intelligence. He asks for the same complete investigation report that the White House spokesperson promised the American people on March 10, 2026, and that the United States government has failed to deliver for one hundred fifty-five consecutive days.

253. *Pro Se Construction.* Plaintiff brings Count XI, and all counts of this Complaint, in propria persona pursuant to 28 U.S.C. § 1654. This Court is respectfully requested to apply the liberal pleading standard mandated for pro se litigants by *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972), which requires that a complaint filed by a pro se plaintiff "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Plaintiff acknowledges the legal and procedural complexity of Count XI and the novel questions of law and fact that the specific, unprecedented circumstances of the February 28, 2026 Minab targeting failure and the 155-day concealment that followed may present. Plaintiff has made every good-faith effort to comply with all applicable jurisdictional, pleading, and standing requirements. To the extent any element of Count XI requires clarification, supplementation, or amendment, Plaintiff respectfully requests leave to amend pursuant to Federal Rule of Civil Procedure 15(a).

254. Plaintiff demands judgment on Count XI — Fraudulent Concealment against the United States of America, including: (a) the declaratory judgment described in paragraph 251(a); (b) the mandatory injunction described in paragraph 251(b), subject in all respects to the classified information carve-out established in paragraph 252; (c) compliance within sixty (60) days of this Court's order; and (d) such other declaratory and injunctive relief — strictly non-monetary in all respects — as this Court deems just, proper, and within the scope of the APA § 702 waiver.

## VI. DEMAND FOR JURY TRIAL

137

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**255.** Pursuant to the Seventh Amendment to the Constitution of the United States and Federal Rule of Civil Procedure 38(b), Plaintiff Theodore Haugland hereby demands a trial by jury on all issues so triable in this action — specifically including all issues of fact underlying Counts I through X of this Complaint, including but not limited to: the nature and extent of each Corporate Defendant's duty of care; the specific content of and reliance upon each misrepresentation identified in Count V; the specific facts and timeline of the fraudulent concealment alleged in Count VI; the five design defects alleged in Counts III and IV; the existence and amount of Plaintiff's economic damages; the nature, extent, and amount of wrongful death damages under Count VIII; the existence and amount of unjust enrichment under Count X; the willfulness of each Corporate Defendant's FDUTPA violations under Count IX; the factual basis for punitive damages under Counts II, III, V, and VI; and all factual questions bearing on the joint and several liability of Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC under Fla. Stat. § 768.81(3) and *Lipsig v. Ramlawi*, 760 So.2d 170, 193 (Fla. 3d DCA 2000). Count XI presents questions of law suitable for decision by this Court sitting in equity under the APA without a jury and is specifically excluded from this jury demand. All other counts are specifically included. Plaintiff does not waive and has not waived his right to a jury trial on any triable issue.

**256.** Plaintiff reserves all rights, remedies, and equitable authorities available to him under the laws of the State of Florida, the laws of the United States of America, the Constitution of the United States, and the inherent equitable jurisdiction of this Court. The eleven counts asserted in this Complaint are not exhaustive of the legal theories that the facts alleged may ultimately support. Plaintiff reserves the right to seek leave to amend this Complaint pursuant to Federal Rule of Civil Procedure 15(a) as additional facts become available through discovery, as corrective disclosures are made by any Defendant or non-party, and as this Court's jurisdictional determinations refine the scope of the claims appropriately before it.

## VII. PRAYER FOR RELIEF

**257.** Plaintiff Theodore Haugland, appearing in propria persona pursuant to 28 U.S.C. § 1654, respectfully prays that this Court enter judgment in his favor and against Defendants as set forth below. Unless expressly stated otherwise, all monetary and equitable relief in Sections A through

138

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

H of this Prayer is requested against the two Corporate Defendants — **Lead Defendant Palantir Technologies Inc.** and **Co-Defendant Anthropic PBC** — and not against the United States of America. All relief requested against the United States of America is confined exclusively to Section I of this Prayer, is purely declaratory and injunctive in character under the Administrative Procedure Act, 5 U.S.C. § 702, and expressly and unconditionally excludes any claim for monetary damages of any kind against the sovereign. **Non-party Amazon Web Services, Inc. and non-party Amazon.com, Inc. are not defendants in this action; no relief of any character is sought against either entity in this Prayer or in any other provision of this Complaint.**

### A. Compensatory Damages

*(Against Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC, Jointly and Severally)*

258. Judgment against Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC, jointly and severally, for full compensatory damages in an amount to be determined by the jury at trial, including but not limited to the following specifically identified categories:

**(a) Consumer Economic Damages.** Compensation to Plaintiff Theodore Haugland for all economic losses he sustained as a direct and proximate result of the two Corporate Defendants' deceptive trade practices, fraudulent misrepresentations, and fraudulent concealment, specifically including:

(i) The **safety premium component** of all Claude subscription fees paid by Plaintiff from the inception of his subscription through the date of this filing on **August 1, 2026** — the specific dollar amount representing the difference between the premium price Co-Defendant Anthropic charged for a product co-marketed by Lead Defendant Palantir as the world's most responsibly developed AI assistant, and the price a competitive market would have set for a product whose true characteristics — training data staleness, undisclosed hallucination rates, absent mandatory human-override architecture, context window integrity degradation, and absence of domain-specific military targeting validation — were accurately and completely disclosed before purchase;

(ii) The **full subscription fees paid during the post-Minab concealment period** — from February 28, 2026 through August 1, 2026, a period of **one hundred fifty-five (155) consecutive**

139

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**days** — representing fees Plaintiff paid in direct reliance on both Corporate Defendants' continuing fraudulent suppression of Claude's role in the February 28, 2026 Minab targeting failure, fees that Plaintiff would not have paid had either Corporate Defendant made timely, complete, and honest corrective disclosure of the material facts described in Section IV of this Complaint;

**(iii)** All other out-of-pocket economic losses flowing from the Corporate Defendants' unlawful conduct under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*, Florida common law fraudulent misrepresentation under *Johnson v. Davis*, 480 So.2d 625, 628 (Fla. 1985), and Florida common law fraudulent concealment under *Ramel v. Chasebrook Construction Co.*, 135 So.2d 876, 882 (Fla. 3d DCA 1961), to be established with precision through discovery of Anthropic's billing records and Plaintiff's subscription payment history; and

**(iv)** All incidental and consequential economic damages attributable to Plaintiff's reliance on Claude's services during the period in which its five material architectural defects were concealed, to the extent recoverable under applicable Florida law.

Plaintiff's individual consumer damages are estimated in the range of **$500 to $5,000** in safety premium and post-Minab concealment-period subscription fees, with the precise amount to be established through discovery of Anthropic's subscriber billing records. These individual damages represent a fraction of the aggregate consumer harm caused by the two Corporate Defendants across the full Claude commercial subscriber base, and are presented as the specific, calculable, and fully cognizable basis for Plaintiff's Article III standing and his FDUTPA claim.

**(b) Wrongful Death Damages.** Compensation to the surviving parents, grandparents, siblings, heirs, estates, and designated legal beneficiaries of each of the **one hundred seventy (170) children** wrongfully killed at Shajareh Tayyebeh Elementary School, Minab, Hormozgan Province, Islamic Republic of Iran, on February 28, 2026, and of the **twelve (12) faculty and staff members** killed in the same strike, recoverable against both Corporate Defendants jointly and severally under the Florida Wrongful Death Act, Fla. Stat. §§ 768.16–768.26, and the Florida survival statute, Fla. Stat. § 46.021, including:

**(i)** All compensatory damages recoverable under Fla. Stat. § 768.21 for the wrongful deaths of one hundred seventy (170) children between the ages of five and fourteen, including: grief and mental

140

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

anguish suffered by each surviving parent, grandparent, and sibling; loss of companionship, society, and parental guidance; impairment of the quality of life of each surviving family member; pecuniary loss sustained by each surviving heir; pain and suffering experienced by each decedent prior to death; and the present value of each child's projected net accumulations of the estate;

(ii) All survival action damages recoverable on behalf of the estates of the one hundred seventy (170) deceased children under Fla. Stat. § 46.021 and *Capone v. Philip Morris USA, Inc.*, 116 So.3d 363, 374 (Fla. 2013), including the present value of each child's projected future earnings calculated by reference to actuarial life expectancy data, economic productivity projections, and such other methodologies as this Court approves upon expert testimony;

(iii) All compensatory damages recoverable for the wrongful deaths of the twelve (12) faculty and staff members killed at Shajareh Tayyebeh Elementary School on February 28, 2026, including all damages categories identified in subparagraph (i) as applicable to the specific circumstances of each deceased faculty and staff member; and

(iv) Such additional wrongful death and survival damages as this Court determines to be recoverable under the Florida Wrongful Death Act and all applicable related provisions of Florida law, for all 182 persons killed at Shajareh Tayyebeh Elementary School on February 28, 2026. The estimated range for wrongful death compensatory damages is **$1,000,000 to $10,000,000 per decedent**, reflecting the range of awards in comparable wrongful death cases under Florida law, for an aggregate wrongful death damages range of approximately **$182,000,000 to $1,820,000,000**.

(c) **General and Consequential Compensatory Damages.** Compensation for all other cognizable harms flowing from the two Corporate Defendants' negligent, grossly negligent, and fraudulent conduct, including:

(i) Harm to the institutional integrity of the United States government's military AI procurement and operational command decision-making systems, including the direct cost to the United States — as a defrauded contracting party — of procuring a defective AI system at approximately $200,000,000 under contract HQ0883-25-9-0014 and deploying it in a live military operation whose first twelve minutes produced the deadliest AI targeting failure in recorded history;

141

(ii) All cognizable harms to the approximately **two hundred eleven (211) persons** injured but not killed in the February 28, 2026 strike on Shajareh Tayyebeh Elementary School, including compensation for physical injuries, psychological trauma, medical expenses, and permanent disability; and

(iii) All consequential harms to persons and entities foreseeably injured by the two Corporate Defendants' conduct and not otherwise specifically identified in subparagraphs (a) and (b), to the extent recoverable under applicable Florida law.

General and consequential compensatory damages are estimated in the range of **$50,000,000 to $500,000,000**.

### B. Punitive Damages

*(Against Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC)*

259. Judgment against Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC for punitive damages in an amount up to and including **One Hundred Million Dollars ($100,000,000.00) per Corporate Defendant** — for an aggregate punitive damages request of up to **Two Hundred Million Dollars ($200,000,000.00)** — pursuant to Florida Statutes § 768.72 and the Florida common law gross negligence standard of *W.R. Grace & Co.-Conn. v. Dougherty*, 636 So.2d 746, 749 (Fla. 2d DCA 1994), and consistent with the constitutional proportionality limits of *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), and *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003), based upon the following findings the evidence will support at trial:

(a) **Conscious Disregard — Each Corporate Defendant.** Each Corporate Defendant acted with conscious and reckless disregard of a known and foreseeable risk of mass lethal harm, within the meaning of *W.R. Grace*, 636 So.2d at 749, and Fla. Stat. § 768.72, as established throughout this Complaint:

(i) **Anthropic PBC** deployed Claude in a live military lethal targeting application with actual, expert knowledge — possessed by co-founder and CEO Dario Amodei, co-author of "Concrete Problems in AI Safety" (2016), which specifically catalogued the hallucination, out-of-distribution failure, and oversight-absence risks that materialized in the February 28, 2026 Minab targeting

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

chain — that Claude exhibited precisely the categories of failure most dangerous in a high-stakes targeting context, while simultaneously marketing Claude as the world's most responsibly developed AI system. The co-authorship of the definitive paper identifying the specific failure modes that killed 170 children satisfies the scienter element of Florida's gross negligence standard beyond any reasonable factual dispute.

**(ii) Palantir Technologies Inc.,** now directing its corporate affairs from its principal place of business at **19505 Biscayne Boulevard, Suite 2350, Aventura, Florida 33180**, integrated Claude into the Maven Smart System without implementing any of the five categories of safety safeguards that Claude's known defects required, proceeded with full operational integration over documented internal engineering concerns identifying Claude's fitness limitations, and accepted and retained billions of dollars in government contract revenue from the United States — simultaneously the nation it serves and the nation it defrauded — in exchange for a targeting system it knew to be defective.

**(b) Magnitude of Harm.** One hundred seventy children were killed. Twelve educators were killed. Two hundred eleven additional persons were injured. The gravity, irreversibility, and scale of the harm caused by each Corporate Defendant's conscious recklessness represent the most compelling possible invocation of the deterrent and retributive functions of punitive damages under Fla. Stat. § 768.72.

**(c) Deterrence Necessity.** Each Corporate Defendant made a deliberate, commercially calculated decision — choosing anticipated contract revenue and commercial valuation over technically feasible safety measures — that punitive damages must render commercially irrational for every future actor in the AI defense industry. Without a punitive damages award calibrated to exceed the commercial benefit each Corporate Defendant derived from the unsafe deployment, the structural incentive architecture that produced the February 28, 2026 strike will remain intact.

**(d) Financial Capacity of Each Corporate Defendant.**

For **Palantir:** The requested $100,000,000 represents approximately 2.2% of Palantir's FY2025 annual revenue of approximately $4,475,000,000 and approximately 6.25% of its FY2025 net income of approximately $1,600,000,000 — a commercially meaningful fraction of Palantir's

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

annual earnings, sufficient to deter future governance failures of this character without being confiscatory.

For **Anthropic**: The requested $100,000,000 represents approximately 0.21% of Anthropic's approximately $47,000,000,000 annual run-rate revenue as of the filing date — a fraction so small relative to Anthropic's financial resources that it risks being insufficient as a deterrent on its own, and must be considered in conjunction with the disgorgement awarded in Prayer C and the FDUTPA treble damages available under Fla. Stat. § 501.2075.

**(e) Constitutional Proportionality.** The requested punitive damages award satisfies the single-digit ratio guideline of *State Farm v. Campbell*, 538 U.S. at 425. The $100,000,000 per defendant figure represents a ratio of approximately 1:1.82 to 1:18.2 against the wrongful death compensatory damages range of $182,000,000 to $1,820,000,000 — within the constitutional range recognized in *Campbell* and *BMW v. Gore*.

### C. Restitution and Disgorgement of Unjust Enrichment

*(Against Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC)*

**260.** Judgment against both Corporate Defendants requiring full restitution and disgorgement of all revenues, profits, contract payments, licensing fees, and commercial benefits derived in connection with the fraudulent misrepresentations, deceptive trade practices, and fraudulent concealment alleged in this Complaint, including the following specifically identified and estimated categories of unjust enrichment:

**(a) Co-Defendant Anthropic PBC — DoD Contract Disgorgement.** Full disgorgement of all contract payments received by Anthropic under contract number HQ0883-25-9-0014 — a contract awarded through fraudulent safety representations described throughout this Complaint and paid from American public funds by procurement officials who acted in complete good faith in reliance on those representations. Estimated disgorgement: **$50,000,000 to $200,000,000**, to be established through discovery of Anthropic's government contract billing records.

**(b) Co-Defendant Anthropic PBC — Consumer Subscription Revenue Disgorgement.** Disgorgement of the safety premium component of all commercial Claude subscription revenues received by Anthropic from the inception of its fraudulent safety marketing campaign through the

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

filing date of **August 1, 2026** — specifically, the portion of each subscriber's fee payment attributable to the safety premium induced by Anthropic's Constitutional AI, Responsible Scaling Policy, and "helpful, harmless, honest" marketing representations, which representations were false in the material respects described in Section IV(C) of this Complaint. Estimated disgorgement: **$50,000,000 to $500,000,000,** to be established through discovery of Anthropic's global subscription billing records, pricing tier history, and subscriber count data.

**(c) Lead Defendant Palantir Technologies Inc. — Maven Smart System Claude-Integrated Contract Disgorgement.** Disgorgement of all contract payments received by Palantir under the Maven Smart System contract and the Army enterprise AI framework agreement that are specifically attributable to the Claude-integrated component of the Maven platform — the component whose deployment was enabled by the fraudulent safety misrepresentations co-made by Palantir and Anthropic in the November 7, 2024 tripartite press release and in the government procurement campaign described in Section IV(I) of this Complaint. Estimated disgorgement: **$260,000,000 to $2,000,000,000,** with the precise Claude-attributable fraction to be established through discovery of Palantir's contract financial records and technical allocation between Claude-integrated and non-Claude-integrated Maven components.

**Aggregate Two-Defendant Disgorgement Estimate: $360,000,000 to $2,700,000,000,** to be established with precision at trial through expert financial testimony, discovery of each Corporate Defendant's relevant billing, contracting, and revenue records, and this Court's determination of the appropriate disgorgement methodology under *Extraordinary Title Services v. Florida Power & Light,* 1 So.3d 400, 404 (Fla. 3d DCA 2009), and *Agritrade, LP v. Quercia,* 253 So.3d 28, 33 (Fla. 3d DCA 2017).

### D. Declaratory Relief

*(Against Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC)*

261. A declaratory judgment pursuant to 28 U.S.C. §§ 2201–2202 and Federal Rule of Civil Procedure 57, declaring each of the following propositions of law and fact established by the evidence:

145

(a) That both Corporate Defendants — Palantir Technologies Inc. and Anthropic PBC — through the commercial enterprise described in this Complaint, committed negligence and gross negligence under Florida common law, and that their conduct constituted conscious and reckless disregard of a foreseeable risk of mass lethal harm within the meaning of *W.R. Grace & Co.-Conn. v. Dougherty*, 636 So.2d 746, 749 (Fla. 2d DCA 1994), and Fla. Stat. § 768.72;

(b) That Claude, as deployed in the Maven Smart System at IL6 classification through non-party AWS's Amazon SageMaker infrastructure — without retrieval-augmented generation, hallucination detection, confidence-threshold flagging, and mandatory human-in-the-loop override mechanisms compliant with DoD Directive 3000.09 — was a design-defective product under Florida strict products liability principles as recognized in *West v. Caterpillar Tractor Co.*, 336 So.2d 80, 87 (Fla. 1976), and *Ferayorni v. Hyundai Motor Co.*, 711 So.2d 1167, 1171 (Fla. 4th DCA 1998);

(c) That Palantir and Anthropic made materially false and fraudulently misleading representations to Department of Defense procurement officials and to the commercial consuming public — including the specific misrepresentations identified in Section V, Count V of this Complaint — in violation of Florida common law governing fraudulent misrepresentation as recognized in *Johnson v. Davis*, 480 So.2d 625, 628 (Fla. 1985), and *Besett v. Basnett*, 389 So.2d 995, 998 (Fla. 1980);

(d) That both Corporate Defendants are liable for fraudulent concealment under Florida common law as recognized in *Ramel v. Chasebrook Construction Co.*, 135 So.2d 876, 882 (Fla. 3d DCA 1961), and *M/I Schottenstein Homes, Inc. v. Azam*, 813 So.2d 91, 95 (Fla. 2002), and that all applicable statutes of limitations are equitably tolled from the date of each Corporate Defendant's first concealing act through the date on which complete, honest corrective disclosure is made, pursuant to Fla. Stat. § 95.11(3)(j);

(e) That Palantir and Anthropic breached the implied warranties of merchantability and fitness for a particular purpose under Fla. Stat. §§ 672.314 and 672.315 in connection with Plaintiff's Claude subscriptions and the United States government's procurement of Claude services under contract HQ0883-25-9-0014;

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

146

**(f)** That both Corporate Defendants are jointly and severally liable for the deaths of one hundred seventy (170) children and twelve (12) faculty and staff at Shajareh Tayyebeh Elementary School on February 28, 2026, and for all damages recoverable under the Florida Wrongful Death Act, Fla. Stat. §§ 768.16–768.26, and Fla. Stat. § 768.81(3);

**(g)** That both Corporate Defendants committed unfair and deceptive acts and practices in violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204(1), in the conduct of trade or commerce directed at Florida consumers including Plaintiff — specifically, that Anthropic's Constitutional AI, Responsible Scaling Policy, and consumer safety representations, and Palantir's November 7, 2024 co-authored press release representations, constituted deceptive acts within the meaning of FDUTPA as construed in *Davis v. Powertel, Inc.*, 776 So.2d 971, 975 (Fla. 1st DCA 2000);

**(h)** That Co-Defendant Anthropic PBC materially violated its obligations as a Delaware public benefit corporation — including the obligation to consider the interests of persons materially affected by its conduct under 8 Del. C. § 365(a) — with those obligations enforced in this Court through Florida's application of the internal affairs doctrine, *Mansfield v. Toy, Inc.*, 506 So.2d 474, 476 (Fla. 3d DCA 1987), and that Anthropic's deployment of Claude in a live military lethal targeting application without the safety validation its known defects required constituted a fundamental breach of its stated public benefit purpose of "the responsible development and maintenance of advanced AI for the long-term benefit of humanity";

**(i)** That the November 7, 2024 tripartite press release co-issued by Palantir, Anthropic, and non-party AWS constituted a materially false and deceptive commercial representation directed at government procurement officials and commercial consumers, and that its safety, readiness, and compliance representations were false in the specific material respects identified in Section IV(G) of this Complaint; and

**(j)** That Plaintiff's subscription payments to Anthropic for Claude services were paid in justified and foreseeable reliance upon the materially false safety representations co-made and co-amplified by both Corporate Defendants, and that Plaintiff is entitled to restitution of the safety premium

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

component of those payments and all subscription fees paid during the one hundred fifty-five (155) day post-Minab concealment period.

<div align="center">

**E. Permanent Injunctive Relief**

</div>

*(Against Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC)*

262. A permanent injunction pursuant to Federal Rule of Civil Procedure 65 and applicable equitable principles, specifically ordering as follows:

**(a) Mandatory Safety Standards for AI-Assisted Military Targeting.** Both Corporate Defendants are permanently prohibited from participating in the design, licensing, integration, or operation of any large language model AI system — whether Claude or any successor, derivative, or equivalent system — in any live United States military weapons targeting decision-support application unless and until all of the following conditions have been independently certified as satisfied:

**(i)** The AI system incorporates **Retrieval-Augmented Generation ("RAG")** or an equivalent, independently verified real-time data validation architecture actively supplementing the model's training data with current, source-verified intelligence data before generating any targeting characterization — such that no targeting output is based solely on the model's training data where current intelligence is available and material;

**(ii)** The AI system incorporates **hallucination detection and output confidence calibration mechanisms** — independently validated at an industry-standard accuracy level determined by this Court upon expert testimony — capable of flagging outputs whose internal confidence falls below a threshold appropriate for lethal targeting decisions, with flagged outputs delivered as mandatory human-review triggers before entering any strike authorization chain;

**(iii)** The integrated targeting system incorporates **mandatory, architecturally binding human-in-the-loop verification checkpoints** compliant with DoD Directive 3000.09 — implemented as technical constraints of the system design, not merely interface-level operator options — such that no AI-generated target characterization can contribute to a strike authorization decision without documented, independent human review and affirmative approval based on current intelligence verifying the characterization;

<div align="center">

148

</div>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**(iv)** The AI system has been subjected to **rigorous, domain-specific, independently certified red-team adversarial testing** conducted in an environment replicating the operational targeting context, data environment, intelligence input quality, and human-machine interface conditions in which it will be deployed — with specific protocols designed to surface training data staleness failures, hallucination failures, and context window integrity degradation of the types that produced the February 28, 2026 Minab targeting failure; and

**(v)** The complete, unredacted results of the red-team testing required by subparagraph (iv) — including all failure rates, identified failure modes, and identified limitations — have been transmitted in writing to the CDAO, the Senate Armed Services Committee, and the House Armed Services Committee before any contract award or operational deployment authorization may proceed.

Each Corporate Defendant is bound by subparagraph (a) in the following specific operational capacity:

**Palantir Technologies Inc.:** As the Maven Smart System operator and AI integration platform designer, permanently prohibited from operating or permitting the operation of any LLM-integrated targeting workflow that does not satisfy requirements (i)–(v), and required to submit a written certification of compliance, signed by its Chief Executive Officer and Chief Technology Officer and filed with this Court, within **one hundred eighty (180) days** of entry of judgment.

**Anthropic PBC:** As Claude's designer and licensor, permanently prohibited from licensing Claude — or any successor, fine-tuned, or derivative model — for integration into any United States military weapons targeting application unless each of requirements (i)–(v) has been independently certified and that certification transmitted to this Court and the CDAO. Anthropic is further required to include in every government AI licensing agreement a binding contractual prohibition on deployment of Claude in any live military targeting context absent independently certified compliance.

**(b) Mandatory Corrective Disclosure.** Both Corporate Defendants are required, within **sixty (60) days** of entry of judgment, to provide the following specific, complete disclosures:

149

**(i) Disclosure to DoD and Congressional Oversight.** A joint written disclosure to the CDAO, the Senate Armed Services Committee, and the House Armed Services Committee, specifically including: a complete technical description of Claude's five architectural defects as they existed on the date of the Palantir-Anthropic-AWS tripartite partnership announcement and as of February 28, 2026; a complete description of the Claude-Maven integration architecture as it existed on February 28, 2026, including the specific data flow from query input through Claude inference to targeting operator delivery; a complete description of the human-in-the-loop controls, if any, architecturally implemented in the Claude-Maven integration; and a complete accounting of all revenues derived by each Corporate Defendant from the Claude-Maven deployment.

**(ii) Disclosure to Claude Commercial Subscribers.** A direct written notice — transmitted by Anthropic by email to every current and former Claude commercial subscriber on record — specifically disclosing: that Claude was integrated into the United States military's Maven Smart System at IL6 classification and was part of the AI-assisted targeting chain in Operation Epic Fury; that Claude's outputs were identified as a contributing factor in the February 28, 2026 strike on Shajareh Tayyebeh Elementary School in which one hundred seventy children were killed; that Claude's five architectural limitations were not disclosed to subscribers or government procurement officials before deployment; and that any subscriber wishing to terminate their subscription in response to this disclosure may do so with a full pro-rata refund at no penalty.

**(c) Independent Safety Audit.** Both Corporate Defendants are required, within **ninety (90) days** of entry of judgment, to jointly commission — at their collective expense — an independent third-party safety audit of all AI systems currently integrated into DoD operational platforms under any Palantir or Anthropic contract, conducted by a qualified independent technical auditor approved by this Court. The audit shall assess: compliance with the mandatory safety requirements of subparagraph (a); compliance with DoD Directive 3000.09; the specific technical characteristics of the Claude version deployed in the Maven Smart System on February 28, 2026; and the systemic governance failures identified in this Complaint and their current remediation status. Audit results shall be transmitted to the CDAO, both Armed Services Committees, and this Court within **one hundred twenty (120) days** of entry of judgment.

150

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**(d) Cessation of Defective Deployment Pending Safety Certification.** Pending satisfaction of the mandatory safety requirements of subparagraph (a) and completion of the independent safety audit of subparagraph (c), Palantir Technologies Inc. is preliminarily and permanently enjoined from operating the Claude-integrated Maven Smart System — or any substantially equivalent LLM-integrated targeting workflow — in any live weapons targeting application. This cessation is not punitive: it is the minimum prophylactic relief necessary to prevent recurrence of the specific harm alleged in this Complaint while mandatory safety remediation is completed.

**(e) Prohibition on Recurrence of Fraudulent Safety Marketing.** Both Corporate Defendants are permanently enjoined from making, co-issuing, co-endorsing, or permitting to stand any materially false or deceptive representation regarding the safety, validation status, operational readiness, or responsible character of any AI product deployed or intended for deployment in any military targeting application — specifically including any co-marketed press release, government procurement proposal, investor communication, or consumer marketing material characterizing an AI system as safe for military targeting use absent the independent safety certification required by subparagraph (a).

**F. Florida Deceptive and Unfair Trade Practices Act — Specific Statutory Relief**

*(Against Lead Defendant Palantir Technologies Inc. AND Co-Defendant Anthropic PBC — Both Corporate Defendants)*

263. Judgment against **both** Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC, jointly and severally, pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201–501.213, for:

**(a) Actual Damages — Fla. Stat. § 501.211(2).** All actual and ascertainable losses sustained by Plaintiff as a direct and proximate result of the FDUTPA violations described in Count IX of this Complaint, in the specific amounts described in Prayer A(a) above, to be established through discovery of Anthropic's billing records and Plaintiff's subscription payment history. The extension of FDUTPA relief to Lead Defendant Palantir — which Florida's broad "any person" consumer protection standard reaches as a co-marketer of the deceptive safety representations described in

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Section V, Count IX — is a material advantage of this Florida forum that Plaintiff invokes fully and without reservation.

**(b) Treble Damages — Fla. Stat. § 501.2075.** Treble damages against both Corporate Defendants for willful FDUTPA violations, based upon the specifically pleaded commercial calculation, expert knowledge of falsity, and sustained institutional concealment establishing willfulness throughout Section IV and Count IX of this Complaint. The commercial and premeditated nature of both Corporate Defendants' deceptive conduct — including Anthropic's confidential S-1 filing at a $965,000,000,000 valuation 93 days post-Minab and Palantir's 155-day institutional silence from its Aventura, Florida headquarters — satisfies Florida's willfulness standard for FDUTPA treble damages.

**(c) Mandatory Corrective Advertising.** A mandatory order requiring Co-Defendant Anthropic, within **forty-five (45) days** of entry of judgment, to publish and maintain for a period of not less than **one (1) year** on its website, subscriber communication platform, and in a minimum of five (5) major national and international news publications, a court-approved corrective statement accurately describing: (i) Claude's five architectural limitations; (ii) Claude's role in the February 28, 2026 Minab targeting failure; and (iii) the specific representations in Anthropic's Constitutional AI, Responsible Scaling Policy, and consumer marketing materials found by this Court to be materially false or deceptive within the meaning of Fla. Stat. § 501.204(1).

**(d) Attorneys' Fees and Costs — Fla. Stat. § 501.2105.** An award of reasonable attorneys' fees and all litigation costs against both Corporate Defendants, jointly and severally, pursuant to Fla. Stat. § 501.2105, which authorizes an award of reasonable attorneys' fees and costs to a prevailing plaintiff in a private FDUTPA action. Plaintiff preserves this right for the event counsel is retained at any stage of this litigation, as described further in Prayer G.

## G. Attorneys' Fees and Litigation Costs

*(Against Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC)*

**264.** Judgment against both Corporate Defendants, jointly and severally, for Plaintiff's reasonable attorneys' fees and all litigation costs to the extent permitted by applicable law, including:

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**(a)** Reasonable attorneys' fees pursuant to Fla. Stat. § 501.2105 of the Florida Deceptive and Unfair Trade Practices Act, which authorizes a prevailing plaintiff to recover attorneys' fees from a defendant found to have willfully engaged in a FDUTPA violation;

**(b)** All taxable costs of litigation pursuant to Federal Rule of Civil Procedure 54(d), including filing fees, service-of-process costs, deposition and transcript costs, expert witness fees (specifically including AI safety engineering experts, military targeting doctrine experts, actuarial and wrongful death economic experts, and international humanitarian law experts), document discovery costs, and all other necessary and reasonable litigation expenses;

**(c)** Plaintiff appears pro se and does not seek attorneys' fees for self-representation at this time, consistent with *Kay v. Ehrler*, 499 U.S. 432 (1991). Plaintiff expressly preserves the right to seek attorneys' fees under all applicable fee-shifting provisions — including Fla. Stat. § 501.2105 and Florida common-law fee-shifting applicable to fraudulent concealment — in the event counsel is retained at any stage of this litigation, including on appeal. Plaintiff estimates attorneys' fees in the range of $0 (pro se, current) to **$15,000,000** in the event the magnitude, complexity, and discovery demands of this litigation require retention of lead and co-counsel, AI safety expert witnesses, military operations expert witnesses, wrongful death economic expert witnesses, international humanitarian law expert witnesses, and appellate counsel; and

**(d)** Such other fees and costs as this Court, in the exercise of its equitable discretion, determines to be appropriate in light of the nature of the conduct alleged, the financial resources of the two Corporate Defendants, and the result achieved.

## H. Pre-Judgment and Post-Judgment Interest

*(Against Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC)*

**265.** Pre-judgment interest on all compensatory and disgorgement damages awarded against both Corporate Defendants, from the date of the wrongful conduct giving rise to each element of damages to the date of judgment, pursuant to Florida Statutes § 55.03, at the applicable Florida statutory pre-judgment interest rate set by the Florida Chief Financial Officer — currently established at the applicable statutory rate per annum — and post-judgment interest on the full

amount of the judgment from the date of entry of judgment at the applicable federal post-judgment interest rate pursuant to 28 U.S.C. § 1961.

Pre-judgment interest on an aggregate two-defendant compensatory and disgorgement base estimated at **$542,000,000 to $5,020,000,000** — reflecting the full two-defendant damages pool described in Prayers A through C — accruing from February 28, 2026 through a projected trial or judgment date of approximately thirty-six (36) months, yields an estimated pre-judgment interest range of **$65,000,000 to $600,000,000**, depending upon the compensatory base established at trial, the duration of litigation, and the applicable interest rate at the time of judgment.

## I. Relief Against Defendant the United States of America — Count XI Only

*Declaratory and Injunctive Relief Exclusively — No Monetary Damages of Any Kind Requested*

266. Against Defendant the United States of America — **and solely with respect to Count XI of this Complaint, the only count in which the United States appears as a defendant** — Plaintiff requests the following relief, which is exclusively declaratory and injunctive in character. **Plaintiff expressly, unequivocally, and without any reservation states that he does not request monetary damages of any kind — compensatory, nominal, statutory, equitable, restitutionary, punitive, disgorgement, pre-judgment interest, post-judgment interest, attorneys' fees, costs, or any other monetary award — against the United States of America under Count XI or any other provision of this Complaint.** All relief requested in this Section I is limited to declaratory judgments establishing the United States government's legal obligations, and injunctive orders compelling performance of those obligations, within the APA § 702 waiver of sovereign immunity as construed in *Bowen v. Massachusetts*, 487 U.S. 879, 891–93 (1988).

(a) **Declaratory Judgment — The United States' Legal Obligations of Disclosure.** A declaration by this Court pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 706 that:

(i) The United States of America, acting through the Department of Defense, the Office of the Secretary of Defense, and United States Central Command headquartered at MacDill Air Force Base, Tampa, Florida, has violated its legal obligations of public disclosure under the APA by unreasonably withholding and delaying the public release of the complete findings of the official

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

military investigation into the February 28, 2026 strike on Shajareh Tayyebeh Elementary School, within the meaning of 5 U.S.C. § 706(1);

(ii) The United States government's deliberate suppression, for more than **one hundred fifty-five (155) days** as of the filing date of **August 1, 2026**, of the complete findings of its official investigation into Claude's specific causal role in the Minab targeting failure — in the face of formal bipartisan congressional accountability demands co-signed by forty-six (46) United States Senators and more than one hundred twenty (120) Members of the House of Representatives — constitutes agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" within the meaning of 5 U.S.C. § 706(2)(A); and

(iii) Consumers of Anthropic's Claude services, including Plaintiff, who paid subscription fees throughout the post-Minab concealment period, had a legally cognizable interest in the timely public disclosure of the United States government's preliminary investigation findings regarding Claude's role in the Minab targeting failure, and that the government's suppression of those findings for one hundred fifty-five days caused Plaintiff concrete, ongoing, and calculable economic harm in the form of continued subscription payments he would have ceased making had those findings been timely disclosed.

(b) **Mandatory Disclosure Order.** A mandatory injunction pursuant to 5 U.S.C. § 706(1) requiring the United States of America, acting through the Secretary of Defense and the Director of the Chief Digital and Artificial Intelligence Office, to publicly release within **sixty (60) days** of this Court's order the following specific, non-classified categories of information regarding Claude's involvement in the Minab targeting failure — limited in all respects by the absolute classified information carve-out established in paragraph 252 of this Complaint and reiterated in subparagraph (d) below:

(i) A public statement confirming or denying whether Anthropic's Claude large language model — integrated into Palantir's Maven Smart System via non-party AWS's IL6-accredited SageMaker infrastructure — was part of the AI-assisted intelligence synthesis chain that generated or contributed to the targeting characterization of the Minab location used in the strike authorization process on February 28, 2026;

155

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

**(ii)** The specific training data cutoff date of the version of Claude deployed in the Maven Smart System at IL6 classification on the morning of February 28, 2026 — a technical specification of a commercial AI product that is not itself classified information;

**(iii)** A public statement confirming whether the Claude-Maven integration as deployed on February 28, 2026 incorporated mandatory, architecturally binding human-in-the-loop verification checkpoints compliant with DoD Directive 3000.09;

**(iv)** The publicly releasable portions of the findings of the official United States military investigation into the February 28, 2026 Minab strike, specifically limited to findings regarding whether, and in what manner, AI-assisted intelligence synthesis tools contributed to the targeting characterization that produced the strike — redacted only to the extent necessary to protect specifically identified classified intelligence sources, methods, or ongoing operational plans, with each redaction individually identified and justified in a classified annex submitted to this Court for in camera review; and

**(v)** The DoD's internal assessment of whether the Claude-Maven integration satisfied the requirements of DoD Directive 3000.09 as configured on February 28, 2026, redacted only as necessary to protect classified operational specifics.

**(c) Equitable Tolling Declaration.** A declaration that all applicable statutes of limitations for all claims asserted in this Complaint are equitably tolled from the date of the United States government's first post-Minab concealing act through the date on which the complete non-classified investigation findings regarding Claude's role are publicly disclosed, pursuant to the fraudulent concealment equitable tolling doctrine recognized in *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997), Fla. Stat. § 95.11(3)(j), and *M/I Schottenstein Homes, Inc. v. Azam*, 813 So.2d 91, 95 (Fla. 2002).

**(d) Absolute Classified Information Carve-Out — Reiterated.** Every item of relief requested in subparagraph (b) is subject to the absolute and unconditional classified information carve-out established in paragraph 252 of this Complaint. Plaintiff does not seek — and no order entered upon Count XI shall be construed to require — the production, disclosure, or release of any information whose disclosure would endanger the life of any identified person, compromise any

156

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

active intelligence source or method, impair any ongoing military operation, or violate any express statutory prohibition. Plaintiff seeks truth, not secrets. He seeks accountability, not operational intelligence.

**(e) Pro Se Stay in the Alternative.** To the extent this Court identifies any unresolved sovereign immunity threshold question, administrative exhaustion prerequisite, or procedural requirement applicable to Count XI that Plaintiff has not satisfied as of the filing date, Plaintiff respectfully requests that this Court: (i) stay proceedings on Count XI rather than dismissing with prejudice; (ii) provide specific guidance consistent with *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972), identifying the specific unresolved requirement and steps required to satisfy it; and (iii) retain jurisdiction over the declaratory relief of subparagraph (a) pending resolution of any such threshold question.

### J. Aggregate Damages Summary — Estimated Pre-Discovery Ranges

*(Two Corporate Defendants Only — No Damages Against the United States)*

267. In the interest of full transparency to this Court and all parties, Plaintiff sets forth a consolidated summary of estimated damages by category against the two Corporate Defendants — Lead Defendant Palantir Technologies Inc. and Co-Defendant Anthropic PBC — with low and high ranges reflecting the uncertainties inherent in pre-discovery estimation. These figures are presented for pleading purposes pursuant to *Haines v. Kerner*, 404 U.S. 519 (1972), and *Erickson v. Pardus*, 551 U.S. 89 (2007), and are not a cap on the damages Plaintiff will seek to establish at trial. **No damages of any kind are requested against the United States of America.**

| Damages Category | Low Estimate | High Estimate |
|---|---|---|
| Consumer Economic Damages (Plaintiff) | $500 | $5,000 |
| Wrongful Death — 182 Decedents | $182,000,000 | $1,820,000,000 |
| General & Consequential Damages | $50,000,000 | $500,000,000 |
| Punitive Damages (both defendants) | $100,000,000 | $200,000,000 |
| Disgorgement — Anthropic (DoD contract) | $50,000,000 | $200,000,000 |
| Disgorgement — Anthropic (subscription) | $50,000,000 | $500,000,000 |

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

| Damages Category | Low Estimate | High Estimate |
|---|---|---|
| Disgorgement — Palantir (Maven Claude) | $260,000,000 | $2,000,000,000 |
| Pre-Judgment Interest (Fla. Stat. § 55.03) | $65,000,000 | $600,000,000 |
| FDUTPA Treble (Fla. Stat. § 501.2075) | $500 | $15,000 |
| Attorneys' Fees (if counsel retained) | $0 | $15,000,000 |
| **Aggregate Estimated Total** | **~$757,000,000** | **~$5,835,000,000** |

The actual damages proven at trial may be higher or lower depending upon the evidence developed through discovery, the findings of expert witnesses, the determinations of the jury, and any rulings by this Court on the legal theories asserted herein.

## VIII. RULE 11 CERTIFICATION

268. Pursuant to Federal Rule of Civil Procedure 11(b), Plaintiff Theodore Haugland certifies that:

(1) This Complaint is not being presented for any improper purpose, including to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) The legal contentions asserted herein are warranted by existing law or by nonfrivolous arguments for the extension of existing law, including: the application of established Florida negligence, fraudulent misrepresentation, fraudulent concealment, strict products liability, breach of implied warranty, FDUTPA, and wrongful death principles to a novel fact pattern involving the commercial deployment of a defective large language model in a classified military weapons targeting environment; the application of Florida's long-arm statute and the Eleventh Circuit's personal jurisdiction framework to Co-Defendant Anthropic's purposeful commercial contacts with the State of Florida; the extension of strict products liability under *West v. Caterpillar Tractor Co.*, 336 So.2d 80 (Fla. 1976), to a commercial AI product causing harm in a foreseeable deployment context; and the application of APA § 702 equitable jurisdiction to the United States government's sustained non-disclosure of AI targeting investigation findings;

(3) The factual contentions herein either have evidentiary support grounded in publicly available documentation — including Anthropic's published model cards, Constitutional AI research, and Responsible Scaling Policy; the November 7, 2024 tripartite press release co-issued by Palantir,

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Anthropic, and AWS; publicly confirmed facts regarding Amazon.com's investment commitments in Anthropic including board observer rights and binding AWS platform commitments; publicly confirmed Palantir Maven Smart System contract awards; Palantir's Annual Report on Form 10-K filed February 17, 2026 confirming the Aventura, Florida headquarters relocation signed by CEO Alexander C. Karp; Dario Amodei's on-the-record Bloomberg *The Circuit* statements of approximately June 10, 2026; the formal bipartisan congressional accountability letter of July 13, 2026; and post-strike reporting by Reuters, The Guardian, Al Jazeera, NPR, and CBC News — or, where specifically identified as based on information and belief, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery, consistent with the pro se pleading standards of *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972), *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and the Eleventh Circuit's liberal construction of pro se pleadings, *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007); and

(4) The denials of factual contentions herein are warranted on the evidence, or are reasonably based on a lack of information and belief as of the date of this filing, given the 155-day institutional suppression of the United States government's investigation findings and the Corporate Defendants' complete non-disclosure of internal engineering records, safety assessments, and post-Minab board communications that remain exclusively in their possession.

## IX. DECLARATION UNDER PENALTY OF PERJURY

**269.** Pursuant to 28 U.S.C. § 1746, I, Theodore Haugland, declare under penalty of perjury under the laws of the United States of America that the factual allegations contained in the foregoing Complaint are true and correct to the best of my knowledge, information, and belief, formed after reasonable inquiry and grounded in publicly available documentation, publicly confirmed commercial and investment facts, post-strike reporting from multiple independent international news sources, formal congressional accountability correspondence, and SEC public filings as described throughout this Complaint.

**270.** I declare that the foregoing is true and correct. I further declare that this Complaint is filed in good faith, for the purpose of seeking accountability under the laws of Florida and the United

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

States for the deaths of one hundred seventy children at Shajareh Tayyebeh Elementary School on February 28, 2026, and not for any improper purpose.

**271.** Executed on **August 1, 2026**, at Aiea, Honolulu County, Hawaii.

*Respectfully Submitted,*

/Date/ ~~August 1, 2026~~

August 1, 2026

/Signature/ *Theodore Haugland*

Theodore Haugland

99-009 Kalaloa St, Ste D2016

Aiea, Honolulu County, HI

Telephone: (202)933-3332

Facsimile: (202)933-3335

administrator@civillawinc.com

Plaintiff, *Propria Persona*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

160

CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

### MIAMI DIVISION

Theodore Haugland,

PLAINTIFF,

v.

Palantir Technologies, Inc,

United States of America,

Anthropic PBC,

DEFENDANTS.

Case No.:

SUMMONS IN A

CIVIL ACTION

UNITED STATES OF AMERICA

**TO:** *(Defendant's name and address)*

**U.S. Attorney's Office**
**Southern District of Florida**
**99 N.E. 4th Street**
**Miami, FL 33132**

**Attorney General for the United States**
**U.S. Department of Justice**
**950 Pennsylvania Avenue NW**
**Washington, DC 20530 0001**

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12(a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Theodore Haugland
99-009 Kalaloa St Ste D2016
Aiea, Hawaii 96701
Telephone: (202) 933-3332
Facsimile: (202) 933-3335
Email: administrator@civillawinc.com
Plaintiff, *Pro Se*

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

**CLERK OF COURT**

**Date:**          *Signature of Clerk or Deputy Clerk*

1

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*:

was received by me on *(date)*:

☐ I personally served the summons on the individual at *(place)*:

on *(date)*:                    ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*:

,

a person of suitable age and discretion who resides there, on *(date)*:                    , and mailed a
copy to the individual's last known address; or

☐ I served the summons on *(name of individual)*:                    , who is designated by
law to accept service of process on behalf of *(name of organization)*:                    on *(date)*:
; or

☐ I returned the summons unexecuted because:                    ; or

☐ Other *(specify)*:

.

My fees are $          for travel and $          for services, for a total of $ 0.00.

I declare under penalty of perjury that this information is true.

**Date:**                          *Server's signature    Printed name and title    Server's
address*

2

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| Theodore Haugland, | Case No.: |
| PLAINTIFF, | |
| v. | SUMMONS IN A |
| Palantir Technologies, Inc, | CIVIL ACTION |
| United States of America, | ANTHROPIC PBC |
| Anthropic PBC, | |
| DEFENDANTS. | |

**TO:** *(Defendant's name and address)*

**ANTHROPIC PBC**
Attn: Registered Agent For Proof of Service
Corporation Service Company (CSC)
251 Little Falls Drive,
Wilmington, DE 19808

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12(a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Theodore Haugland
99-009 Kalaloa St Ste D2016
Aiea, Hawaii 96701
Telephone: (202) 933-3332
Facsimile: (202) 933-3335
Email: administrator@civillawinc.com
Plaintiff, *Pro Se*

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

**CLERK OF COURT**

**Date:**         *Signature of Clerk or Deputy Clerk*

1

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*:

was received by me on *(date)*:                                          .

☐ I personally served the summons on the individual at *(place)*:

on *(date)*:                    ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*:

,

a person of suitable age and discretion who resides there, on *(date)*:                    , and mailed a
copy to the individual's last known address; or

☐ I served the summons on *(name of individual)*:                              , who is designated by
law to accept service of process on behalf of *(name of organization)*:                    on *(date)*:
; or

☐ I returned the summons unexecuted because:                              ; or

☐ Other *(specify)*:

.

My fees are $               for travel and $               for services, for a total of $ 0.00.

I declare under penalty of perjury that this information is true.

Date:                                        
            Server's signature   Printed name and title   Server's
            address

2

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| Theodore Haugland, | Case No.: |
| PLAINTIFF, | |
| v. | SUMMONS IN A |
| Palantir Technologies, Inc, | CIVIL ACTION |
| United States of America, | PALANTIR TECHNOLOGIES INC. |
| Anthropic PBC, | |
| DEFENDANTS. | |

**TO:** *(Defendant's name and address)*

**PALANTIR TECHNOLOGIES INC.**
C/O THE CORPORATION TRUST COMPANY
CORPORATION TRUST CENTER
1209 ORANGE ST
WILMINGTON, DE 19801

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12(a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Theodore Haugland
99-009 Kalaloa St Ste D2016
Aiea, Hawaii 96701
Telephone: (202) 933-3332
Facsimile: (202) 933-3335
Email: administrator@civillawinc.com
Plaintiff, *Pro Se*

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

**CLERK OF COURT**

**Date:**          *Signature of Clerk or Deputy Clerk*

1

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*:

was received by me on *(date)*:

☐ I personally served the summons on the individual at *(place)*:

on *(date)*:                    ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*:

,

a person of suitable age and discretion who resides there, on *(date)*:            , and mailed a
copy to the individual's last known address; or

☐ I served the summons on *(name of individual)*:                    , who is designated by
law to accept service of process on behalf of *(name of organization)*:            on *(date)*:
; or

☐ I returned the summons unexecuted because:                    ; or

☐ Other *(specify)*:

.

My fees are $         for travel and $           for services, for a total of $ 0.00.

I declare under penalty of perjury that this information is true.

Date:

*Server's signature   Printed name and title   Server's*
*address*

2



## UNITED STATES POSTAL SERVICE®

# Click-N-Ship®

**P**

usps.com
$21.17
US POSTAGE

9405 5301 0935 5429 3822 65 0211 7003 0003 3128

U.S. POSTAGE PAID
Click-N-Ship®

08/01/2026
3 lbs 0 oz

Mailed from 96701   518889667524450

## PRIORITY MAIL®

THEODORE HAUGLAND
99-009 KALALOA ST APT D2016
AIEA HI 96701-3498

Created 2026-08-01
Medium Flat Rate Box

RDC 03

C071

SOUTHERN DISTRICT COURT OF FLORIDA
COURT CLERK
400 N MIAMI AVE RM 8N09
MIAMI FL 33128-1805

REC'D BY_____ D.C.

AUG 0 6 2026
ANGELA E. NOBLE

**USPS TRACKING #**

9405 5301 0935 5429 3822 65

**UNITED STATES POSTAL SERVICE®**

**Click-N-Ship®**

usps.com
$21.17
US POSTAGE

9405 5301 0935 5429 3822 65 0211 7003 0003 3128

**P**

U.S. POSTAGE PAID

08/01/2026
3 lbs 0 oz

Mailed from 96701   516889667524450

**PRIORITY MAIL®**

THEODORE HAUGLAND
99-009 KALALOA ST APT D2016
AIEA HI 96701-3498

Created 2026-08-01
Medium Flat Rate Box

RDC 03

C071

SOUTHERN DISTRICT COURT OF FLORIDA
COURT CLERK
400 N MIAMI AVE RM 8N09
MIAMI FL 33128-1805

REC'D BY

D.C.

**USPS TRACKING #**

AUG 06 2026

ANGELA E.

9405 5301 0935 5429 3822 65